**HONEYWELL INTERNATIONAL, INC., and Honeywell Intellectual Properties, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**Lockheed Martin Corp., Defendant–Intervenor.**

No. 02–1909C.

United States Court of Federal Claims.

June 14, 2005.

Lawrence J. Gotts, Mark Koehn, and Elizabeth Miller Roesel, Pillsbury Winthrop Shaw Pittman, LLP, McLean, Virginia, counsel for plaintiffs, Honeywell International, Inc. and Honeywell Intellectual Properties, Inc.

John J. Fargo, Christopher L. Crumbley, and Trevor M. Jefferson, Washington, D.C., counsel for defendant, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C.

Thomas J. Madden, Paul A. Debolt, and Justin E. Pierce, Venable, LLP, Washington, D.C., counsel for defendant-intervenor, Lockheed Martin Corp.

## MEMORANDUM OPINION AND ORDER CONSTRUING CERTAIN CLAIMS OF UNITED STATES PATENT NO. 6,467,914

BRADEN, Judge.

In the decade following the United States Supreme Court's unanimous affirmance of the landmark *en banc* decision in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978–79 (Fed.Cir.1995) ("*Markman I*"), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ("*Markman II*"), the United States Court of Appeals for the Federal Circuit has devoted a great deal of effort to provide federal trial courts with a workable analytical framework to construe the meaning of a patent's claims that is faithful to 35 U.S.C. § 112 and affords the court an opportunity to consider relevant, but reliable, evidence, in a wide range of diverse and increasingly complex applications of mechanical, electrical, chemical, computer, pharmaceutical, bio, and nano technology.

From the court's reading of controlling appellate precedent, intrinsic evidence has been endorsed as most relevant and reliable to establish the metes and bounds of the property right conveyed by the privilege of the patent grant. Extrinsic evidence has been determined to be useful to identify the

academic and industry credentials of "one skilled in the art," akin to the "reasonable man" in the tradition of tort law. If the court must resort to extrinsic evidence to avoid determining that a claim is indefinite, only the most probative and reliable of such evidence should be considered-and, with caution.

In this case, the court determined that it was unnecessary to consider extrinsic evidence to construe the language of the patent claims at issue, in most instances. *See Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir.1998) (internal citations omitted) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."). In only one claim, where extrinsic evidence was considered, the court was able to construe the disputed term by referring to prior art and was not dependent on technical treatises, technical dictionaries, nor the parties' experts.

In light of the multitude of issues addressed herein, an outline of this Memorandum Opinion and glossary of selected acronyms follow:

OUTLINE

I. THE RELEVANT TECHNOLOGY.

A. Night Vision Aids.
 1. The Electromagnetic Spectrum.
 2. Night Vision Goggles.
B. Cockpit Displays.
 1. Cathode Ray Tubes.
 2. Liquid Crystal Displays.
 3. Color.
C. Characteristics And Types Of Optical Filters.
D. The '914 Patent.

II. FACTUAL AND PROCEDURAL BACKGROUND.

III. DISCUSSION.
A. Jurisdiction.
B. Standing.
 1. Plaintiff.
 2. Intervenor.
C. Controlling Appellate Precedent Concerning Construction Of Patent Claims.
 1. A Federal Trial Judge Must First Attempt To Construe Ambiguous Claim Terms Utilizing Intrinsic Evidence.
 a. Claim Language.
 b. Specification Explanation And Definition.
 c. Prosecution History.
 2. Only In Limited Circumstances May A Federal Trial Judge Construe Claim Terms Utilizing Extrinsic Evidence.
 a. Prior Art.
 b. Technical Treatises And Technical Articles.
 c. Expert Testimony.
 d. Scientific Or Industry Specific Dictionaries.
 e. Inventor Testimony.
 3. A Federal Trial Court Should Construe Claims To Preserve A Patent's Validity Only Where All Other Tools Of Claim Construction Are Exhausted.
 4. The Import Of *Phillips v. AWH Corp.,* 376 F.3d 1382 (Fed.Cir.2004).
D. Construction Of Certain Claims Of United States Patent No. 6,467,914.
 1. "Display System."
 a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.

 b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 d. Specific Precedent Governing Construction Of A Patent's Preamble.
 e. The Court's Construction Of "A Display System For Use In Association With A Light Amplifying Passive Night Vision Aid And A Local Color Display, Including A Local Source Of Light, Comprising" In This Case.
2. "Local" And "Color Display."
 a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 d. The Court's Construction Of "Local Color Display" In This Case.
 i. In The Preambles To Claim 1 And Claim 2.
 ii. In Claim 1(a).
 iii. In Claim 2(a).
3. "Local" And "Source of Light."
 a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Brief.
 c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Brief.
 d. The Court's Construction Of "Local Source Of Light" In This Case.
4. "Optical Filter" And "Filter."
5. "Filters" And "Filtering."
6. "Filters Light From The Local Color Display."
 a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Briefs.
 c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 d. The Court's Construction Of "Filters Light From The Local Color Display" In This Case.
7. "Notch Filter."

a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Briefs.
b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
d. The Court's Construction Of "Notch Filter" In This Case.

8. "Passes."

9. "Color Band[s]."
a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
d. The Court's Construction Of "Color Bands" In This Case.

10. "Predetermined Color Bands."

11. "Red Color Band."
a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
d. The Court's Construction Of "Red Color Band" In Thi s Case.

12. "Predetermined Red Color Band."

13. "Substantially Blocks."
a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
d. The Court's Construction Of "Substantially Blocks" In This Case.

14. "First," "Second," "Third," "Fourth," And "Filter."

15. "Blue Color Band."
a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.

 iii. Post–Claim Construction Hearing Briefs.
 b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 d. The Court's Construction Of "Blue Color Band" In This Case.
 16. "Green Color Band."
 a. Honeywell's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 b. The Government's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 c. Intervenor Lockheed Martin's Proposed Construction.
 i. Pre–Claim Construction Hearing Brief.
 ii. At The Claim Construction Hearing.
 iii. Post–Claim Construction Hearing Briefs.
 d. The Court's Construction Of "Green Color Band" In This Case.
 17. "Narrowband Of The Red Color Band."

## IV. CONCLUSION.

\* \* \* \* \* \*

## GLOSSARY OF SELECTED ACRONYMS

| | |
|---|---|
| AGC | Automatic Gain Control |
| ANVIS | Aviators' Night Vision Imaging System |
| CIE | Commission International l'Eclairage or International Commission on Illumination |
| CRT | Cathode Ray Tube |
| IEEE | Institute of Electrical and Electronics Engineers, Inc. |
| IPL | Instrument Panel Lighting |
| JEDEC | Joint Engineering Display and Electronic Committee |
| LCD | Liquid Crystal Display |
| MCP | Microchannel Plate |
| nm | Nanometer |
| NVG | Night Vision Goggles |
| NVIS | Night Vision Imaging System |
| RGB | Red Green Blue |
| SED | Spectral Energy Distribution |
| $\lambda$ | Wavelength or the distance between successive peaks of an electromagnetic wave. |
| nu, $\nu$ | Frequency or the number of complete cycles of electromagnetic radiation completed each second. |

\* \* \* \* \* \*

## I. THE RELEVANT TECHNOLOGY.

In 1973, a second-generation of Night Vision Goggles ("NVG") was developed by the United States Army to provide helicopter pilots with a brighter view at night of underlying terrain to allow them to fly at low levels. See January 24, 2005 Technology/Industry Primer ("Jt.Primer") at 3;[1] see also November 22, 2004 Direct Testimony and Expert Report of Dr. Harry Lee Task ("PMX35") ¶8 at 4. NVGs, however, were very sensitive to cockpit lighting, warning lights, displays, and particularly to light of longer wavelengths in the visible spectrum and infrared radiation. See Jt. Primer at 6–8; see also PMX 35 ¶9 at 4. In particular,

1. Although counsel for all parties collaborated in preparing the January 24, 2005 Technology/Industry Primer, the parties agree that it is not evidence nor a stipulation as to fact or law. See Jt. Primer at 2. The court has obtained permission to reproduce the graphics that are copyrighted by HowStuffWorks.com.

NVGs' sensitivity to red light created numerous problems that were known prior to the October 10, 1985 filing of the patent at issue in this case, including the fact that nearby light sources in a cockpit could overwhelm the sensor elements and interrupt NVG functioning or amplify reflections from the cockpit lights, causing the pilot to see confusing images. *Id.*

Many techniques were developed by the military and private companies to try to solve the incompatibility between the NVG and aircraft lighting and cockpit displays. *See* PMX 35 ¶¶ 8–12 at 4–6. In the 1980's, the United States Army began to utilize an Aviation Night Vision Imaging System ("ANVIS") goggles with a third-generation image intensifying tube that was much more sensitive to light, *i.e.*, ranging from approximately 450 nanometers ("nm") to 930 nm, instead of 400 nm to 700 nm. *See* Jt. Primer at 3; *see*

*also* PMX 35 ¶¶ 9–13 at 4–7. As a result, the visible range below 580 nm could be used for cockpit lighting and display since light in that range, in large part, was invisible to NVGs and allowed the pilot to see outside the aircraft. *See* PMX 35 ¶ 13 at 6–7.

### A. Night Vision Aids.

#### 1. The Electromagnetic Spectrum.

The electromagnetic spectrum ("spectrum") describes the range of electromagnetic waves that transports energy, both in electric and magnetic fields. *See* Jt. Primer at 3. Energy from cosmic rays have the shortest wavelengths; electrical oscillations have the longest wavelengths. *Id.* "Visible spectrum" or light is the portion of the spectrum located between the ultraviolet light region and the infrared region, as depicted below:

*Id.* at 4.

Light is characterized by wavelength and frequency. *Id.* Wavelength, referred to by the symbol lambda, ¢, is the distance between successive peaks of an electromagnetic wave. *Id.* Frequency referred to by the symbol nu, ᶜ, is the number of complete cycles of electromagnetic radiation completed

each second. *Id.* Wavelength and frequency are inversely related, *i.e.*, light with a higher frequency has a shorter wavelength; light with a shorter frequency has a longer wavelength. *Id.* at 4–5. Wavelength times frequency equals the speed of light. *Id.* at 5. Light and infrared radiation customarily are described in terms of wavelength. *Id.*

## 2. Night Vision Goggles.

NVGs are sensitive to visible light and infrared radiation regions of the electromagnetic spectrum. *Id.* at 5. An unaided human eye only can see light within the visible region of the electromagnetic spectrum, which has a narrow range, as shown above. *Id.* The human eye adapts to different lighting environments and has two distinct sensitivity curves, as illustrated below:

### DAY AND NIGHT SENSITIVITY OF THE HUMAN EYE

*Id.* at 6.

The peak sensitivity of the human eye drifts toward shorter wavelengths of light in extreme darkness, known as scotopic vision, which is rarely used in human activities. *Id.* at 6. Colors are seen by day vision, known as photopic vision. *Id.* Radiant energy, originating from the sun during the day and the stars or moon at night, is the electromagnetic energy that the human eye detects. *Id.* At night, there is less visible light present than during the day, so the human eye has extreme difficulty detecting the radiant energy that remains. *Id.*

Night vision aids enable the user, generally a pilot, to see objects at night by amplifying the very low levels of radiant energy from the visible and infrared spectrum. *Id.* Some night vision aids are capable of amplifying the radiant energy reflected from an object at night in overcast conditions. *Id.*

NVGs utilize a "two-step energy conversion process" to enable the user to observe very low levels of light and infrared radiation and convert the latter into visible light: first, by converting photons into electrons and amplifying the electrons; and second, by converting the amplified electrons back into photons, in visible light for the user. *Id.* at 7–8. A schematic of a typical night vision aid is reproduced below:

*Id.* at 7.

Low-level radiation first enters the NVG at an objective lens that focuses low levels of light and infrared radiation onto an input window of an intensifier tube. *Id.* The intensifier tube consists of a photocathode and a microchannel plate ("MCP") that amplifies light and infrared radiation. *Id.* The photocathode converts photons into electrons. *Id.* Electrons are then emitted from the cathode and received at the input surface of the MCP, generally constructed of a honeycomb-like plate of many hollow tubes fused together. *Id.* Each electron passing through the tube frees other electrons, creating tens of thousands of electrons that exit the tube for each one that entered the tube. *See* Jt. Primer at 7–8.

Exiting electrons strike a phosphor screen that acts as the reverse of the photocathode and converts the electrons back into photons of visible light at a higher intensity than the input photons. *Id.* at 8. If an observer uses an ocular lens, the light emitted appears as a green image. *Id.* This energy is increased by a factor of 10,000 to 20,000 at maximum sensitivity and is known as "gain" or "image intensification" of the NVGs. *Id.* Although NVGs amplify low level light and infrared radiation by a factor of 10,000 to 20,000, they also amplify normal level and bright lights, such as streetlights or cockpit lights, by the same factor, which can damage the NVGs. *Id.* To prevent this problem, ANVIS goggles were developed that have a feature known as "automatic gain control" to govern image intensification within the MCP. *Id.* This reduction of intensification, however, affects the ANVIS goggles' entire field, thereby preventing the user from seeing dimly illuminated objects when normal level and bright lights are introduced. ANVIS goggles also are sensitive to light from about 540 nm to 910 nm. *See* Jt. Primer at 8. To address this issue, ANVIS goggles utilize a "minus blue" filter that reduces the sensitivity of the goggles to the longer wavelengths. *Id.*

### B. Cockpit Displays.

Aircraft use a variety of displays in the cockpit, such as cathode ray tubes ("CRTs") and liquid crystal displays ("LCDs"). *Id.* at 9. Both, however, can generate or reflect light that interferes with the operation of the NVG. *Id.* at 9–11.

#### 1. Cathode Ray Tubes.

CRTs are "picture tube for television" technology used in a broad range of commercial and military applications, including aircraft displays. *Id.* at 9. CRTs operate by receiving an input that is processed by generating electron beams that strike a screen coated with one or more layers of phosphor, wherein each layer can generate one or more colors in a color display. *Id.* When an electron beam strikes a particular phosphor, a phosphor dot on the screen is excited to emit light of a certain color. *Id.* at 10. Full color CRTs typically have three phosphors that correspond to the three most common primary colors of the display: red, green and blue. *Id.* There are different sets of primary colors, each of which can produce many more colors in the visible spectrum. *Id.* Prior to the advent of flat screen technologies, every computer monitor and television used a CRT, similar to that shown below:

**410**

**SCHEMATIC OF A CATHODE RAY TUBE**
**Copyright © 1998-2004 HowStuffWorks, Inc. All rights reserved.**

*Id.* at 9.

### 2. Liquid Crystal Displays.

LCDs are used in many commercial applications, including aircraft cockpit displays. *Id.* In transmissive LCDs, light is generated at the back of the display using a fluorescent tube, known as an LCD backlight. *Id.* This tube has a phosphor coating on the inside that emits light when excited by mercury vapor, which produces color, as determined by the chemical characteristics of the phosphors. *Id.* Color is then passed through an array of liquid crystal picture elements or pixels. *Id.* Each liquid crystal pixel also acts as a "shutter" that either passes or blocks the light to varying degrees. *Id.* at 10–11. A LCD is comprised of two polarizing filters and a cavity containing a liquid crystal compound. *Id.* at 10. When electricity is not applied to a pixel, the backlight is polarized by the first polarizer and is placed to permit light to pass through the second polarizer. *Id.* In a color LCD, each pixel has three subpixels that correspond to the three primary colors of the display. *Id.* at 11. When electricity is applied, the two polarizers act together to block the backlight, as shown below:

SCHEMATIC OF A LIQUID CRYSTAL DISPLAY

Copyright © 1998-2004 HowStuffWorks, Inc. All rights reserved.

*Id.*

### 3. Color.

Color is a psychological response to different wavelengths of light based on the human perception. *Id.* at 12. How color is perceived depends upon the amount of energy light has at each wavelength. *Id.* Spectral energy distribution ("SED") shows the relative intensity of light at each wavelength. *Id.* The SED, however, is not useful for identifying specific colors. *Id.* In 1931, the Commission International l'Eclairage or International Commission on Illumination ("CIE") developed a system for identifying specific colors by measuring the chromaticity of light. The CIE system, which uses the diagram reproduced below, is well known and widely accepted. *Id.*

## 1931 C.I.E. CHROMATICITY DIAGRAM

*Id.* at 13.

All existing colors can be represented by a single point on the CIE Diagram, as plotted on chromaticity coordinates (x,y). *Id.* The upside down u-shaped perimeter of the diagram represents the 100% saturated, or pure spectral colors. *Id.* Colors, however, desaturate or become more and more pastel toward the center, until they are white. *Id.* Every color can be correlated to a dominant wavelength or complimentary dominant wavelength. *Id.*

### C. Characteristics And Types Of Optical Filters.

Optical filters are devices that selectively pass or block electromagnetic radiation. *Id.* at 14. Whether radiation is passed or blocked is based upon a transmissive spectrum that shows wavelengths that have high transmittance (passing) and low transmittance (blocking). *Id.* Typically, filters derive their names by the way the transmittance graph looks. *Id.* For example, filters that pass shorter wavelengths and block longer

wavelengths are called "low pass filters." *Id.* Filters that pass longer wavelengths and block shorter wavelengths are "high pass filters." *Id.*

A combination of optical filters will create a filter with properties that are cumulative, *i.e.,* the combination of a "highpass filter" that passes light above 500 nm and a "lowpass filter" that passes light below 600 nm will result in light being emitted in the 500–600 nm range. *Id.* The transmittance values of filters are multiplied, wavelength by wavelength, to calculate the cumulative effect. *Id.*

### D. The '914 Patent.

The '914 patent[2] describes the technical problem in 1985 of having "a night vision aid, such as ANVIS goggles, be operable in a cockpit or similar environment in which a full color display is illuminated." '914 patent, col. 2, ll. 2–5.

The '914 patent consists of three claims. Claims 1 and 2 are independent claims and

---

**2.** The '914 patent appears in the record as PMX 1 or DMX 1.

Claim 3 is dependent upon Claim 2. *See* '914 patent, col. 5, l. 30—col. 6, l. 31.

Claim 1 describes:

A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light, comprising:

(a) a first optical filter that filters light from the local color display, wherein said first optical filter is a notch filter that passes light comprising predetermined color bands including a predetermined red color band and that substantially blocks light associated with color bands other than said predetermined color bands; and

(b) a second optical filter that filters light at the night vision aid, wherein said second optical filter substantially blocks light of at least said predetermined red color band.

'914 patent, col. 5, l. 30—col. 6, l. 11.

Claim 2 describes:

A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light having blue, red, and green color bands, comprising:

(a) a plurality of filters at the local color display including (1) a first filter for filtering the blue color band of the local source of light; (2) a second filter for filtering the green color band of the local source of light; and (3) a third filter for filtering the red color band of the local source of light

and passing a narrowband of the red color band; and

(b) a fourth filter which filters light at the night vision aid, said fourth filter cooperating with said plurality of filters to substantially block at least said narrowband of the red color band from being admitted to the night vision aid.

'914 patent, col. 6, ll. 12–28.

Claim 3 describes:

The display system of claim 2 wherein said narrowband of the red color band is substantially five to twenty nanometers wide.

'914 patent, col. 6, ll. 29–31.

## II. FACTUAL AND PROCEDURAL BACKGROUND.[3]

Honeywell Intellectual Properties, Inc. is the owner of the '269 patent application and '914 patent and Honeywell International, Inc. (hereinafter collectively, "Honeywell") is the exclusive licensee of the '269 patent application and '914 patent. The issuance of the patent, however, was withheld because of a Secrecy Order, issued on April 2, 1986.

On December 18, 2002, Honeywell filed a Complaint in the United States Court of Federal Claims asserting essentially three claims against the Government allegedly for violating: (1) the Invention Secrecy Act of 1951, 35 U.S.C. §§ 181–88, as a result of the Government's issuance of an April 2, 1986 Secrecy Order concerning Honeywell's '914

---

3. The relevant facts and procedural background recited herein largely were derived from: the United States Patent No. 6,467,914 ("'914 patent"), granted on October 22, 2002 and issued from United States Patent Application Serial No. 06/786,269 ("'269 application"), originally filed on October 10, 1985, the prosecution history thereof, and prior art; Plaintiffs' December 18, 2002 Complaint ("Compl."); the United States ("Gov't" or "Government"); May 23, 2003 Motion To Issue Notice to Third–Party Lockheed Martin Corp. ("Lockheed Martin"); the Government's June 16, 2003 Answer ("Gov't First Answer"); Defendant–Intervenor's September 3, 2003 Motion to Intervene ("Int.Motion"); Plaintiffs' September 9, 2003 Response thereto ("Pl. Reply to Int. Motion"); Defendant–Intervenor's September 17, 2003 Answer ("Int.Answer"); Plaintiffs' December 23, 2004 Opening Claim Construction Brief ("12/23/04 Honeywell Brief"); Defendants' January 14, 2005 Claim Construction Brief("1/14/05 Def. Joint Brief"); Plaintiffs'

January 21, 2005 Reply Claim Construction Brief ("1/21/05 Honeywell Brief"); Plaintiffs' April 1, 2005 Opening Post–Hearing Brief Regarding Claim Construction ("4/1/05 Honeywell Brief"); the Government's April 1, 2005 Post–Hearing Claim Construction Brief ("4/1/05 Gov't Brief"); Defendant–Intervenor's April 1, 2005 Post-*Markman* Brief ("4/1/05 Int. Brief"); Plaintiffs' Post–Hearing Reply Brief Regarding Claim Construction ("4/15/05 Honeywell Brief"); Government's Post–Hearing Claim Construction Reply Brief ("4/15/05 Gov't Brief"); Defendant–Intervenor's April 15, 2005 Reply to Honeywell's Opening Post–Hearing Brief Regarding Claim Construction ("4/15/05 Int. Brief"); April 15, 2005 Joint Stipulation ("Jt.Stip."); Plaintiffs' May 13, 2005 Amended Complaint ("Am.Compl."); the Government's May 31, 2005 Answer ("Gov't Answer to Am. Compl."); and Defendant–Intervenor's May 31, 2005 Answer ("Int. Answer to Am. Compl.").

patent and related '269 application;[4] (2) the Fifth Amendment to the United States Constitution, as a result of the Government's taking of Honeywell's '914 patent and related '269 application; and (3) 28 U.S.C. § 1498(a), as a result of the unlicensed, or otherwise unlawful, use of the '914 patent by or on behalf of the Government. *See* Compl. at ¶¶ 53–75. The case was assigned to the Honorable Emily C. Hewitt.

On May 23, 2003, the Government filed a Motion to Issue a Notice to Third Party Lockheed Martin, pursuant to 41 U.S.C. § 114(b) and RCFC 14(b). On June 5, 2003, the court granted the Government's Motion. On June 16, 2003, the Government filed a First Answer.

\* \* \* \* \* \*

On August 15, 2003, this case was assigned to the undersigned judge. On September 3, 2003, Lockheed Martin filed an Unopposed Motion to Intervene, insofar as Honeywell alleged that the C–130J Hercules aircraft, which is manufactured by Lockheed Martin, incorporated technology claimed in the '914 patent. *See* Int. Motion at 1. On September 9, 2003, Honeywell filed a Response to Lockheed Martin's Motion to Intervene. On September 12, 2003, both Lockheed Martin and the Government filed a Reply to Honeywell's Response. On September 17, 2003, the court issued a revised Order granting Lockheed Martin's Motion to Intervene with respect to only Counts III and IV of the Complaint. On September 17, 2003, the court entered an Order setting discovery and pretrial deadlines agreed to by the parties. On that date, Lockheed Martin also filed an Answer in response to the December 18, 2002 Complaint.

On February 10, 2004, the Government filed an Unopposed Motion for Entry of a Stipulated Protective Order. On February 20, 2004, the court granted the Unopposed Motion and entered a Stipulated Protective Order. On April 30, 2004, the court entered an Order setting the date of a claim construction hearing for December 6–10, 2004, which

subsequently was rescheduled to November 29, 2004–December 3, 2004 by a May 14, 2004 Order. On July 9, 2004, the court also issued an Order granting Honeywell's Unopposed Motion for Extension of Time of Certain Discovery Deadlines. On July 16, 2004, the court convened a telephone status conference to discuss discovery matters and questions concerning the claim construction hearing. At the invitation of the court, on July 23, 2004 and July 29, 2004, Lockheed Martin and Honeywell forwarded the court letters expressing suggestions about that hearing. On July 23 and 30, 2004, and August 5 and 17, 2004, the court convened additional telephone status conferences to discuss pending discovery matters. On August 25, 2004, the court vacated the September 17, 2003 and May 14, 2004 Orders and established a revised Scheduling Order setting a new date for the claim construction hearing for January 27, 2005, later re-set for January 31, 2005. In addition, on August 25, 2004, the court issued a Claim Construction Procedures Order proposed by the parties. On August 26, 2004, the court convened another telephone status conference to discuss discovery matters. On August 27, 2004, Lockheed Martin filed a Motion to Compel Honeywell's responses to Interrogatories 3 and 4. On August 30, 2004, Lockheed Martin filed a Motion to Compel Honeywell's response to Interrogatory 17.

On September 13 and 23, 2004, the court convened additional telephone status conferences to discuss discovery matters. On October 4, 2004, Lockheed Martin filed a Motion to Compel Honeywell to respond to requests for admission. On October 5, 2004, the court convened a telephone status conference with the parties. On October 6, 2004, the court issued an Amended Claim Construction Procedures Order and an Amended Scheduling Order setting another telephone status conference with the parties for October 12, 2004.

On October 15, 2004, Honeywell filed an Infringement Claim Chart. On October 18, 2004, Honeywell requested entry of a First

---

4. Initially, Honeywell asserted that the Government infringed U.S. Patent Application Serial No. 06/786,268 (" '268 application") and U.S. Patent No. 6,142,637 (" '637 patent"). Honey-

well, however, relinquished claims in the '268 application and '637 patent. *See* 12/23/04 Honeywell Brief at 1, n.1; *see also* 5/13/05 Honeywell Motion.

Amended Protective Order and opposed Lockheed Martin's requests for admission. On October 27, 2004, Lockheed Martin filed a Reply. At the November 1, 2004 telephone status conference, the court was advised that the dispute regarding requests for admission had been resolved to the satisfaction of the parties. Accordingly, on November 2, 2004, the court entered an Order to that effect.

On November 10, 2004, defendants filed a Joint Response Chart that asserted Claims 1, 2, and 3 of the '914 patent were invalid, due to:

(1) the existence of documentary and non-documentary evidence that rendered Honeywell's claims obvious; (2) the insufficiency of the description of the invention to show Honeywell's possession of it; (3) a failure by Honeywell to disclose the best mode for practicing the claimed invention; (4) Honeywell's derivation of the invention from others; (5) the introduction of impermissible new matter to the '914 patent in Honeywell's June 24, 2002 amendment; (6) the misjoinder of inventorship, which led to the granting of the '914 patent (the Government did not join in this defense); (7) the violation of Honeywell's duty to disclose to the second patent examiner the existence of prior art that was material to the PTO granting the '914 patent (the Government did not join in this defense).

On November 15, 2004, Honeywell submitted a Proposed Claim Construction Statement that set forth: (1) Honeywell's proposed claim constructions, including any special or uncommon meanings of words or phrases used in the '914 patent; (2) references from the specification that support,

describe, or explain each of the claim elements and/or Honeywell's proposed construction; (3) material in the prosecution history that describes or explains each of the elements of the claim; and (4) extrinsic evidence, where necessary.

On November 16, 2004, the court entered a First Amended Protective Order reflecting the changes negotiated by the parties. On November 16, 2004, defendants filed a Motion to Amend the Defendants' Joint Response Chart. On November 22, 2004, defendants filed a Joint Proposed Claim Construction Statement, together with a November 22, 2004 Expert Report of Dr. Harry Lee Task.

On December 3, 2004, the court entered an Order setting a status conference on December 17, 2004 and amending the due date for the Joint Claim Construction Statement to December 14, 2004. On December 16, 2004, the court entered an Order granting Lockheed Martin's Motion to Amend Defendants' November 8, 2004 Joint Response Chart. Following the December 17, 2004 status conference, the court entered a Second Amended Protective Order. On December 21, 2004, the parties filed a Joint Claim Construction Statement.

On December 23, 2004, Honeywell filed an Opening Claim Construction Brief seeking the court's construction of certain claims in the '914 patent, together with a four volume appendix—Exhibits 1–39 (PA1–PA514). On January 14, 2005, the Government and Lockheed Martin filed Defendants' Claim Construction Brief, together with five volumes of Exhibits 1–35 (DE1–DE1036).[5] On January

---

5. On January 12, 2005, without requesting leave, the Government and Lockheed Martin filed a joint brief prior to the claim construction hearing that clearly was produced and authored in large part by Lockheed Martin's counsel. *See* 1/14/05 Def. Joint Brief; *see also* TR at 10–16. On January 26, 2005, the court issued a Memorandum Opinion and Order addressing jurisdictional and procedural issues raised by this unilateral action:

The public interest in having transparent judicial proceedings is particularly ill-served where a private party is in fact conducting and funding the Government's defense of a patent infringement case without the Government's public recognition and specific authorization

of such. Therefore, if the Government, in fact, has decided to allow Lockheed Martin to "assume and undertake the conduct and control" of this case, [pursuant to Contract No. F33657–00–C0018 page one and an unidentified one page attachment, *see* May 23, 2003 Motion for Notice to Third–Party, pursuant to RCFC(b) (Exhibit 2 at 2(i)(3)) ], then the Government should advise the court and parties .... On the other hand, if the Government, in fact, intends to continue to defend this case, the court expects each party to proceed independently, representing the best interests of each party's respective clients.

*Honeywell Int'l, Inc. v. United States,* 65 Fed.Cl. 809, 810–11, 2005 WL 1415441 at *2 (Fed.Cl.

21, 2005, Honeywell filed a Reply Claim Construction Brief, together with a Supplemental Appendix Ex. 40–49 (PA515–558). On January 27, 2005, the parties filed a Supplement to the Joint Claim Construction agreeing to the construction of the following terms: "optical filter" and "filter," when used as nouns; "filter" and "filtering," when used as verbs; and "passes," when used as a verb.

The court held a claim construction hearing from January 31, 2005–February 3, 2005 ("TR 1–1138").[6] In addition to argument of the parties, the court considered the reports of the parties' experts as direct testimony and heard cross examination and re-direct.

The court has determined that Honeywell's expert, Lawrence E. Tannas, Jr., and his testimony, met the qualifications of Fed. R.Evid. 702–03. *See* PMX 34 (Nov. 15, 2004 Initial Expert Report of Lawrence E. Tannas, Jr.); PMX 36 (Dec. 1, 2004 Rebuttal Expert Report); PMX 37 (Dec. 7, 2004 Supplement to Expert Reports); *see also* TR at 772–958; 1128–1135. Mr. Tannas has a B.S. and M.S. degree in Engineering from the University of California. *See* PMX 37 at Ex. 1. Mr. Tannas has had more than 25 years of "hands-on" experience with avionic cockpit displays, including research and development, manufacturing, testing, and human factor analysis. *See* PMX 34¶1 at 2. In addition, Mr. Tannas worked for Honeywell in the early 1960's during which time he invented the backup reentry guidance display for the Apollo Reentry Vehicle, which was used in the Apollo 13 mission. *Id.* ¶3 at 2. Subsequently, Mr. Tannas was employed at Martin Marietta Corp. where he developed a cockpit for the SV5 Manned Space Vehicle. *Id.* Prior to starting his own firm in 1999, Mr. Tannas also was employed by Rockwell International where he developed the engineering prototype of a liquid crystal display for the world's first full-scale LCD production. *Id.* Mr. Tannas currently is President of Tannas Electronics, an entity involved in con-

sulting, lecturing, and research. *Id.* ¶5 at 3. In addition, he is President of Tannas Electronic Displays, Inc., which is involved in research, development, and licensing of intellectual property for preparing LCDs for avionics. *Id.*

Mr. Tannas has served as a consultant or lecturer for Fortune 500 companies, several universities, and federal agencies, including the Federal Aviation Administration, National Aeronautics and Space Administration, United States Air Force, United States Navy, National Science Foundation, Defense Advanced Research Projects Agency, and the Central Intelligence Agency. *Id.* ¶2 at 2. Mr. Tannas also is an inventor or co-inventor of eight patents issued by the USPTO. *Id.* ¶3. He has authored or co-authored numerous publications, including serving as author/editor of *Flat–Panel Displays and CRTs* (Van Nostrand Reinhold Co., 1985) and *Flat–Panel Display Technologies, Japan, Russia, Ukraine, and Belarus* (Noyes Publications, 1995). *Id.* ¶4. In addition, Mr. Tannas has been a coordinator and lecturer on flat-panel displays, human factor analysis, and advance cockpit displays at University of California at Los Angeles and other universities. *Id.* ¶4 at 2–3.

Mr. Tannas was retained by Honeywell to provide an opinion as to the meaning of the following words or phrases in the '914 patent: "color display," *id.* ¶12 at 5; "source of light," *id.* ¶13; "local" with "color display," *id.* ¶14; "local" with "source of light," *id.* ¶14 at 5–6; "optical filter," *id.* ¶15 at 6; "notch filter," *id.* ¶16; "color band," *id.* ¶17 at 6–7; "predetermined color band," *id.* ¶18 at 7; "substantially blocks," *id.* ¶19; "filter," *id.* ¶20; "narrow band of the red color band," *id.* ¶21 at 7–8.

In addition to testifying about proposed construction of the above-referenced terms, Mr. Tannas advised the court that he intended to testify about the "background of the patented ['914] invention, including providing

Jan. 26, 2005, amended and reissued on June 14, 2005) (Memorandum Opinion and Order).

Thereafter, the Government reaffirmed that it would conduct a separate defense, particularly since "Lockheed's interest in the infringement issue are not co-extensive [with the Government]." TR at 5.

**6.** The following Honeywell exhibits were admitted into evidence: PMX 1–57, 100–105, 110–112. The following Government and Lockheed Martin exhibits were admitted into evidence: DMX 1–38, DX 50–56.

relevant information concerning the technologies and industry to which the ['914] patent relates, the prior art, and the problems solved by the invention." *Id.* ¶ 22 at 8.

The court also has determined that the Government's expert, Dr. Harry Lee Task met the qualifications of Fed.R.Evid. 702–03. *See* PMX 35 (Nov. 22, 2004 Expert Report of Harry Lee Task, Ph.D.); *see also* TR at 968–1127. Dr. Task has had more than 27 years of "hands-on" experience with research and development in helmet mounted displays, display image quality, vision assessment in space, night vision goggles, night vision goggle compatible lighting, and vision through aircraft transparencies. *See* PMX 35 ¶ 3 at 2. Dr. Task has a B.S. degree in Physics from Ohio University, a M.S. in Physics from Purdue University, a M.S. and Ph.D. in Optical Sciences from the University of Arizona Optical Sciences Center, and a M.S. in Management of Technology from the Massachusetts Institute of Technology Sloan School of Management. *Id.* ¶ 2 at 1–2.

In 1971, Dr. Task was hired by the United States Air Force Aerospace Medical Research Laboratory ("AMRL") as an optical physicist to work on helmet mounted displays and display image quality. *Id.* ¶ 3 at 2. In 1989, Dr. Task became the Chief Scientist for AMRL and served in that capacity until 1991. *Id.* In 1997, Dr. Task became the Senior Scientist for Human Systems Interface for the United States Air Force Research Laboratory, a position equivalent to a one-star General. *Id.* In June 2001, Dr. Task retired from the United States Air Force, but has continued technical work as a consultant. Since his retirement in June 2001, Dr. Task has been an independent consultant and President and Treasurer for Opto–Metrix, Inc., a Subchapter "S" corporation that makes and sells optical protractors. *Id.* ¶ 1 at 1.

Dr. Task also is the inventor or co-inventor of approximately 45 patents issued by the USPTO, author or co-author of over 100 technical-research publications, a member of relevant professional associations, including the Society for Information Display, and a Fellow of the American Society for Testing and Materials. *See* PMX 35 ¶ 4 at 2–3. He

has been retained as an expert in vision and visibility in approximately a dozen cases involving vehicle accidents at night or dusk, however, none concerned NVGs or NVG compatible lighting. *Id.* ¶ 5 at 3.

Dr. Task was retained to provide an opinion as to the meaning of the following words or phrases in the '914 patent: "display system," *id.* ¶ 15 at 8; "local" with respect only to "passive night vision aid," *id.* at ¶¶ 17–18 at 8; "display," *id.* ¶¶ 19–20 at 4–5; "color display," *id.* ¶ 21 at 9; "local source of light," *id.* ¶¶ 22–23 at 9; "notch filter," *id.* ¶¶ 24–25 at 9; "narrowband," *id.* ¶ 26 at 10; "color band," *id.* ¶¶ 27–29 at 10–11; "red color band," *id.* ¶¶ 30–31 at 11–12; "predetermined red color band," *id.* ¶¶ 32–34 at 12; "blue color band," *id.* ¶ 35 at 13; "green color band," *id.* ¶ 36 at 13; and "substantially blocks," *id.* ¶¶ 37–42 at 13–15.

In addition, Dr. Task testified about the background associated with the technical areas of the '914 patent, including the United States Army's 1973 adoption of a second-generation NVG and designation of the AN/PVS–5A as an "interim" pilot's aid for helicopter flying at night. *See* PMX 35 ¶ 8 at 4. Dr. Task admitted that NVGs were limited because of their incompatibility with aircraft lighting and displays. *Id.* Dr. Task explained that the problem was too much light in the cockpit, to which the NVGs were "sensitive." *Id.* ¶ 9 at 4. In addition, pilots trying to look outside the helicopter would see only reflections of the inside of the cockpit, as opposed to the view outside the helicopter. *Id.* On a more technical basis, the wavelengths that the NVGs were sensitive to (and amplified) included the entire visible spectrum (*i.e.,* 400–700 nm) and a small portion of the near infrared wavelengths, *i.e.,* 700–900 nm. *Id.* ¶ 9 at 4.

Dr. Task advised the court that most cockpit lighting and displays utilize incandescent light bulbs that emit a considerable amount of infrared energy compared to energy to which the human eye is sensitive. *Id.* ¶ 10 at 5. This created an issue since most incandescent lights in the cockpit emitted far more "bad" light than "good" light, to which the eye is sensitive. *Id.* Even when the NVGs were sensitive, "the filters typically did their

job with respect to producing the desired color, but they also passed the invisible-to-the-eye infrared light that was incompatible with the NVG operation." *Id.* Therefore, in order to create a display with phosphors compatible with NVGs, longer wavelength side bands needed to be blocked by a filter. *Id.* ¶ 11 at 5–6. To accomplish making a display with a phosphor compatible with NVGs several techniques were developed, including: placing filters over displays to block objectionable infrared and red wavelengths, but pass blue and green wavelengths; incandescent lights in the cockpit were turned off and the instrument panel utilized sources of light that did not emit objectionable light; and a filter passing only shorter wavelengths were put over white phosphor displays to block those wavelengths. *Id.* ¶ 12 at 6. The United States Army also developed an Aviation Night Vision Imaging System ("ANVIS") night vision goggles in the early 1980s that used an image intensified tube that was sensitive in the 450–930 nm range, rather than a full visible spectrum. *Id.* ¶ 13 at 6. When a "long pass" filter was used on the lens in front of the NVG to reduce the sensitivity of the ANVIS to shorter visible wavelengths, the NVG became sensitive to wavelengths of 580–930 nm. *Id.* ¶ 13 at 7. As a result, the visible range of below approximately 530 nm was used for cockpit lighting and display since light in this range was invisible to the NVGs allowing visibility outside the cockpit. *Id.* ¶ 14 at 7. Figure 1, the preferred embodiment of the '914 patent, teaches a significant overlap between the wavelengths (including yellow, orange, and red wavelength bands) sensitive to the human eye and the ANVIS, *i.e.*, approximately 580–700 nm. *Id.* This was the state of the NVG technology in 1985, at the time the '914 patent was filed. *Id.* ¶ 15 at 7 (quoting '914 patent specification describing the problem in 1985 that the '914 patent addressed) ("It is ... desired that a night vision aid such as ANVIS goggles be operable while a full color display is illuminated. It is therefore desired

to prevent light which originates at the full color display from overwhelming the night vision aid.").

Following the claim construction hearing, on February 28, 2005 and March 3, 2005, the court convened telephone status conferences, pursuant to which the court issued a March 11, 2005 Scheduling Order regarding post-hearing briefs and discovery deadlines regarding the August 1–12, 2005 trial.

On March 30, 2005, Lockheed Martin filed a Motion to Supplement the Record with three contracts between Lockheed Martin and the Government to support Lockheed Martin's intervention as a matter of right.

On April 1, 2005, Honeywell filed an Opening Post–Hearing Brief Regarding Claim Construction; the Government filed a Post–Hearing Claim Construction Brief; and Lockheed Martin filed a Post-*Markman* Hearing Brief. On April 7, 2005, the court granted Lockheed Martin's March 30, 2005 Motion to Supplement the Record.

On April 15, 2005, Honeywell filed a Post–Hearing Reply Brief Regarding Claim Construction; the Government filed a Post–Hearing Claim Construction Reply Brief; and Lockheed Martin filed a Reply to Honeywell's Opening Post–Hearing Brief Regarding Claim Construction. In addition, on April 15, 2005, the parties filed a Stipulation agreeing to the meaning of six of the contested claims, which are set forth herein.

On April 20, 2005, Honeywell filed a Motion for Leave to Supplement the Record Regarding Claim Construction of the term "red color band" ("4/20/05 Honeywell Brief"), together with an April 18, 2004 Declaration of Mark Koehn, Esquire and April 19, 2004 Declaration of Lawrence E. Tannas, Jr. and Exhibits 1–13 (PE1–155).[7] Honeywell's Motion requested that the record include the *Draft Standard for Color Active Matrix Liquid Crystal Displays* in U.S. Military Aircraft, WL–TR–93–1177, Darrel Hopper June

---

7. On February 25, 2005, Honeywell filed a Motion to file a corrected version of the December 23, 2004 Opening Claim Construction Brief. On March 14, 2005, Defendants opposed Honeywell's request to file a corrected brief. On March 17, 2005, Honeywell filed a reply together

with Exhibits A–G. On March 24, 2005, the court entered an Order denying Honeywell's February 25, 2005 Motion, but granted Honeywell leave to discuss any corrections in the post-hearing brief to be filed on April 1, 2005.

1994 (Koehn Ex. 1) and Dr. Hopper's deposition testimony related thereto. On May 4, 2005, the Government filed a Brief in Response to Honeywell's Motion to Supplement, together with three volumes of supporting Exhibits ("Gov't Supp. Resp."). The Government did not object to Honeywell's request to supplement the record, but requested counter-designations.

On May 4, 2005, Honeywell also filed a letter to bring the recent decision of the United States Court of Appeals for the Federal Circuit in *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367 (Fed.Cir.2005) to the attention of the court. On May 5, 2005, Honeywell filed a Supplement to the October 15, 2004 Claim Chart ("5/5/05 Honeywell Supp. to Claim Chart") to amend: Section II of the Claim Chart to clarify that "Honeywell no longer asserts that LED displays are a type of display that infringes the '914 patent when used by the Government" (5/5/05 Honeywell Supp. to Claim Chart at 1, ¶ 2.); Section II of the Claim Chart to clarify that "Honeywell no longer asserts that the Cockpit Engineer Display (CED) made by Smiths Industries for B–52H, the Warning Annunciator Panel (WAP) made by Litton Systems/Northrop Grumman for the C–17A, or the Engine/Caution Panel made by Litton Systems for the C–17A are covered by the '914 patent when used by the Government in connection with NVIS" (*Id.* at 2, ¶ 3.); and Section III of the Claim Chart to remove "the statement at page 9 referencing 'Attachment B: claim chart showing how, on information and belief, '914 claim 1 reads on full color, NVIS compatible, Light–Emitting Diode (LED) displays, when used with NVIS" ' (*Id.* at ¶ 4.). Honeywell appears to have withdrawn Attachment B to the Claim Chart. *Id.* On May 6, 2005, the Government filed a Motion for Leave to File the Declaration of Dr. Darrel G. Hopper ("5/5/05 Hooper Decl.").

On May 6, 2005, Honeywell filed a Reply in support of the April 20, 2005 Unopposed Motion to Supplement the Record Regarding Claim Construction. On May 9, 2005, the court granted the Government's May 6, 2005 Unopposed Motion to File an Original Declaration of Dr. Darrel Hopper.

On May 13, 2005, the court granted Honeywell's May 13, 2005 Unopposed Amended Complaint dismissing Counts I, II, III, and IV as they relate to U.S. Patent No. 6,142,637.

On May 13, 2005, Honeywell filed a Motion to Preclude the Government "from making offensive use of certain documents belatedly produced in violation of the Court's [First Amended Protective Order and Second Amended Protective Order]," together with the May 11, 2005 Affidavit of Mark Koehn and Exhibits 1–19 (PE1–PE159). On May 25, 2005, the Government filed a Brief in Opposition. On May 26, 2005, the court denied Honeywell's May 13, 2005 Motion to Preclude. On May 31, 2005, Honeywell filed a Motion for Reconsideration.

On May 31, 2005, both the Government and Lockheed Martin filed an Answer to Honeywell's Amended Complaint.

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has jurisdiction to adjudicate claims that allege "an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same ... [seeking] recovery of ... reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a).

The United States Court of Federal Claims also has jurisdiction to adjudicate claims under the Invention Secrecy Act. *See* 35 U.S.C. § 181.[8]

---

**8.** The Invention Secrecy Act provides that "[w]henever publication or disclosure by the publication of an application or by the grant of a patent on an invention in which the Government has a property interest might, in the opinion of the head of the interested Government agency, be detrimental to the national security, the Com-

missioner of Patents upon being so notified shall order that the invention be kept secret and shall withhold the publication of the application or the grant of a patent therefor under the conditions set forth hereinafter. Whenever the publication or disclosure of an invention by the publication of an application or by the granting of a patent,

The Complaint and Amended Complaint in this action properly invoke the court's jurisdiction under both of these federal statutes that authorize the award of monetary damages.

## B. Standing.

### 1. Plaintiff.

Lower federal courts have been advised to "decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 111, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (Breyer, J. concurring). The party invoking federal jurisdiction, has the burden of proof and persuasion to satisfy the constitutional requirements of Article III standing. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (holding that the burden is on the party seeking to exercise jurisdiction by clearly alleging facts sufficient to establish jurisdiction).

Section 281 of Title 35 of the United States Code provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *see also* 35 U.S.C. § 100(d) ("The word 'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee."); *Prima Tek II, L.L.C. v. A–Roo Co.,* 222 F.3d 1372, 1376–77 (Fed.Cir.2000)

("Standing to sue for patent infringement derives from the Patent Act, ... 35 U.S.C. § 281."); *Paradise Creations, Inc. v. UV Sales, Inc.,* 315 F.3d 1304, 1308 (Fed.Cir. 2003) (emphasis in original) ("This court has determined that in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit.*"). The standard set forth by the United States Supreme Court over a century ago fully retains its vitality. *See Waterman v. Mackenzie,* 138 U.S. 252, 260, 11 S.Ct. 334, 34 L.Ed. 923 (1891) (citations omitted) ("There can be no doubt that he is 'the party interested, either as patentee, assignee, or grantee,' and as such entitled to maintain an action at law to recover damages for an infringement; and it cannot have been the intention of congress that a suit in equity against an infringer to obtain an injunction and an account of profits, in which the court is authorized to award damages, when necessary to fully compensate the plaintiff, and has the same power to treble the damages as in an action at law, should not be brought by the same person.").

Plaintiffs properly have alleged that, at the inception of the lawsuit and at the filing of the Amended Complaint on May 31, 2005, Honeywell Intellectual Properties Inc. was the owner of the '269 patent application and '914 patent and Honeywell International Inc. was an exclusive licensee of the '269 patent application and '914 patent.

---

in which the Government does not have a property interest, might, in the opinion of the Commissioner of Patents, be detrimental to the national security, he shall make the application for patent in which such invention is disclosed available for inspection to ... the Secretary of Defense, and the chief officer of any other department or agency of the Government designated by the President as a defense agency of the United States.... If, in the opinion of ... the Secretary of a Defense Department, or the chief officer of another department or agency so designated, the publication or disclosure of the invention by the publication of an application or by the granting of a patent therefor would be detrimental to the national security, ... the Secretary of a Defense Department, or such other chief officer shall notify the Commissioner of Patents and the Commissioner of Patents shall order that the invention be kept secret and shall withhold the publi-

cation of the application or the grant of a patent for such period as the national interest requires, and notify the applicant thereof." 35 U.S.C. § 181.

An applicant may seek damages caused by the issuance of a Secrecy Order. *See* 35 U.S.C. § 183 ("An applicant ... whose patent is withheld as herein provided, shall have the right ... to apply to the head of any department or agency who caused the order to be issued for compensation for the damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure."). If full settlement of the matter is not achieved "the head of the department or agency may award and pay to such applicant ... a sum not exceeding 75 per centum of the sum which the head of the department or agency considers just compensation for the damage and/or use." *Id.*

## 2. Intervenor.

The United States Court of Federal Claims "may summon any and all persons with legal capacity to be sued to appear as a party ... in any suit ... of any nature whatsoever pending in said court to assert and defend their interests[.]" 41 U.S.C. § 114(b); *see also* RCFC 14(b) ("The court, ... may notify any person with legal capacity to sue and be sued and who is alleged to have an interest in the subject matter of any pending action."); *see also* RCFC 24(a) ("Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."); RCFC 24(b) ("Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.").

The Complaint alleged that aircraft manufactured by Lockheed Martin for the Government incorporate technology disclosed and claimed in the '269 patent application and '914 patent. *See* Compl. ¶¶ 53–60, Ex. B; *see also* Am. Compl. ¶¶ 24–28, Ex. B. Lockheed Martin initially filed a Motion to Intervene and the court subsequently granted Lockheed Martin's Motion. Following the court's January 26, 2005 Memorandum Opinion and Order, Lockheed Martin supplemented the record with three contracts that Lockheed Martin entered into with the Government, "all contain[ing] warranties that each aircraft provided by Lockheed Martin under the contracts 'shall be free of rightful claim of infringement of any United States Patent.'" *See* 3/30/05 Lockheed Martin Motion to Supplement the Record at 2 (citing Ex. 1 (Contract No. F33657–95–C–2055) at 14 (C–130J System Commercial Warranty), Part A(e), p. 42 of 165; Ex. 2 (Contract No. F33657–00–C–0018), Attachment 1 at 14 (C–130J System Commercial Warranty), Part A, e., p. 50 of 65; Ex. 3 (Contract No. 33657–03–C–2014), Attachment 1 at 13 (C–130J System Commercial Warranty), b(5), p. 34 of 48). The remedy for a breach of these warranties by Lockheed Martin would be "'reimbursement of the Government by [Lockheed Martin] of the amount of the Government's loss, cost or damage ... arising out of such patent infringement.'" *See* 3/30/05 Lockheed Martin Motion to Supplement the Record at 3 and n.2. These contracts evidence that the disposition of this action may impair Lockheed Martin's interests, unless it enjoys all the rights of a party, including the right to appeal. Therefore, the court has determined that Lockheed Martin has standing to intervene in this case pursuant to RCFC 24(a).

## C. Controlling Appellate Precedent Concerning Construction Of Patent Claims.

The United States Supreme Court's unanimous affirmance of the *en banc* decision of the United States Court of Appeals for the Federal Circuit in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed.Cir. 1995) ("*Markman I*"), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ("*Markman II*"), settled that the meaning and scope of a patent's claims are issues of law to be determined by a federal trial judge. *Id.* A strong undercurrent, if not undertow, concerned the competence of a jury to understand, must less construe, technical terms of art and functional elements of a patent's claims. *See Markman II*, 517 U.S. at 384, 116 S.Ct. 1384 ("We ... consider both the relative interpretive skills of judges and juries and the statutory policies that ought to be furthered by the allocation."); *see also id.* at 388–89, 116 S.Ct. 1384 (quoting *Parker v. Hulme*, 18 F. Cas. 1138, 1140 (E.D.Pa.1849) ("The judge, from ... training and discipline, is more likely to give a proper interpretation to such instruments than a jury; and ... is, therefore, more likely to be right, in performing such a duty, than a jury can be expected to be.")).

In *Markman I*, the United States Court of Appeals for the Federal Circuit specified three sources relevant to construe a patent's claim: claim language; the specification; and prosecution history. *See Markman I*, 52 F.3d at 979 (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed.Cir.1991)) (" 'To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history.' "). It is important to recognize, however, that in *Markman II* the United States Supreme Court did not constrain a federal trial court from adjudicating the terms of a claim by excluding any relevant and reliable evidence, including that of experts. *See Markman II*, 517 U.S. at 390, 116 S.Ct. 1384 ("The decisionmaker vested with the task of construing the patent is in the better position to ascertain whether an expert's proposed definition fully comports with the specification and claims and so will preserve the patent's internal coherence."). Instead, that decision was entrusted to the considered judgment of the federal trial judge to determine, but following the precedent of the United States Court of Appeals for the Federal Circuit that was established to bring uniformity and doctrinal stability to the decisions of the federal judiciary on all matters concerning patent law. *Id.* ("It was just for the sake of such desirable uniformity that Congress created the Court of Appeals for the Federal Circuit as an exclusive appellate court for patent cases, H.R.Rep. No. 97–312, pp. 20–23 (1981), observing that increased uniformity would 'strengthen the United States patent system in such a way as to foster technological growth and industrial innovation.' *Id.* at 20.").

## 1. A Federal Trial Judge Must First Attempt To Construe Ambiguous Claim Terms Utilizing Intrinsic Evidence.

### a. Claim Language.

A federal trial judge examines claim terms and phrases "through the viewing glass of a person skilled in the art." *See Brookhill–Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed.Cir.2003); *see also Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed.Cir. 2000) ("Claim language must be given ordinary and accustomed meaning, as understood by one of ordinary skill in the art," at the time of the patent application.). In doing so, a federal trial judge in a patent infringement case must determine, as a threshold matter, whether there is ambiguity in any claim term requiring construction and, if so, to consider intrinsic evidence. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996). First, a federal trial judge must "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Id.* Second, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms ... or by implication." *Id.* Third, a federal trial judge may "consider the prosecution history of the patent, if in evidence." *Id.* The United States Court of Appeals for the Federal Circuit has decided that intrinsic evidence is the "most significant source of the legally operative meaning of disputed claim language." *Id.; see also Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1464 (Fed.Cir.1998) ("Proper construction requires an examination of claim language, the written description, and, if introduced, the prosecution history.").

### b. Specification Explanation And Definition.

The United States Court of Appeals for the Federal Circuit recently reaffirmed that the specification is often the best tool to ascertain the "technological and temporal context" of claims. *See Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed.Cir.2005) (citing *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed.Cir.2004)) ("In most cases, the best source for discerning ... [usage in context as understood by one skilled in the art at the time of the invention] is the patent specification wherein the patent applicant describes the invention.").

If a patent's claim language is ambiguous, the specification "including the inven-

tors' statutorily-required written description of the invention is the primary source for determining claim meaning." *Astrazeneca AB v. Mutual Pharm. Co., Inc.,* 384 F.3d 1333, 1336 (Fed.Cir.2004); *see also id.* at 1337 (quoting *Autogiro Co. of Am. v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 397–98 (1967)) (" 'Most courts have simply stated that the specification is to be used to explain the claims'; ... the patent is an integrated document, with the claims 'pointing out and distinctly claiming,' 35 U.S.C. § 112, the invention described in the rest of the specification and the goal of claim construction is to determine what an ordinary artisan would deem the invention claimed by the patent, taking the claims together with the rest of the specification."). Of course, the utility of the specification depends on whether the "written description of the invention [is] ... clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics,* 90 F.3d at 1582.

The United States Court of Appeals for the Federal Circuit has held many times that " 'a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning[;]' the written description in such a case must clearly redefine a claim term 'so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term.' " *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1307 (Fed.Cir.2000) (quoting *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1357 (Fed.Cir. 1999)); *see also Georgia–Pacific Corp. v. United States Gypsum Co.,* 195 F.3d 1322, 1332 (Fed.Cir.1999) (citations omitted) (advising that the "specification of the patent in suit is the best guide to the meaning of a disputed term ... [and if] intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence to contradict the meaning of the claims."); *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 540 (Fed.Cir.1998) (citation omitted) ("When 'the specification explains and defines a term used in the

claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term' ... [unless] such definition is challenged [then] it is often appropriate ... to receive evidence of the meaning and usage of terms of art from persons experienced in the field of the invention."); *Vitronics,* 90 F.3d at 1582 (holding that, in ascertaining the scope of the patent, deference should be afforded claims, as defined by their "customary meaning," with the caveat that the law affords patentees the right to serve as a "lexicographer," if a special or unique definition is clearly stated in the specifications or prosecution history.). Federal trial judges also have been well advised not to construe a claim to exclude the preferred and only embodiment disclosed in a specification: "such an interpretation is rarely, if ever, correct[.]" *Vitronics,* 90 F.3d at 1583.

In *Chemcast Corp. v. Arco Industries Corp.,* 913 F.2d 923, 926–27 (Fed.Cir.1990), the United States Court of Appeals for the Federal Circuit also discussed the distinction between "enablement" and "best mode" requirements.[9] The specification discloses an invention "in such a manner as will enable one skilled in the art to make and utilize it." *Id.* at 926. The purpose of the "best mode," however, is to restrain inventors from applying for patents and concealing from the public preferred embodiments of their inventions. *Id.* at 927.

### c. Prosecution History.

Federal trial judges also have been instructed that prosecution history is relevant to claim construction "because it may contain contemporaneous exchanges between the patent applicant and the [USPTO] about what the claim means." *Vitronics,* 90 F.3d at 1584. Prosecution history, however, can trump the importance of the specification in certain circumstances. For example, in *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the United States Supreme Court held that if claims were narrowed to obtain issuance over

9. The governing statute provides that the specification "shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. Section 112 also requires disclosure of specific instrumentalities or techniques that are the best way of carrying out the invention. *Id.*

prior art during prosecution, they may not later be interpreted by the specifications to cover what was disclaimed before the U.S. Patent Office. *Id.* at 33, 86 S.Ct. 684; *see also Schriber–Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220–21, 61 S.Ct. 235, 85 L.Ed. 132 (1940) ("When . . . the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory compromised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent."). In sum, prosecution history may preclude "a patentee from regaining through litigation, coverage of subject matter relinquished during prosecution of the application of the patent." *Wang Labs. v. Mitsubishi Electronics America, Inc.,* 103 F.3d 1571, 1577–78 (Fed.Cir.1997), *cert denied,* 522 U.S. 818, 118 S.Ct. 69, 139 L.Ed.2d 30 (1997).

## 2. Only In Limited Circumstances May A Federal Trial Judge Construe Claim Terms Utilizing Extrinsic Evidence.

■ If analysis of intrinsic evidence resolves ambiguity about the meaning of the patent claim, as a matter of law, it is improper for a federal trial judge to cite to extrinsic evidence, *i.e.,* evidence outside of the patent record, including expert and inventor testimony, dictionaries, learned treatises, and articles. *See Vitronics,* 90 F.3d at 1584 (allowing extrinsic evidence "to help the court come to the proper understanding of the claims[,]" but not to contradict intrinsic evidence or vary the scope of the claims). That instruction was clarified in *Key Pharm. v. Hercon Lab. Corp.,* 161 F.3d 709 (Fed.Cir. 1998):

> This court has made strong cautionary statements on the proper *use* of extrinsic evidence, which might be misread by some members of the bar as restricting a trial court's ability to *hear* such evidence. We intend no such thing. To the contrary, trial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues, and trial courts have broad discretion in this regard.

Furthermore, a trial court is quite correct in hearing and relying on expert testimony on an ultimate claim construction question in cases in which the intrinsic evidence (*i.e.,* the patent and its file history—the "patent record") does not answer the question.

What is disapproved of is an attempt to use extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.

*Id.* at 716 (citations omitted); *see also Elekta Instrument,* 214 F.3d at 1307 (quoting *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1476 (Fed.Cir.1998)) ("[A] court should rely upon 'the claim language, the written description portion of the specification, the prosecution history, and if necessary to aid the court's understanding of the patent, extrinsic evidence.' "); *Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.,* 206 F.3d 1408, 1414 (Fed.Cir.2000) (affirming a federal trial court's claim construction and cautioning that "both intrinsic and extrinsic evidence [may be considered, however, a federal trial court should] turn[ ] to extrinsic evidence only when the intrinsic evidence is insufficient to establish the clear meaning of the asserted claim."); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 744 (Fed.Cir.1997) ("When, as here, the district court has concluded that the patent specification and the prosecution history adequately elucidate the proper meaning of the claims, expert testimony is not necessary and certainly not crucial.").

■ Extrinsic evidence, however, may be particularly useful to determine how one of ordinary skill in the relevant art would interpret the claim language. *See Brookhill–Wilk 1, LLC,* 334 F.3d at 1298. For example, a federal trial judge should be able to consider extrinsic evidence to learn whether a common term has a special meaning in the relevant field. *See Microsoft Corp. v. Multi–Tech Sys., Inc.,* 357 F.3d 1340, 1347 (Fed.Cir. 2004) (*en banc*) (quoting *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 327 F.3d 1364, 1367

(Fed.Cir.2003)) ("Claim language generally carries the ordinary meaning of the words in their normal usage in the field of invention.").

### a. Prior Art.

■ Depending on the clarity of a patent claim and specification, prior issued patents may provide a source of relevant evidence to determine how a term or phrase has been used or understood by one skilled in the art. That is true whether or not the prior art was referenced in the specification or the prosecution history. *See Arthur A. Collins, Inc. v. Northern Telecom, Ltd.*, 216 F.3d 1042, 1044–45 (Fed.Cir.2000) ("When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning."); see also *Vitronics*, 90 F.3d at 1583. Within the hierarchy of extrinsic evidence, prior art is a more reliable source of evidence as to the meaning of words or phrases in a patent claim than expert testimony. *Id.*

### b. Technical Treatises And Technical Articles.

■ As with prior art, treatises and technical articles, particularly those of note, wide circulation, or likely to be utilized as standard desk reference material by an ordinary person skilled in the art at the time of the patent's issuance may be consulted in the discretion of the court. *See Dow Chemical Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed.Cir.2001) ("[Technical treatises, which are extrinsic evidence, hold a 'special place' and may sometimes be considered along with the intrinsic evidence when determining the ordinary meaning of claim terms."); *see also Vitronics*, 90 F.3d at 1584 n. 6 ("Although technical treatises and dictionaries fall within the category of extrinsic evidence, as they do not form a part of an integrated patent document, they are worthy of special note. Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

### c. Expert Testimony.

■ The United States Court of Appeals for the Federal Circuit has instructed federal trial judges that expert testimony may be helpful in aiding an understanding of the patent, but not for the purpose of varying or contradicting the claims. *See Markman I*, 52 F.3d at 981. The United States Court of Appeals for the Federal Circuit, however, has cautioned that expert testimony may be considered, but only insofar as it aids the trial court to understand the claim language, the specification, or the prosecution history. *See Vitronics*, 90 F.3d at 1584 ("Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."); *see also CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1318 (Fed. Cir.2000) (holding that when "the intrinsic evidence is unambiguous, it is improper for a [federal trial] court to rely on extrinsic evidence such as expert testimony when construing disputed claim limitations."); *but see Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1308 (Fed.Cir.1999) ("*Vitronics* does not prohibit courts from examining extrinsic evidence, even when the patent document is itself clear."); *see also id.* (emphasizing that *Vitronics* "does not set forth any rules regarding the admissibility of expert testimony into evidence.... [and] there are no prohibitions ... on courts hearing evidence from experts. Rather, *Vitronics* merely warned courts not to *rely* on extrinsic evidence in claim construction to contradict the meaning of claims discernible from thoughtful examination of the claims, the written description, and the prosecution history-the intrinsic evidence."); *Key Pharm.*, 161 F.3d at 716 ("[T]rial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues, and trial courts have broad discretion in this regard.").

Federal trial courts also have been advised that "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes,* 182 F.3d at 1309. In that case, Circuit Judge Rader wrote "Additional Views," joined by Circuit Judge Plager, to emphasize that *Vitronics* provides "good counsel when it urges trial judges to focus on the patent document—notably the claims themselves— to ascertain the scope of patent coverage." *Id.* at 1314. Federal trial judges, however, may turn to expert testimony to: "(1) supply a proper technological context to understand the claims (words often have meaning only in context), (2) explain the meaning of claim terms as understood by one of skill in the art (the ultimate standard for claim meaning), and (3) help the trial court understand the patent process itself (complex prosecution histories—not to mention specifications—are not familiar to most trial courts.")." *Id.* (citations omitted); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 976–77 (Fed. Cir.1999) *cert. denied,* 529 U.S. 1066 (2000) (reversing a federal trial court and stating that a court "may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence.").

#### d. Scientific Or Industry Specific Dictionaries.

Although many post-*Markman II* decisions have attempted to clarify the permissible use of dictionaries to define words in a claim, the United States Court of Appeals for the Federal Circuit's initial guidance in *Markman I* remains sound: "The district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and prosecution history." *Markman I,* 52 F.3d at 981; *see also Toro Co. v. White Consol. Indus., Inc.,* 199 F.3d 1295, 1299 (Fed.Cir.1999) ("[The trial court should] not rely solely on a dictionary of general linguistic usage, but would understand the claims in light of the specification and the prior art, guided by the prosecution history and experience in the technologic field.").

#### e. Inventor Testimony.

■ The United States Court of Appeals for the Federal Circuit appropriately has viewed post-issuance testimony by a patent's inventor as subjective opinion about the meaning of claim terms that is entitled to little or no weight. *See, e.g., Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 706 (Fed.Cir.1997) ("The testimony of an inventor often is a self-serving, after-the-fact attempt to state what should have been part of his or her patent application."); *Engel Indus., Inc. v. Lockformer Co.,* 96 F.3d 1398, 1405 (Fed.Cir.1996) ("[The inventor's] subjective intent is of little or no probative weight in determining the scope of the claims, except as documented in the prosecution history.").

### 3. A Federal Trial Court Should Construe Claims To Preserve A Patent's Validity Only Where All Other Tools Of Claim Construction Are Exhausted.

■ Where ambiguity remains after reviewing intrinsic evidence in construing patent claims, two doctrines have been employed to preserve the patent's validity. The United States Court of Appeals for the Federal Circuit has advised federal trial judges that claims should be construed to preserve a patent's validity, however, this presumption is applicable only "where the proposed claim construction is 'practicable,' ... based on sound claim construction principles, and does not revise or ignore the explicit language of the claims." *Generation II Orthotics Inc. v. Med. Tech. Inc.,* 263 F.3d 1356, 1365 (Fed. Cir.2001); *see also Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 914 (Fed.Cir. 2004) (holding that "unless the court concludes, after applying all the available tools of claim construction that the claim is still ambiguous, the axiom regarding the construction to preserve the validity of the claim does not apply"). Likewise, the United

States Court of Appeals for the Federal Circuit has emphasized that the doctrine of claim differentiation is to be reserved only for those cases where neither intrinsic nor extrinsic evidence leads to a definite definition. *See Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n. 15 (Fed.Cir.1990) ("[The doctrine of claim differentiation] although well established in our cases cannot overshadow the express and contrary intentions of the patent draftsman.").

### 4. The Import Of *Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed.Cir.2004).

To the displeasure of the court, none of the parties initially recognized, much less discussed, the pending *en banc* consideration of *Phillips v. AWH Corp.*, 363 F.3d 1207, *reh'g en banc granted, j. vacated*, 376 F.3d 1382 (Fed.Cir.2004) (*"Phillips"*) in their pre-claim construction briefs. *See Honeywell Int'l, Inc. v. United States*, 65 Fed.Cl. 809, 810–11, 2005 WL 1415441 (Jan. 26, 2005, amended and reissued June 14, 2005) (Memorandum Opinion and Order); *see also* TR at 8–13. In *Phillips*, the United States Court of Appeals for the Federal Circuit, sitting *en banc*, requested briefing and argument concerning seven core claim construction issues:

1. Is the public notice function of patent claims better served by referencing primarily to technical and general purpose dictionaries and similar sources to interpret a claim term or by looking primarily to the patentee's use of the term in the specification? If both sources are to be consulted, in what order?

2. If dictionaries should serve as the primary source for claim interpretation, should the specification limit the full scope of claim language (as defined by the dictionaries) only when the patentee has acted as his own lexicographer or when the specification reflects a clear disclaimer of claim scope? If so, what language in the specification will satisfy those conditions? What use should be made of general as opposed to technical dictionaries? How does the concept of ordinary meaning apply if there are multiple dictionary definitions of the same term? If the dictionary provides multiple potentially applicable definitions for a term, is it appropriate to look to the specification to determine what definition or definitions should apply?

3. If the primary source for claim construction should be the specification, what use should made of dictionaries? Should the range of the ordinary meaning of claim language be limited to the scope of the invention disclosed in the specification, for example, when only a single embodiment is disclosed and no other indications of breadth are disclosed?

4. Instead of viewing the claim construction methodologies in the majority and dissent of the now-vacated panel decision as alternative, conflicting approaches, should the two approaches be treated as complementary methodologies such that there is a dual restriction on claim scope, and a patentee must satisfy both limiting methodologies in order to establish the claim coverage it seeks?

5. When, if ever, should claim language be narrowly construed for the sole purpose of avoiding invalidity under, *e.g.*, 35 U.S.C. §§ 102, 103, and 112?

6. What role should prosecution history and expert testimony by one of ordinary skill in the art play in determining the meaning of the disputed claim terms?

7. Consistent with the Supreme Court's decision in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and our *en banc* decision in *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed.Cir.1998), is it appropriate for this court to accord any deference to any aspect of trial court claim construction rulings? If so, on what aspects, in what circumstances, and to what extent?

*Phillips*, 376 F.3d at 1383.

In post-claim construction hearing briefs, however, the parties rationalized their oversight by advising the court that the resolution of *Phillips* would not affect the claim construction in this case because the '914 claims are not dependent upon dictionary definition, but rather can be resolved by the claim language or description of the '914

invention, as set forth in the specification and embodiments therein. *See* 4/1/05 Honeywell Brief at 9–10; *see also* 4/1/05 Gov't Brief at 12.

The Government's proposed construction of the term "red color band" in this case primarily relied on a dictionary definition. *See* 1/14/05 Def. Joint Brief at 30–33; 4/1/05 Gov't Brief at 37; 4/15 Gov't Brief at 21. In *Phillips,* however, the Government wherein argued that "[p]rimary reliance on dictionaries that are not part of the patent's public record subordinates the patentee's own explanation of his invention in favor of a dictionary definition never at issue during the patent prosecution before the USPTO." 9/20/04 Brief for the United States as *Amicus Curiae* at 9, *Phillips v. AWH Corp.* The Government explained to the court that its proposed construction of the "red color band" was misstated and taken out of context by the court in light of the Government's adherence to an "approach approved by the [United States Court of Appeals for the] Federal Circuit in cases such as *Key Pharmaceuticals v. Hercon Laboratories Corp.,* 161 F.3d 709 (Fed.Cir.1998)." *See* 4/15/05 Gov't Brief at 3. The Government also was quick to point out that Honeywell equally was culpable of relying on extrinsic evidence in its proposed construction of the terms: "display system," *see* 12/23/04 Honeywell Brief at 9–11 (citing *e.g.,* WEBSTER'S; IEEE DICTIONARY; Dr. Task, TR at 31–32, 35; Mr. Tannas, TR at 34, 129); "optical filter," *see also id.* at 15–19 (citing, *e.g.,* APPLIED, OPTICS; MCGRAW HILL; Mr. Tannas Initial Report (PMX 34 at ¶ 15); Mr. Tannas, TR at 168–71, 279–80, 351–52; Dr. Task, TR at 19, 31–32, 244–45, 247, 249–56); and "color band," *see also id.* at 24–26 (citing *e.g.,* Webster's; MCGRAW HILL; Mr. Tannas Initial Report (PMX 34 at ¶ 17); Mr. Tannas, TR at 183; Dr. Task's Initial Report ( PMX 35 ¶ ¶ 27–28); Dr. Task, TR at 58, 63–65, 70–71, 127–29).

Since the infringement and potential damage claims in this case are scheduled for trial on August 1, 2005, the court has decided to issue this claim construction Memorandum Opinion, reserving the right to amend these constructions prior to the issuance of a Final Judgment, in light of any subsequent appellate precedent, including *Phillips,* and any further evidence that may be adduced at trial.

**D. Construction Of Certain Claims Of United States Patent No. 6,467,914.**

At a January 31, 2005–February 4, 2005 claim construction hearing, initially the parties requested that seventeen claims of the '914 patent be construed by the court. On April 14, 2005, the parties filed a Joint Stipulation to evidence their agreement of the meaning of six claims. Therefore, the court now is required only to construe the eleven claims that remain in dispute.

For each claim term or phrase at issue, the court has set forth the parties' arguments before, during, and after the claim construction hearing to highlight those occasions where there was a shift, which sometimes was subtle and at other times stark. The court also has made liberal use of the transcript of the claim construction hearing to highlight the areas of the court's inquiry and representations made by counsel therein and to underscore the court's disposition of each word or phrase of a claim that was construed.

As a predicate to the following patent claim construction, the court has determined that one of ordinary skill in the art in 1985 would be knowledgeable about night vision compatible aids, compatible instrument and panel lighting, and manufacturing displays for military cockpits.

**1. "Display System."**

Preamble language common to both Claim 1 and Claim 2 of the '914 patent states that the invention is: "*A display system* for use in association with a light amplifying passive night vision aid and a local color display including a local source of light[.]" *See* '914 patent, col. 5, ll. 31–33, col. 6, ll. 11–13 (emphasis added).

The parties have proposed the following competing constructions of "display system" and other claim language for the court's consideration:

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light: No further construction is necessary. To the extent preamble needs to be construed at all, it should be construed as follows: complex unity subject to a common plan or serving a common purpose that combines a light amplifying passive night vision aid and a local color display including a local source of light. | "Display System for Use in Association With" means two or more filters, which are used in combination with a night vision aid, such as night vision goggles, and a local color display, to make the color display compatible with the night vision aid. For use in association with: in combination with. |

*See* Honeywell *Markman* Slide 35; Gov't *Markman* Slide 002 (bold added by parties).

### a. Honeywell's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Honeywell's pre-hearing brief informed the court that no further construction of the language of the preambles common to both Claim 1 and Claim 2 was necessary. *See* 12/23/04 Honeywell Brief at 8. In the alternative, if the court decided to construe "display system," Honeywell urged the court to consider the entire preamble, not just the first seven words. *Id.* In addition, Honeywell proffered that either a traditional or specialized dictionary definition supported the "ordinary meaning" of "*system* as a complex unity formed of often diverse parts," which in this case includes, "a light amplifying passive night vision *aid* and a local color display including a local source of light." *Id.* (emphasis added). Honeywell cautioned, however, that the "fact that the *display system* is recited as being *for use in association with* . . . *a local color display* does not require that the display system be distinct from the local color display." *Id.* at 16 (emphasis added).

Next, Honeywell turned to the specification and figures therein to support the proposition that the "filter(s) may be *either* in front of the local color display or *within* the display." *Id.* at 10 (emphasis added); *see also id.* at 10–11 (*comparing* '914 patent, figure 1 showing filter 23 in front of 17, the local color display, *with* '914 patent, figure 3 showing filters 61, 62, and 63 within 37, the local color display).

FIG. 1

'914 patent, figure 1, sheet 1 of 2.

FIG. 3

'914 patent, figure 3, sheet 2 of 2.

### ii. At The Claim Construction Hearing.

At the claim construction hearing, initially Honeywell requested the court construe only the words "display system." TR at 126 ("I think perhaps on reflection the two terms, the two words that should be construed are 'display system.' "). After further inquiry by the court, Honeywell decided to request construction of "display system," as well as the remainder of the preamble language common to both Claims 1 and 2:

THE COURT: So you're arguing that the words that now—you want to argue just about the words "display system" and not the rest?

HONEYWELL'S COUNSEL: We are arguing ... in our position on the whole preamble, the word—we're going to *take display system first,* and then *address how* it's implicated *in the balance of the preamble*[.]

TR at 128 (emphasis added). Thereafter, Honeywell argued that "display system" means "the entire combination ... [rather than being] confined to the two components[.]" TR at 129. In that regard, Honeywell argued "[t]hat display has to be a local color display or the local source of light, and it's got to have a night vision aid." TR at 152.

### iii. Post–Claim Construction Hearing Briefs.

During post-hearing briefing, Honeywell argued that "display system" should be construed in accord with the ordinary meaning of "a system that *includes* a display or display functionality." 4/1/05 Honeywell Brief at 12 (emphasis added) and n.2 (citing IEEE DICTIONARY; PMX 28 at 264, 915; Lockheed PPT at 70–72); *see also* DMX 36 at D000087 (citing prosecution history where examiner construed "display system" to refer to a system having a "plurality of CRT's"); PMX 44 at 5:35 (Miller, '562 patent) ("display system" refers to "a system that includes a color CRT display and a contrast enhancement filter."). At this juncture, however, Honeywell appeared no longer to be arguing that a "display system" included both a night vision aid and a local color display, but only a "display or display functionality." *Compare* 12/23/04 Honeywell Brief at 8–9 *with* 4/1/05 Honeywell Brief at 12.

### b. The Government's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

The Government's pre-hearing brief represented that the preamble language "establishes that this display system is comprised of two or more filters and not [the night vision goggles] and the local color display." 1/14/05 Def. Joint Brief at 8–9 (citing Ex. 1 '914 patent, col. 5, ll. 31–33 and col. 6, ll. 11–14). The Government also asserted that

the '914 patent specification supported its construction, because the "Background of the Invention" section of the specification provided that: "[t]he invention relates to electronic passive night vision aids *and* to a system for operating such night vision aids *in conjunction with* a local display such as a cockpit display." *Id.* at 9–10 (emphasis added) referring to '914 patent, col. 1, ll. 19–21. In addition, the "Summary of the Invention" section of the specification provided that: *"In accordance with* the present invention, an ANVIS aid, such as an ANVIS goggles set, is provided with an optical filter. A second optical filter blocking light in an opposite sense from the first optical filter is placed over displays, which may otherwise present light that would interfere with the ANVIS." '914 patent, col. 2, ll. 11–15 (emphasis added).

The Government further advised the court that the prosecution history established that the original '914 patent described an invention with "full color display which uses separate primary color light sources is made compatible with an ambient night vision (ANVIS) aid." Ex. 7 '914 Wrapper D0005. During prosecution, however, Honeywell distinguished the '914 patent invention from prior art representing that: "In order to enable highly-sensitive night vision (ANVIS) goggles to be operated in an environment having full color displays, it is necessary to provide a technique to protect the ANVIS goggles .... *The present invention accomplishes that by filtering* the display light with optical filters *and by providing an additional optical filter* at the night vision aid." Ex. No. 7 '914 Wrapper D000109 (emphasis added).

### ii. At The Claim Construction Hearing.

At the claim construction hearing, the Government stated that it was seeking construction of more than "display system," but rather the phrase "display system for use in association with[.]" TR at 165.

GOVERNMENT'S COUNSEL: [T]he display system is clearly the noun .... I think the "for use in association with" defines a separate clause that is a description

of the intended use of the display system and nothing more.

THE COURT: Well, what do you do with the "including" phrase?

GOVERNMENT'S COUNSEL: Well, we believe that the "including" phrase, including a local source of light refers explicitly to the local color display. So the local color display includes a local source of light[.] ... The specification makes very clear that the "including" phrase refers to the local color display, and not to the display system[.] ... Let's go to the specification.... It states that, and it uses the phrase "system." "The invention relates to an electronic passive night vision aids and to a system for operating such night vision aids in conjunction with a local display, such as a cockpit display ['914 patent, col. 1, ll. 19–21]." ... the system is something that brings them together[.]

TR at 169–172.

### iii. Post–Claim Construction Hearing Briefs.

During post-hearing briefing, the Government conceded that "display system" means "two or more filters," but that the "proper construction of 'for use in association with' ... shows that the display system, comprising two or more filters, is intended to be used in combination with a night vision aid and a local color display, but that these elements are not *part* of the claimed invention." 4/1/05 Gov't Brief at 13 (emphasis in original). The Government emphasized that the '914 patent specification referred to "system" only once and in a way that supported the Government's construction, *i.e.,* the "Technical Field" portion of "Background of the Invention" stated: "This invention relates to electronic passive night vision aids and to a *system* for operating such night vision aids in conjunction with a local display such as a cockpit display." DMX 1 ('914 patent, col. 1, ll. 19–21). Accordingly, the Government concluded that this phrase must mean that filters are the only required elements of the invention and that a night vision aid and a local color display are independent devices that operate in conjunction with the display system. *See* 4/1/05 Gov't Brief at 15–16. The Government also urged that during the '914 patent prosecution history, in response to the Examiner's rejection for obviousness in light of USPTO No. 3,517,122 (Maass), Honeywell represented that the '914 patent filters were for a different purpose than generating RBG color signals, *i.e.,* Honeywell filters "provide a technique to protect the ANVIS goggles from the relatively high intensity light produced by the local cockpit displays. The present ['914 patent] invention accomplishes that by filtering the display light with optical filters." 4/1/05 Gov't Brief at 16 (citing DMX 7 at DE–328).

### c. Intervenor Lockheed Martin's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's construction of "display system" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 8–14.

### ii. At The Claim Construction Hearing.

The court considered the following colloquy at the claim construction hearing relevant to the court's decision to construe the entire preamble language common to Claim 1 and Claim 2.

LOCKHEED MARTIN'S COUNSEL: And it's one of the reasons you can't turn to a dictionary definition and say let's take the dictionary definition of system, or let's take the dictionary definition of system as modified by display. You really have to look to a definition of system as modified by display, and is modified by the phrase "for use in association with" a night vision goggle and a local color display, including a local source of light, and that's the only way you can come to a definition, and it's one of the reasons why you can't rely on a dictionary here.

TR at 183.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: [Honeywell's counsel] in his initial brief indicated that the preamble did not need to be construed because it simply discussed the purpose, if you will, of the invention. I

believe he has moved away from the arguments from what I heard today, would indicate that he understands that the preamble does need to be construed[.]

TR at 184.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: Your Honor, we were discussing the preamble, and you can see from the prosecution history—... the preamble was considered to be a limitation on the claim by Honeywell. Because it's a limitation, it needs to be construed.... [W]e have an extract from the prosecution history where we deal with this issue of indefiniteness that we talked about before.... [T]he words "in association with" to be "in combination with."

THE COURT: Well, this was the patent examiner who felt it was indefinite.

LOCKHEED MARTIN'S COUNSEL: Yes, this is the patent examiner finding that it was .... [I]ndefiniteness is one of the first things you look for when you're looking at patent issue, and here they found indefiniteness, and a change was made in the preamble to indicate that the—basically changed it so the preamble read "in combination with a night vision goggle and a local display, a display system comprising."

TR at 186–87.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: Also, Honeywell tried to argue around the Patent Office's prior art rejections, and successfully did it by claiming that its display system that was described in the body of the claim was distinct from prior art systems. That's the type of thing that brings the preamble into play as a claim limitation.

TR at 188.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: [T]he night vision aid and the local color display were essential limitations because, as the patent acknowledges, the claimed novelty of the invention is the combination of filters which make up the display system, with the night vision goggle, and the local color display, and the only reference to night vision goggles and local color display is found in the preamble. The preamble also needs to be—... construed because the preamble is necessary to give life, meaning, and vitality to the claims.

TR at 189.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: So turning to the specification, there are two pieces of the specification that are relevant to the definition of the display system, and both of those are consistent with the definition that—... in the specification that needs to be considered when looking at the definition of display system, and it is the statement in the specification that you find under the heading "Background of the Invention," which states: "This invention relates to electronic passive night vision aids and to a system for operating such night vision aids in conjunction with a local display such as a cockpit display." My point in quoting this is that this statement support[s] the interpretation that we have been discussing and it shows that there are three parts to this invention: night vision aids, a system for operating those aids, and local displays. So it is a night vision aid and a system that operates those night vision aids in conjunction with a local display such as a cockpit display.... [T]he summary of the invention in the 914 patent, and it provides that, and I quote: "In accordance with the present invention, an ANVIS aid such as an ANVIS goggle set is provided with an optical filter. A second optical filter blocking light in an opposite sense from the first optical filter is placed over the displays which may otherwise present light that would interfere with the ANVIS." So again what we see here is we see a reference to the ANVIS aid in the night vision goggles, a local display, and the filters, each of them forming their own separate functions.

TR at 196–99.

\* \* \* \* \* \*

THE COURT: I'm not sure I read that that way in 44, because it says the present invention basically includes the goggles

that have a filter, and then there is a second optical filter blocking light in the opposite direction. I don't read it the way you do. What am I missing?

LOCKHEED MARTIN'S COUNSEL: Well, it says you have with the present invention an ANVIS, such as goggles.

THE.COURT: Got it.

LOCKHEED MARTIN'S COUNSEL: Which is provided with an optical filter.

THE COURT: Got it.

LOCKHEED MARTIN'S COUNSEL: Which [are] going to be part of the system.

TR at 198–99.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: I am attempting to show that the display system is in fact separate from the local color display, and the night vision goggles, I have a couple more slides along those lines that I would like to show the Court. The first is slide No. 58, and in this slide Honeywell is arguing in response to an action from the Patent Office that its claimed display system was distinct from prior art display systems that were cited when the Patent Office rejected its complaints.

THE COURT: Remind me what year this was that the PTO had this rejection....

GOVERNMENT'S COUNSEL: It's September 9, 1986, and I know we were referring to—I believe Lockheed is also referring to Bates Nos. D000108 to 109, I believe.

THE COURT: Okay. Now, I have on my chronology, see I just did my own little thing, November 13, 1989, I said PTO issued a notice of allowability, and they did that after this episode—

GOVERNMENT'S COUNSEL: Right, right.

THE COURT: —in response. Okay.

GOVERNMENT'S COUNSEL: That would be right.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: So in order to show that their claimed display system was distinct from prior art display systems they argued to the Patent Office.

It says, "In order to enable highly sensitive night vision ANVIS goggles to be operated in an environment having full color displays, it is necessary to provide a technique to protect the ANVIS goggles from relatively high intensity light produced by the local cockpit displays." And it goes on and states, "The present invention accomplishes that by filtering the display light with optical filters and providing an additional optical night vision aid. The filter for the night vision aid is adapted to block light from the preferred range of frequencies, thereby effectively blocking out light from the display." So again what this tells us is there is a display, the display is generating light, and their invention says let us filter that light so that we can keep offending light from reaching the night vision goggles. If we turn to slide 59, and here we have—again this is from Exhibit 7, the 914 file history, and the Bates number here is D000110. Honeywell makes another statement to the Patent Office which shows that its display system is operationally separate from the local color display. Here it says, "It is respectfully submitted that the prior art neither shows nor suggests that a multiple monochromatic tube color display be provided with separate filters in order to provide enhanced filtration of multi-color displays." So again what they are saying is is that their invention is to provide this enhanced filtration. This is the filtration that would filter out the offending light from reaching the night vision goggles.

THE COURT: I would read that that their enhancement would be the multiple monochromatic tube color display, which includes—no, no, no—which is provided together with, okay, separate displays, and it's different than what you said.

LOCKHEED MARTIN'S COUNSEL: Well, I would say I was reading it. "Respectfully submit that the prior art neither shows nor suggests that a multiple monochromatic tube color display be provided with separate filters."

THE COURT: What I am saying back to you is what they are saying is that the prior art didn't talk about—

LOCKHEED MARTIN'S COUNSEL: That's correct.

THE COURT: —multiple monochromatic tube color display, but we are now. We meaning—

LOCKHEED MARTIN'S COUNSEL: I think if we read this whole thing in context, what I have done is extract something here, we see the whole contact saying—

THE COURT: Right.

LOCKHEED MARTIN'S COUNSEL: —that they were dealing with a piece of prior art that had multiple monochromatic displays, and in those monochromatic displays the displays were providing different colors, different primary colors that could be combined, and Honeywell tried to distinguish the prior art by saying, wait a minute, we're not just providing multiple monochromatic displays, we are providing a special filter, separate filters, and those separate filters are to give enhanced filtration of multi-color displays in order to achieve the night vision compatibility goal of the invention.

THE COURT: Let me go back and ask something that may be intuitive to you but not necessarily to me. Was the prior art basically tubes that they put filters on, but tubes that did something else, project the real color?

LOCKHEED MARTIN'S COUNSEL: That's correct.

THE COURT: Okay.

LOCKHEED MARTIN'S COUNSEL: What the prior art was you had a prior art display which consisted of three monochromatic tubes, each generating a primary color, red, blue, and green.

THE COURT: Okay.

LOCKHEED MARTIN'S COUNSEL: And through the electronic signals that went into those tubes you can manipulate the intensity of the color.

THE COURT: And that was the way they wanted to address the issue of the redness?

LOCKHEED MARTIN'S COUNSEL: Right, and those three tubes together could give you a full color display. . . .
TR at 208–13.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Lockheed Martin advised the court that one of ordinary skill in the art would construe the preamble phrase "display system for use in association with" to mean "two or more filters which are used in combination with a night vision aid, such as night vision goggles ('NVG'), and a local color display, to make the color display compatible with the night vision aid." 4/1/05 Int. Brief at 10. Lockheed Martin maintained that Honeywell "claimed only a filtering system that would render a full color display compatible with NVG." *Id.* Stated another way, Lockheed Martin contended that Honeywell claimed only: "A (a display system) for use in association with B (a night vision aid) and C (a local color display), comprising: D (a first optical filter or a plurality of filters) and E (a second optical filter or a fourth optical filter)." *Id.* Honeywell did not claim: "A, comprising: B, C, D, and E." *Id.; see also* 4/15/05 Int. Brief at 3–8.

In the court's judgment, Lockheed Martin's post claim construction hearing brief best described the dispute over the term "display system." Lockheed Martin argued that Honeywell's construction asserted that "display system consists of the entire cockpit." 4/1/05 Int. Brief at 10. Stated differently, the filters in Honeywell's display system "may make the local color display [not only] compatible with the NVG, [but also] producing red, green, and blue color bands generated by the three light sources that combine to make a full color image." *Id.* Lockheed Martin argued that "nothing in the claims, the specification[,] or the file history indicate that Honeywell's display system performed any role in the production of the color emitted by the display." *Id.* at 11.

### d. Specific Precedent Governing Construction Of A Patent's Preamble.

The United States Court of Appeals for the Federal Circuit has instructed federal

**436**

trial courts that whether a preamble is treated as a limitation is determined "on the facts of each case in light of the claim as a whole and the invention described in the patent." *Storage Tech. Corp. v. Cisco Sys., Inc.,* 329 F.3d 823, 831 (Fed.Cir.2003); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.* 868 F.2d 1251, 1257 (Fed.Cir.1989) (reviewing the "entirety of the patent [is necessary] to gain an understanding of what the inventors actually invented and intended to encompass by the claim."); *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995) (A claim preamble has the "import that the claim as a whole suggests for it. In other words, when the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.").

Where the written description "consistently uses" specific terms to refer to the "invention as a whole, ... [the] preamble of each claim serves as a convenient label [or descriptive name] for the invention as a whole." *Storage Tech.,* 329 F.3d at 831 (citing *IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1434 (Fed.Cir.2000)) (merely giving a descriptive name to the claimed invention does not limit the scope of the claim). Where the preamble "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention," it is not limiting. *See Rowe v. Dror,* 112 F.3d 473, 478 (Fed.Cir.1997). On the other hand, where there is no "meaningful distinction to be drawn between the claim preamble and the rest of the claim, for only together do they comprise the 'claim.' ... [T]he preamble ... is said to constitute or explain a claim limitation." *Pitney Bowes,* 182 F.3d at 1305.

█ In addition, where claim language derives an antecedent basis from the preamble, it may be considered as a necessary component of the claimed invention. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed.Cir. 2002) (quoting *Pitney Bowes,* 182 F.3d at 1305) ("In general, a preamble limits the invention if it recites essential structure or

steps, or if it is 'necessary to give life, meaning and vitality' to the claim.").

**e. The Court's Construction Of "A Display System For Use In Association With A Light Amplifying Passive Night Vision Aid And A Local Color Display, Including A Local Source Of Light, Comprising" In This Case.**

█ In this case, the court has decided to construe all of the operative preamble language common to both Claim 1 and Claim 2 of the '914 patent, *i.e.,* "A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light," as necessary to understanding the '914 patent and therefore as a limitation thereof. *See Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1339 (Fed.Cir.2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").

The court begins with "system" in the aforementioned phrase modified by the adjective "display" to describe the general purpose or function of the system. The prepositional phrase "for use in connection with," applies to two other nouns that are objects of this phrase, *i.e.,* "aid" and "display." "Light amplifying," "passive" and "night vision" are adjectives modifying "aid." Likewise, "local" and "color" are adjectives modifying "display," when it is used as a noun. The placement of the terms "night vision aid" and "local color display" in the prepositional phrase prior to the verb "comprising" advised one of ordinary skill in the art that the claimed system may include or be used together or in combination with a "night vision aid" and a "local color display." *See* '914 patent, col. 5, ll. 22–28.

From the use of the verb "comprising," the court also construed the preamble language common to both Claims 1 and 2 as "presumptively open-ended," *i.e.,* encompassing display systems that include a first optical filter, as described, and a second optical filter, as described. *See Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367, 1371–72 (Fed.Cir.

2005) (Where a claim uses the "word 'comprising' transitioning from the preamble to the body [it] signals that the entire claim is presumptively open-ended.... Because the patentee invoked this open-ended treatment ... the scope of [the] claim ... encompasses all [display systems] satisfying the elements set forth in [each] claim."); *see also Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1347 (Fed. Cir.2001) ("When a patent claim uses the word 'comprising' as its transitional phrase, ... [it] creates a presumption that the body of the claim is open. In the parlance of patent law, use of[the] transitional phrase 'comprising' creates a presumption that the recited elements are only a part of the device, and that the claim does not exclude additional, unrecited elements."); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir.1997) (" 'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added."); MANUAL OF PATENT EXAMINING PROCEDURE § 2111.03 (8th ed.2001) ("MPEP"). In addition, the court has determined that the '914 patent optical filters are "essential elements" thereof and that a night vision aid and local color display may be included or used together or in combination with these filters. *See* '914 patent, col. 5, l. 31. Claim 2 encompassed all display systems "comprising" a plurality of three filters, as described, and a fourth filter, as further described. *See* '914 patent, col. 6, ll. 12–28.

Therefore, the court construes the operative preamble language as follows:

A system comprised of optical filters that can be used in combination with an aid, with light amplifying, passive, and night vision qualities, and a display of colors that includes a source of light perceptible by the night vision aid.

*See Pitney Bowes*, 182 F.3d at 1306 ("If the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance of the claim.").

Since the court has determined that the preamble language common to Claims I and 2 is unambiguous and not contradicted by the specification, the court rejects Honeywell's entreaty that it consider extrinsic evidence to interpret this claim, including the IEEE DICTIONARY and the testimony of the experts. *See, e.g.*, 12/23/04 Honeywell Brief at 9–11; 4/1/05 Honeywell Brief at 12; 4/15/05 Honeywell Brief at 1.

### 2. "Local" And "Color Display."

█ The term "local color display" appears in the preamble to Claim 1: "A display system for use in association with ... local color display including[.]" '914 patent, col. 5, ll. 31–32. The preamble to Claim 2 also utilizes the same language. *See* '914 patent, col. 6, ll. 11–13. In addition, in Claim 1(a), the '914 patent discusses "local color display" in the first two lines: "a first optical filter that filters light from the local color display[.]" '914 patent, col. 6, ll. 1–2. Claim 2(a)(1) also discusses "local color display" as "a plurality of filters at the local color display[.]" '914 patent, col. 6, 1. 15.

The parties have proposed the following competing constructions of the term "local color display:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| **Local:** located in the vicinity of the night vision aid | **Local color display:** a functional device in proximity to an operator or an observer within a defined area, such as a cockpit, that presents |
| **Color display:** device that provides a visual representation of data using more than one color | information in a visual format in more than one perceptible color |

Honeywell *Markman* Slides 60, 68; Gov't *Markman* Slide 008 (bold added by parties).

### a. Honeywell's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Honeywell's pre-hearing brief requested a separate construction of the word "local" and the term "color display," because "[t]he problem addressed by the '914 patent is interference between a full color display and a night vision aid ... [and][s]uch interference occurs

only when the full color display is operated in the vicinity of the night vision aid[,] ... [accordingly, the court was advised that] the most appropriate construction for *local* is located in the vicinity of the night vision aid." *See* 12/23/04 Honeywell Brief at 11 (quoting '914 patent, col. 2, ll. 1–3) (emphasis in original) ("[A] night vision aid such as AN-VIS goggles [is to] be operable while a full color display is presented in the vicinity of the goggles[.]").

Honeywell criticized the Government's proposed construction of *"local,* as incorporated in its construction of *local color display,* [because] [f]irst, in the context of the patent, *local* means in the vicinity of the night vision aid, not in the vicinity of an operator or observer." *Id.* at 12 (emphasis in original) (citing Dr. Tannas). Second, the court was warned that the Government's proposed construction "introduces an unnecessary and extraneous requirement, namely that the *local color display* be 'within a defined area, such as a cockpit.' Nothing in the language of the claims requires this limitation." *Id.* (emphasis in original). Honeywell insisted that "[t]he claims are broad enough to encompass a *local color display* that is used in the vicinity of a *night vision aid,* but necessarily not in a defined area, such as a cockpit." *Id.* (emphasis in original). Moreover, Honeywell cited the specification as instructing that " 'the present invention can be used by other viewers in association with environments other than an aircraft cockpit' without placing any limitation on the type of environment in which the invention can be used." *Id.* (citing '914 patent, col. 2, ll. 49–59) (emphasis in original).

### ii. At The Claim Construction Hearing.

At the claim construction hearing, Honeywell's counsel pointed out that the term "local" appears "twice in the preamble, first, to modify color display, to make it a local color display, and second, to modify source of light, to make it a local source of light." TR at 224. Honeywell's counsel further explained:

HONEYWELL'S COUNSEL: The normal rule for claim terms is that the same term gets the same construction each time it appears in the claim. Therefore, Honeywell took the approach to define local for all purposes. The only exception to that rule is where the specification or elsewhere in the intrinsic evidence the patentee clearly indicated that the term should have a different meaning in different contexts, and because we didn't see that in the claim, we defined local by itself to have the same meaning in each phrase. The Defendants, on the other hand, construed local color display and local source of light.... They say that local is in proximity to an operator or observer within a defined area such as a cockpit. But Honeywell's position is local is simply located in the vicinity of the night vision aid.

THE COURT: Why does it make a difference to you?

HONEYWELL'S COUNSEL: I'm not sure why it makes a difference. We tried to define the term as we thought it—in accordance with the meaning given to it in the patent. Local does have a unique meaning in the patent. The whole patent is talking about the relationship between the light emitted from a display, and the night vision aid, and the light interferes with the night vision aid. The invention solves that problem. So local has the meaning of location, where are things located.

THE COURT: In relationship to something.

HONEYWELL'S COUNSEL: In relationship to something. I think the key here is the relationship between where the display is located in relation to the night vision aid. The operator, well, yes, the operator might be wearing night vision goggles, so that might be the same definition, but it might not in all cases. For example, if the display is located in the rear of the aircraft where there are no night vision goggles, but there is an operator viewing the display, then it wouldn't make sense to define local for local color display as being near an operator because that is not what's meant by the patent.

THE COURT: So if the operator is someplace totally different, then you don't—

HONEYWELL'S COUNSEL: That's right.

THE COURT: Obviously your patent is not going to be relevant—

HONEYWELL'S COUNSEL: That's right.

THE COURT: —to that fellow in the back seat.

HONEYWELL'S COUNSEL: Precisely. It's just as simple as that. We tried to define it as we understood the patent. So the first issue is ... does local have a different meaning in those two phrases. Honeywell's answer to that is no, it has the same meaning. The second issue is does local, is that in relation to the night vision aid or the operator or the observer? And Honeywell's answer to that is it's in relation to the night vision aid. And the third question is, is local limited to a defined area such as a cockpit? And we think the term is not so limited.... I don't think Defendants have pointed to any place in the intrinsic evidence to indicate that the term should have a different meaning and a different—

THE COURT: But how does it harm you if I construe the language the way that the Defendant wishes to have it construed?

HONEYWELL'S COUNSEL: I think it's—I'm not sure what they are trying to accomplish by "in proximity to an operator" or—

THE COURT: Well, ... I'm just asking you does it make any difference to you.

HONEYWELL'S COUNSEL: Not that I know of, but I don't want to have it misconstrued because I don't know what's coming down the pike. And within a defined area though, such as a cockpit, I think that does harm us, because I don't think the invention is limited to cockpit applications.

THE COURT: Give me an example.

HONEYWELL'S COUNSEL: An example would be—we gave the example later in our presentation of a foot soldier carrying a PDA and wearing night vision goggles, so there is light from the display.

THE COURT: All right, I need a PDA definition here.

HONEYWELL'S COUNSEL: Personal computer, like a palm pilot or—

THE COURT: Oh, okay, got it. All right. So he's carrying a palm pilot with his goggles on.

HONEYWELL'S COUNSEL: Right, and he's in a open area. There is no confined area such as a cockpit.... Like a handheld GPS as an example, Your Honor.

THE COURT: Okay, so?

HONEYWELL'S COUNSEL: I mean, in this case we're not aware of any such—

THE COURT: But that circumstance has nothing to do with your patent.

HONEYWELL'S COUNSEL: Well, as far as we know reading the claims, it would have something to do with the patent.

THE COURT: Why? You don't have the two pieces that you're looking for, the display system.

HONEYWELL'S COUNSEL: The display would be the PDA, the palm pilot with the screen that's lite, and light coming out of that display.

THE COURT: And you're saying ... there is no filter on that, and there is nothing inside the machine that—

HONEYWELL'S COUNSEL: Well, you certainly could put the night vision filter concept in a PDA. There is nothing in the claim that says you couldn't. Just because the example is given in the patent of a cockpit and a pilot—

THE COURT: That's a much broader reading of display[.]

HONEYWELL'S COUNSEL: I don't think—

THE COURT: The display was the box. I mean, I'm pretty sure that's exactly the way you defined it. Here is the display.

HONEYWELL'S COUNSEL: We were talking about display system being—

THE COURT: Yes.

HONEYWELL'S COUNSEL: —a comprehensive system.

THE COURT: Right.

HONEYWELL'S COUNSEL: That included the display, and the night vision aid, and the filters. But the local color display is just that. It's a color display. It has to

have more than one color. It has to display information to a viewer, and local places it in the vicinity of a night vision aid. But other than that the claim isn't limited. It doesn't say cockpit display. It isn't necessarily an instrument that's in an airplane.

THE COURT: Well, that went to . . . my question about who was the person that's skilled in the art.

HONEYWELL'S COUNSEL: Well, the history of the invention definitely goes back to aircraft and aviation.

THE COURT: I don't have any trouble with that, but I guess I—I'm having difficulty foreseeing whatever claims you may want to assert that may not even be in this case that are broader.

HONEYWELL'S COUNSEL: But technology expands. Somebody invented the personal computer, but nowadays we put computers in everything from dishwashers to microwaves to television. They are all ubiquitous, but that doesn't mean that the core invention of the computer isn't in these various devices. If the claim doesn't say cockpit, it's not limited to a cockpit.

TR at 225–31.

\* \* \* \* \* \*

THE COURT: [B]ut one does have some sense about when privilege is given up for a time period from the public to someone, what do they get for that period, and it cannot be the universe. It's got to be something less than the universe, in my view.

HONEYWELL'S COUNSEL: Well, I think we've heard many times from opposing counsel the claims are king, and we agree with that principle, the claims are king. . . . And one of the concepts that comes out of Federal Circuit case law, the *Rennashaw* case, for example, stresses the importance that you have to find a word in the claim to define before you can engage in claim construction, and here we're trying to engage in construing the claim "local."

THE COURT: Yes.

HONEYWELL'S COUNSEL: And local certainly pertains to location, and where things are located in relationship to one another, but I don't believe there is anything in the claim that limits the invention to a cockpit.

THE COURT: Okay. . . . My local was not in relation to cockpit, it was a relationship to the pilot itself. I mean, without the pilot there is no—none of the rest of this makes much difference.

HONEYWELL'S COUNSEL: But I think it does as Mr. Brafman's example pointed out because the night vision aid could be hooked up remote to a remote viewer, and he could be viewing the area outside whatever confined area he happens to be in.

TR at 236–38; *see also* TR at 248.

\* \* \* \* \* \*

In addition, Honeywell objected to the Government's proposed construction utilizing the words "visual" with "format," "functional" with "device," and "perceptible" with "color."

HONEYWELL'S COUNSEL: So Honeywell's construction for color display alone is a device that provides visual representation of data using more than one color, and Defendants have modified that construction, and the portion of their construction that pertains to the color display is a functional device that presents information in a visual format in more than one perceptible color. So as you can see, there are not great differences between those two definitions. However, what Honeywell takes issue with is the addition of the words "functional" to modify "device," and the addition of the word "perceptible" to modify the word "color." We think those words are extraneous, and unnecessary to define what the claim terms.

THE COURT: How is perceptible extraneous?

HONEYWELL'S COUNSEL: We believe a color is inherently perceptible. Color pertains to human vision. Without the human there would be no color. The world doesn't know color without the human, and the human visual system, and therefore perception . . . . We also rely on Dr. Task's definition in his expert report and in his direct. The definition did not

change. He defined color as a display presenting more than one color. He did not believe it was necessary to insert the word "perceptible." He did agree with it once Defendants adopted that, but he didn't believe it was necessary when he first defined it.

THE COURT: And functional, you disagree with that because you think that's redundant of device?

HONEYWELL'S COUNSEL: Right, a device—

THE COURT: Because a device is inherently functional?

HONEYWELL'S COUNSEL: —is inherently functional, right.

TR at 240–42.

### iii. Post–Claim Construction Hearing Briefs.

During post-hearing briefing, Honeywell's briefs appeared to abandon arguing that "local" required construction separate from "color display" and, instead, moved to focus on "whether the starting period for filtering is inside or outside the local color display." 4/1/05 Honeywell Brief at 23. Here, Honeywell maintained that "[a]ll that is required is that you have 'light from the local color display' and a 'first optical filter' that filters such light[.]" *Id.* By shifting the argument to the location of the filters rather than construing the term "local color display," Honeywell failed to provide the court with any meaningful guidance as to the meaning of "local color display," other than to state: "in the case of the '914 patent, there is clear disclosure of filters located *inside* the local color display." *Id.* at 24 (emphasis in original). The court was advised, however, that "[s]uch filters filter light 'from the local color display,' even though the starting point for filtering is not external to the local color display, nor has the light left the local color display before it is filtered." *Id.* In addition, Honeywell asserted that "nothing in the language of the claims or the written description permits the court to limit the scope of claim 1 to the Figure 1 embodiment, in which a first optical filter 23 is 'located in front of local display 17.' " *Id.* at 25.

### b. The Government's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

The Government's pre-hearing brief advised the court that one of ordinary skill in the art would conclude that the court should adopt the Government's proposed construction that a "local color display" is a "functional device that presents information in a visual format[,]" a fact the Government represented that Honeywell does not contest. *See* 1/14/05 Def. Joint Brief at 15 (citing 12/23/04 Honeywell Brief at 12). In support, the Government cites the portion of the '914 patent specification that instructed: "Figure 3 shows an arrangement in which the local source of light 50 comprises red 51, green 52, and blue 53 color bands sourced from the monochromatic display transducers." '914 patent, col. 4, ll. 40–48; *but compare* '914 patent, col. 1, ll. 25–26 ("It is intended that the local display may be viewed either with or without the night vision aid in use.") *with id.* ll. 42–48 ("A local color display ... is also viewable by the crewmember ... the local display is intended to be viewable without the aid of the ANVIS.") *with* '914 patent, col. 2, l. 57 (emphasis added) ("The cockpit has *several local displays such as color display*[.]"). The prosecution history indicated that the "local color display" may be "a full color cathode ray tube display." Ex. 7 '914 Wrapper D000018, ll. 35–36; *see also* Ex. 8 '760 Application D001179, ll. 29–30. In fact, Figure 3 of the specification depicts CRTs that provide "a monochromatic image ... for full color display, which appears on a front screen as a combined full color image." Ex. 7 '914 Wrapper D000010, ll. 8–11; *see also* Ex. 8 '760 Application D001182, ll. 2–5.

## FIG. 3

Therefore, the Government assured the court that "the proper reference point for 'local' ... is the observer." 1/14/05 Def. Joint Brief at 15. But, the Government also argued that " 'local' *refers to the location of the display within the cockpit such that it is visible with or without the use of ANVIS*." *Id.* (citing '914 patent, col. 2, ll. 46–48, 58–59; col. 1, ll. 41–46) (emphasis added). The Government concluded that "one of ordinary skill in the art could understand that a local color display must be *within a defined area* for an operator or observer to view and to act upon, if necessary, the data and information produced by the local color display." 1/14/05 Def. Joint Brief at 15 (emphasis added).

### ii. At The Claim Construction Hearing.

At the claim construction hearing, the Government continued to argue that "local" means in reference to a human observer. GOVERNMENT'S COUNSEL: The differences are for local, what the reference point for vicinity is, and for color display, the functional and the perceptible. And we don't think that any of these terms are necessarily superfluous. We don't think that they are wrong. With respect to local, we believe that the correct reference point is the observer. This is straight out of the patent specification, and specifically out of the specification where it states that

the local color display, ... needs to be visible to a viewer. So for example, the first section I cited here, which is column 2, lines 46 through 48, says that "The local display is intended to be viewable without the aid of the ANVIS," referring to, of course, as I spoke about before, the goggle sits in front of the eyes but not against the eyes so you can look around the goggles, so you can look down and see the display. The second provision is, "The cockpit has several local displays, such as a local color display, which are illuminated so as to be clearly visible without the use of ANVIS." Again, it makes it clear that the observer is the one that's going to be looking at the displays. So the reference point is again the observer. And finally, the last provision says, "It is important that the display indicators remain illuminated not only for the benefit of the crewmen who are not wearing night vision aids, but also because those using the goggles will typically view the instruments by looking under the goggles." And again this just recognizes the point that the observer is going to be viewing the display without the goggle. So really what should be important is whether the viewer is local to the display and not the goggle, because if the viewer is not

local to the display, he can't view it anyway.

TR at 243–44.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: [W]e believe Honeywell's construction runs counter to the expressed purposes of the patent, which is to get a full color display which you can view without the goggles, and it doesn't overwhelm you [sic] goggles. So you want to be able to look around your goggles and see a full color display. If it wasn't important for the observer to be able to look at a display without the goggles and see color, then you wouldn't have any reason to have this patent.

TR at 245.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: We think it's clear that local refers to a defined area. It doesn't have to be a cockpit enclosure. It could be some other defined area. But we believe that local carries with it the implication that there is a defined area. The phrase from the patent that was recited, it's column 2, lines 53 through 54, I believe, "The present invention can be used by other viewers in association with environments other than an aircraft cockpit." We believe that phrase—that term "environment" also implies that there is a recognized environment. There is a recognized region around the observer and the display that local implies. So it's a defined area, whether it's an environment, whether it's an enclosure, whether it's a cockpit, but we believe that all of this comes out of the clear meaning of local. If the Court is satisfied, I'll turn to perceptible in the color display. We don't believe the perceptible before color is superfluous. The whole point is having a full color display meaning it has to show more than one color. If the colors are not perceptibly different, then it doesn't look like a color display. It looks like a monochrome display. That's the only reason ... perceptible is in there. It's not superfluous, and it just shows that the colors need to be perceptibly different. And then finally, going back to the functional language, we don't believe that is superfluous either. As we

discussed before with respect to display system, the—I'm sorry—as related to the display system, the color display has to be functional apart from Honeywell's proposed system. So saying it's a functional device implies that it is functional on its own. It doesn't require the patent to perform its function.

TR at 246–47.

### iii. Post–Claim Construction Hearing Briefs.

The Government's post-claim construction brief conceded that "local" means "in proximity to," but that the display should be proximate to an observer or operator, despite the fact that Honeywell maintained that "local" means in proximity to the location of the night vision aid. See 4/1/05 Gov't Brief at 20. Since the specification clearly indicated that local color display may be seen by a crewmember not wearing night vision goggles, the Government argues that Honeywell's proposed construction is wrong. Id.; see also id. at 21 (citing '914 patent, col. 1, ll. 41–46) ("[I]t is important that the display indicators remain illuminated, not only for the benefit of the crewmen who are not wearing night vision aids, but also because those using the goggles will typically view the instruments by looking under the goggles.").

### c. Intervenor Lockheed Martin's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's construction of "local color display" was the same as that of the Government. See 1/14/05 Def. Joint Brief at 14–16.

### ii. At The Claim Construction Hearing.

At the claim construction hearing, Lockheed Martin disagreed with Honeywell's explanation that "local is used differently when it's referring to the local display and local source of light ... the ordinary, customary meaning of local source of light is that the local source of light must be part of the local

color display." TR at 253. As for the specification, it teaches that the "original Figure 3 . . . shows the local source of light as being integral to the local color display." TR at 257. In sum, the claims and specification "lead to the conclusion that local source of light must mean that . . . it is integral to and part of the local color display." TR at 257.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Lockheed Martin advised the court that the " '914 patent's claims do not expressly define the proper reference point for the local color display. . . . A review of the specification establishes, however, that the reference point for the 'local' is the observer and not simply the night vision aid." 4/1/05 Int. Brief at 24. Subsequently, Lockheed Martin appeared to move to seek a construction of a different phrase, "light from the local color display." 4/15/05 Int. Brief at 12. In that regard, Lockheed Martin argued that Claim 1 "applies to filters located outside of the [local color display] and Claim 2 applies to filters located inside the display." *Id.* at 13.

### d. The Court's Construction Of "Local Color Display" In This Case.

The court has declined to construe the word "local" in the abstract. Construing an adjective without the object noun provides no guidance to the parties or the public as to how the court has determined the legal parameters of the '914 patent subject matter.

### i. In The Preambles To Claim 1 And Claim 2.

The court has determined that a "local color display" is a device that may be used together or in combination with optical filters, *i.e.,* "a display system." *See* '914 patent, col. 5, l. 31; *see also* '914 patent, col. 6, l. 13. In the preamble language common to Claims 1 and 2, a "local color display" is also one that shows or exhibits at least one color perceptible to an observer or observers who may be located near or in proximity to the "local display system." Since a display system would be irrelevant without an observer or observers capable of perceiving the dis-

play, necessarily a "local color display" also must be perceptible to an observer or observers, *i.e.,* one utilizing a night vision aid. Therefore, the court construes "local color display" as:

A device that may be used together or in combination with optical filters and shows or exhibits at least one color perceptible to an observer or observers utilizing a night vision aid.

This construction is not contradicted by the specification. *See* '914 patent, col. 2, ll. 46–48 and 58–59 (emphasis added) ("as the local color display is intended to be *viewable*"); *see also* '914 patent, col. 1, ll. 63–64 ("filtration of light according to wavelengths generally permits the use of full color displays").

### ii. In Claim 1(a).

Claim 1(a) describes "a first optical filter that filters light from the *local color display.*" '914 patent, col. 6 ll. 1–2 (emphasis added). The court does not construe this language to limit the location of the "first optical filter" 23, described in Claim 1(a), to a location external to the "local color display." *Id.* The "first optical filter," whether located internal to or external to the "local color display" is included in the claimed invention. *Id.*

### iii. In Claim 2(a).

In Claim 2(a), a "local color display" includes a source of light having blue, red and green color bands. *See* '914 patent, col. 6, ll. 13–14. Therefore, the court construes "local color display" in Claims 2 and 2(a) to include a source of light presenting at least one or more colors. *See* '914 patent, col. 6, ll. 12, 15. Similar to the "first optical filter" in Claim 1(a), the "plurality of filters at the local color display" is not limited to a location internal or external to the local color display. *See* '914 patent, col. 6, ll. 15–22. The plurality of filters, whether located internal or external to the "local color display," is included in the claimed invention. *Id.*

Since the court has determined that claim term "local color display" is unambiguous and not contradicted by the specification, the

court considers it unnecessary to consider any extrinsic testimony regarding the meaning of "local color display."

### 3. "Local" And "Source of Light."

 The term "local source of light" appears in the preambles to Claim 1 and Claim 2 to describe part of the "local color display." *See* '914 patent, col. 5, l. 33; '914 patent, col. 6, l. 13.

The parties have proposed the following competing constructions of "local source of light:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Source of Light: device that emits electromagnetic radiation within the visible spectrum and may also emit infrared radiation | A local source of light: the integral element of the local color display that provides the light that enables the display to be seen by the human eye |

Honeywell *Markman* Slide 73; Gov't *Markman* Slide 012 (bold added by parties).

### a. Honeywell's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

Honeywell's pre-hearing brief represented that "[t]he term *light* usually refers to electro-magnetic radiation in the visible spectrum." 12/23/04 Honeywell Brief at 13 (citing WEBSTER'S at 1308) (emphasis in original). In addition, Honeywell asserted that "it is clear that the *source of light* may also emit infrared radiation, *i.e.*, longer wavelengths of electromagnetic radiation that are invisible." 12/23/04 Honeywell Brief at 14 (emphasis in original) (citing '914 patent, col. 1, ll. 38–40). The specification language cited by Honeywell, however, provides: "illumination from cockpit display sources overwhelms sensor elements which are used in such night vision aids, and thereby interrupts the night vision aid for up to several minutes." '914 patent, col. 1, ll. 37–40. The remainder of Honeywell's pre-hearing brief weaved in extrinsic evidence, particularly that of Dr. Task, to persuade the court that "the claim states that the local color display *includes* the local source of light, [and therefore], it is superfluous to specify that it is *integral* with the

display." 12/23/04 Honeywell Brief at 14–15 (emphasis in original).

#### ii. At The Claim Construction Hearing.

At the claim construction hearing, Honeywell continued to argue that the "ordinary meaning of source of light does not require … that it be an integral element of the local color display." TR at 250–51.

> HONEYWELL'S COUNSEL: So now I'll go to source of light, and this again is in the preamble, and Honeywell again has construed the term "source of light," and Defendants have construed the entire phrase "local source of light." And here the key difference between the parties' proposed constructions is the requirements in Defendant's construction that the local source of light be an integral element of the local color display.

TR at 250.

\*　　\*　　\*　　\*　　\*　　\*

> THE COURT: Well, I would think the "local," going back to your prior discussion, would be the focus for you.
>
> HONEYWELL'S COUNSEL: But once again, there is no indication in the patent that the term "local" when it modifies color display has a different meaning from when it modifies source of light, and the principle is that when the same term is used in different places in the patent, it has to be given the same meaning, and I don't believe Defendants have tied integral to local. They haven't come out and construed local differently when it comes to local source of light. I think what they rely on is the term "includes," but includes is not limited to a device that is integral. It has to include it. It has to be part of it, but it need not be integral. I don't believe Defendants have pointed to anything in the claim language itself or the specification that requires that the source of light be integral with the local color display, so it's a narrow difference.

TR at 251–52.

During rebuttal, Honeywell's counsel argued:

HONEYWELL'S COUNSEL: [T]hey say, "The ordinary and customary meaning of local source of light is the local source of light be part of the local color display." And Honeywell agrees with that, and we would accept that as the construction. And then ... with Figure 3, first of all, to address the new matter argument, the examiner approved the amendment of Figure 3, and held it was not new matter, so I think that's a red herring. Then we believe Defendants make irreconcilably different arguments with respect to these two figures. First, when they are talking about filter 61, 62, 63, they say those are functionally distinct from the local color display. But then when it comes to the local source of light, 51, 52, 53, they say those are integral with the local color display. We accept that both are integral. However, this is only one embodiment of the invention. The claims are not limited either to integral filters or integral source of [light]. But the Defendant[s'] arguments can't be reconciled, and do not support reading the term "integral" into "local source of light" because this is only one embodiment of the invention.

TR at 258–59.

### iii. Post–Claim Construction Hearing Briefs.

In post-claim construction hearing briefs, Honeywell reminded the court that Claim 1(a) does not require that "the starting point for filtering the source of light ... is the local color display." 4/1/05 Honeywell Brief at 23. Instead, Honeywell argued that the claim is satisfied whether the "starting point for filtering is inside or outside the local color display. All that is required is that you have 'light from the local color display' and a 'first optical filter' that filters such light[.]" *Id.* Figures 2 and 3 demonstrate that filters 61, 62, and 63 are located inside the local color display 37 filtering light "from the local color display." *Id.* at 24. Therefore, Honeywell concluded that "nothing in the language of the claims or written description permits the court to limit the scope of Claim 1(a) to the Figure 1 embodiment, in which a first optical filter 23 is 'located in front of the local display 17.'" *Id.* at 25 (citing '914 patent, col. 3.,

1. 15); *see also* 4/15/05 Honeywell Brief at 8. In fact, Figures 2 and 3 show that the filtering is done within the local color display. *See* 4/1/05 Honeywell Brief at 24.

### b. The Government's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

The Government countered that one of ordinary skill in the art would conclude that the "local source of light is an integral part of the local color display .... Honeywell's [use] of the word 'including,' ... indicates that [Honeywell] intended for the local source of light to be part of, and not external to, the local color display[.]" 1/14/05 Def. Joint Brief at 17. The Government relied on two portions of the specification in support. *Id.* at 17 (citing '914 patent, col. 3, ll. 9–10 ("it may be necessary to filter light from the local light source 50 of the display[.]")); *see also id.* (citing '914 patent, figure 3 (showing the local source of light 50 as being within the display)).

#### ii. At The Claim Construction Hearing.

At the claim construction hearing, the Government deferred to the argument of Lockheed Martin. *See* TR at 257, ll. 18–23.

#### iii. Post–Claim Construction Hearing Brief.

The Government's initial post-hearing brief urged the court to construe "local source of light" to mean "the integral element of the local color display that provides the light that enables the display to be seen by the human eye." 4/1/05 Gov't Brief at 21. In doing so, the Government appeared to abandon prior reliance on specification requirements in column 3, ll. 9–10, and instead argued that "[the] proposed construction arises from the plain language of the claim: The preambles of both claims state that the local display includes—*i.e.,* has an integral part—a local source of light nothing more is necessary[.]" 4/1/05 Gov't Brief at 22. The Government also argued that Honeywell adopted the Government's construction at the claim construc-

tion hearing. *Id.* (citing TR at 258) (Honeywell's Counsel: "The local source of light [must] be part of the local color display. Honeywell agrees with that, and we would accept that as the construction. We accept that both [the filters and local source of light] are integral.").

### c. Intervenor Lockheed Martin's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

In the pre-hearing brief, Lockheed Martin's construction of "local source of light" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 17–18.

#### ii. At The Claim Construction Hearing.

At the claim construction hearing, Lockheed Martin warned the court that:

LOCKHEED MARTIN'S COUNSEL: [T]he cases indicate look at words in context, look at the totality of the words to arrive at a meaning. And when you look at the totality ... here you are going to find that local is used differently when it's referring to the local display and the local source of light. And we are focusing on the definition of "local" when we talk about local source of light.... [T]he ordinary, customary meaning of local source of light is that the local source of light must be part of the local color display.

TR at 253.

 * \* \* \* \* \**

LOCKHEED MARTIN'S COUNSEL: If we turn to the specification, ... we see ... new Figure 3 on the right, new Figure 3, that is, is the Figure 3 that appears in the 914 patent as opposed to the original application. And we have the description that new Figure 3 shows an arrangement in which the local source of light comprises red, blue, and green color bands sourced from monochromatic display transducers such as the three cathoid ray tubes which are used to provide a color display. We heard earlier today from [Honeywell's counsel] ... that the local source of light, that source of light was part of that display, was in that display. Certainly if we look to the original Figure 3 ... we find that the local source of light, which are the catho[de] ray tubes 51, 52, and 53. They are integral to or part of that local display. It's important to look at this original figure because ... *Tanden Corporation* ... basically holds that amendments to a patent cannot change the disclosure in any way contrary to its substance as filed. So when the Court looks at the prosecution history, looks at the different drawings, what you have to do is consider them in light of the original application.

TR at 254–55.

#### iii. Post–Claim Construction Hearing Brief.

Lockheed Martin's initial post-hearing brief represented that one of ordinary skill in the art would conclude that "local source of light" means "the integral element of the local color display that provides the light that enables the display to be seen by the human eye." 4/1/05 Int. Brief at 26. The court also was advised that the specification does not show that Honeywell defined this term differently. *See* '914 patent, col. 3, 11. 9–10 ("it may be necessary to filter light from the source 50 of the display[.]"). Lockheed Martin also made no further argument about the meaning of "local source of light." *See* 4/15/05 Int. Brief at i.

### d. The Court's Construction Of "Local Source Of Light" In This Case.

For the reasons previously discussed, the court has declined to construe the word "local" in the abstract. Construing an adjective without the object noun provides no guidance to the parties or the public as to how the court has determined the legal parameters of the '914 patent subject matter.

The court has determined, in the preamble language common to Claims 1 and 2, that "local source of light" as:

An essential element of the local color display that must be perceptible to an observer or observers with a night vision aid.

This construction is not contradicted by the specification. *See* '914 patent, col. 2, ll. 46–48; *see also* '914 patent, col. 1, ll. 63–64.

### 4. "Optical Filter" And "Filter."

The parties have agreed that the terms "optical filter" and "filter," when used as nouns in the claims of the '914 patent, mean "a device that selectively passes and blocks electromagnetic radiation."[10] The parties agree that "filters" (plural), when used as a noun, means two or more filters.

### 5. "Filters" And "Filtering."

The parties have agreed that the terms "filter" and "filtering," when used as verbs in the claims of the '914 patent, mean "selectively to allow (or allowing) light to pass and be blocked." Jt. Stip. ¶ 2.

### 6. "Filters Light From The Local Color Display."

■ In Claim 1(a), "a first optical filter" is described as one that "filters light from the local color display." '914 patent, col. 6, ll. 1 and 2. No other claim recites this specific language.

The parties have proposed the following competing constructions of "filters light from the local color display":

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Filters light from the local color display: No further construction is necessary. To the extent this phrase needs to be construed at all, it should be construed as follows: "filters light coming from the local source of light that is part of the local color display and the filtered light is transmitted from the local color display." | Filters light from the local color display: the starting point for filtering the source of light is the local color display |

Honeywell *Markman* Slide 91; Gov't *Markman* Slide 021 (bold added by parties).

### a. Honeywell's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

In Honeywell's pre-hearing brief, the court was advised that the proposed construction of "filters light from the local color display" is consistent with the plain meaning of the claim and specification and that nothing therein requires that the starting point for filtering the source of light occur at the "local color display." *See* 12/23/04 Honeywell Brief at 19. The court was warned that it would be improper to limit Claim 1 to "embodiments wherein the optical filter is 'located in front of the display' or 'is placed over displays.'" 12/23/04 Honeywell Brief at 20 (citing '914 patent, col. 3, ll. 15–16; *see also* '914 patent, col. 2, l. 13).

The specification's use of the phrase "light ... from the local color display" includes the embodiment of Figure 2 that shows local color display 37, without any filter in front of the display. *Id.* at 20. Honeywell also argued that Figure 3 shows "the same local color display 37 as shown in Figure 2, but in more detail." *Id.* (citing '914 patent, col. 4, ll. 44–46). And, Figure 3 shows that "light from the local color display 37 is filtered by filters 61, 62, and 63, all of which are 'part of and located within the local color display.'" *Id.* at 20. In addition, the specification described the filtering in Figure 3 uses the same language as Claim 1(a), *i.e.*, "a filter 61, such as a band pass *filter*, may be used with CRT 51 so that any *light* within a narrow range of frequencies ¢ may be transmitted *from* the *local color display* 37." *Id.* (emphasis added) (citing '914 patent, col. 4, ll. 49–57). Accordingly, Honeywell concluded that the specification is clear that filtering light from the local color display does not require an external filter in front of or over the local color display or that the starting point for filtering is the local color display. *Id.*

---

**10.** The United States Court of Appeals for the Federal Circuit recently observed in *Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1367 (Fed.Cir.2005) that the AUTHORITATIVE DICTIONARY OF THE INSTRUMENTS OF ELECTRICAL AND ELECTRONICS ENGINEERS STANDARD TERMS 435 (7th ed.2000) lists eight different meanings for "filter" when this word is used as a noun.

### ii. At The Claim Construction Hearing.

At the claim construction hearing, Honeywell reiterated that:

> HONEYWELL'S COUNSEL: The plaintiff's primary position is that [this] term ["filters light from the local color display"] does not require any construction whatsoever.... If it does need to be construed, it has got to mean at least what we say .... So the plain meaning of the claim then is clear from its face and there is no reason to rewrite the English here, Your Honor. We have light from the local color display and we have a first optical filter that filters light and that's exactly what the claim says. Nothing in the claim places that filter anywhere.

TR at 329; *see also* TR at 331.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Honeywell continued to argue that the phrase "filters light from the local color display" in Claim 1 does not require that the local color display be the "starting point" for filtering light. *See* 4/1/05 Honeywell Brief at 23. Instead, Honeywell advised the court that this claim only required that there be "light from the local display" and a "first optical filter" that filters that light. The starting point for filtering may be either inside or outside the local color display. *Id.* In support, Honeywell emphasized that Figure 2, showing a local color display at 37, and Figure 3, showing the filters at 61, 62, and 63 within the display, teach that they all filter light "from the local color display, the starting point for filtering is not external to the local color display and the light is filtered before it exits the local color display." 4/1/05 Honeywell Brief at 23–24.

In addition, Honeywell disputed defendants' dictionary definition of "from" to require that the first optical filter must filter light that has left the color display. *See* 4/15/05 Honeywell Brief at 8. Instead, Honeywell suggested that an alternative definition that designated the "source or origin" of light as the color display. *Id.* at 8–9. Honeywell also relied on specification language instructing that "a filter 61 ... may be used with CRT 51 so that only light with a narrow range of frequencies ¢ may be transmitted from the local color display 37." *Id.* at 9 (citing '914 patent, col. 4, ll. 54–57). In addition, Figure 3 teaches that the starting point of the color band ¢ is *not* the local color display, but filter 61 inside the local color display. *Id.* Therefore, Honeywell disputed defendant's attempt to limit Claim 1 to Figure 1 since the phrase "from the local color display" is used to describe Figure 2 and Figure 3. *Id.*

### b. The Government's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

The Government, in its pre-claim hearing brief, conceded that the '914 patent "indicates that some of the filters for its display system will be placed external to the local color display and thereby filter light from the local display." 1/14/05 Def. Joint Brief at 24 (citing '914 patent, col. 3, ll. 15–24) ("first optical filter is placed over displays"); *see also* '914 patent, col. 2, ll. 10–15 (emphasis added) ("an [aviator's night vision ("ANV")] aid, such as [a] ... goggles set, is provided with an optical filter. A second optical filter blocking light in an opposite sense from the first optical *filter is placed over displays*, which may otherwise present light that would interfere with the ANVIS.").

### ii. At The Claim Construction Hearing.

At the claim construction hearing, the Government's principal focus was the preposition "from" in the phrase: "filters light from the local color display."

> GOVERNMENT'S COUNSEL: We believe the claim term "from" does need to be construed. It provides structure and function to the claim. There is obviously a disagreement over what it means, so it is obviously ripe for construction.... First optical filter that filters light from the local color display. I don't think that could be any clearer that the light has to be from the local color display before it is filtered.

It is the clear meaning, it is absolutely clear from the English grammar what we're talking about here.

TR at 337–38.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: [Honeywell] started talking about figure 3 and I think a couple misrepresentations were made and I want to clear that up. But first I want to just note that the specification uses this sort of the same way. It shows that filter can be placed over displays. [Honeywell's counsel] spoke at length about figure 3 and how it shows things inside the displays. I don't think that's clear from the specification at all. . . . [I]t shows that there are filters at the display in figure 3, but . . . figure 3 is even irrelevant to what we're talking about here because . . . we have figure 1, which actually [Honeywell's counsel] started to try to put up in front of figure 3 when we started talking about this[.] Figure 1 is obviously what is being described by claim 1. There is no requirement that every claim read on every embodiment of the invention. Claim 1 can pertain to figure 1. Claims 2 and 3 could pertain to figures 2 and 3. There is nothing saying that claim 1 has to cover figure 3. So I don't think that argument carries any weight at all. As you see from figure 1, there is clearly a filter on top of the display. The specification clearly says located in front of the local display, 17, is a first optical filter 23. That filter is on top of it, would filter light from the local color display. Again, as I mentioned before, Honeywell turns to figures 2 and 3 and which there is absolutely nothing in the patent tying claim 1 to figures 2 and 3. There is nothing in there that says figures 2 and 3 show a filter filtering light *from* the local color display.

TR at 339–40 (emphasis added).

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: Claim 1 talks about something with two filters but also says the first filter filters light from the local color display. When we get to claims 2 and 3 we're talking about a different embodiment. Now, that's what figures 1, 2, and 3 show is different embodiments, different examples of the different embodiments. So figure 1, again, is relevant because it shows light being filtered from the local color display; whereas 2 and 3 don't.

TR at 341.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: And there is nothing in the specification that would tie claim 1 to figures 2 and 3, which plaintiff is trying to do. I don't have much else to say on this. I think it is absolutely clear from the language, from the grammatical usage of the word "from" in the common, ordinary meaning of "from."

TR at 342.

The Government also argued that it was not necessary to consult the specification because the clarity of the language at issue:

GOVERNMENT'S COUNSEL: The claims are clear. It says filters light from the local color display. You don't need to look at the specification. You don't need to look at the figures. If you do look at those things, they confirm our construction, but it is a clear reading of the English that it filters light from the local color display. I don't know how you can be any clearer than that. Now, we got into this argument about preferred embodiments and that you can't read the claims to exclude preferred embodiments. That is accurate law. I agree. We have two things missing here. One, *there is no preferred embodiment listed in the claims or listed in the specification,* so I don't know what they are saying is the preferred embodiment. . . . I would like to hear it but I don't know.

THE COURT: So it is not the three figures?

GOVERNMENT'S COUNSEL: I don't know. There is nothing in there that says in a preferred embodiment, this happens. You see that sometimes in patent language in the specification, but I don't think it is in the specification here. The other thing is that the rule is that the claims cannot be construed to exclude the preferred embodiment. Each claim does not have to cover each embodiment. And that's the differ-

ence. You can't construe the claims as a whole such that it would read out the preferred embodiment because that makes sense, if you have a preferred embodiment, the inventor would have drafted the claims to cover it. But what does not follow from that is that claim 1 has to cover every embodiment, claim 2 has to cover every embodiment. That's wrong. It is also wrong to characterize claim 1 as a generic claim. There are *Vitronics* claims, and then you can have, they are genus and species, sometimes, that's what they are called, but that's not what we're talking about here. We're talking about claims that are directed to different embodiments. And, again, it comes out in a clear reading of the claims. It doesn't have to say in the specification that claim 1 pertains to one embodiment and claim 2 to a different embodiment. It just comes out of the claims.

TR at 362–64 (emphasis added).

### iii. Post–Claim Construction Briefs.

The Government's post-hearing brief argued that the "claim construction analysis [of "filters light from the local color display"] can literally 'begin and end' with the words of the claim." 4/1/05 Gov't Brief at 27. Here, the Government made three new arguments. First, that Honeywell's construction improperly reads "from" out of the phrase "filters light from the local color display." *Id.*

Second, Honeywell's reference to Figure 3 confused the issue by misreading language that provides: Figure 3 shows "light within a narrow range of frequencies ¢ may be transmitted from the local color display." *Id.* at 28. Instead, the Government argued that this language confirms that because Figure 3 shows ¢ exiting the display that light is being transmitted from the display and hence is filtered external to the display. *Id.*

Third, the Government criticized Honeywell for misreading *Vitronics* for the proposition that a claim should not be construed to exclude preferred embodiments. *Id.* The Government distinguished *Vitronics* as inapplicable because there was only one claim at issue in that case, and the court excluded the only embodiment in the patent. *Id.* (citing

*Vitronics*, 90 F.3d at 1583). Accordingly, the Government reasoned that *Vitronics* did not establish a rule that all claims must cover all embodiments described in the specification. Therefore, since the Government concluded that the '914 patent did not state a preferred embodiment in this case, the law does not require that Claim 1 "cover Figure 3" or that all claims be construed to cover all figures. *Id.* Instead, a patent claim should be "construed to encompass at least one disclosed embodiment in the written description." *Id.* at 29 (quoting *Johns Hopkins Univ. v. Cell-Pro, Inc.*, 152 F.3d 1342, 1355 (Fed.Cir. 1998)).

### c. Intervenor Lockheed Martin's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's proposed construction of "light from the local color display" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 24.

#### ii. At The Claim Construction Hearing.

LOCKHEED MARTIN'S COUNSEL: And for our definition of the term "from" we mean "from" when it is used "with". From the local color display means the starting point for filters the source of light is the local color display. So the filtering occurs outside the local color display, not in the local color display under our recitation.... Claim 1 recites a first optical filter that filters light from the local color display. And the plain and ordinary meaning—

THE COURT: Why is it that the box at the bottom of the 3 doesn't do that? Explain that to me.

LOCKHEED MARTIN'S COUNSEL: You know, it is interesting when you look at the box at 3. You can't tell where those filters are located when you look at that particular box. It is indeterminate. The box is not like—we see in figure 1 of the patent that I'm showing up here where we

show the filter 23 being outside the display 17.

TR at 342–43.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: [Y]ou can't tell whether those filters are inside or outside from that particular diagram, whether those filters are inside or outside the local display. We have tried. Everybody has tried to look at it, but you can't tell from that particular one. If you looked at original figure 3, which we don't have, you would see those filters are inside the local display.

THE COURT: That's what I thought.

LOCKHEED MARTIN'S COUNSEL: In the original figure 3. The original figure 3 is that rectangular box that shows the three cathode ray tubes and filters in front of them. Now, under the rules that we talked about yesterday, you would have to read this figure 3 as being consistent with the original figure 3, so you would say that—

THE COURT: They would have to be then outside?

LOCKHEED MARTIN'S COUNSEL: On the inside. They would have to be on the inside because they were in the original specification that was filed, they were on the inside. And figure 3 can't change the original—and that was figure 3 in the original specification.

THE COURT: Okay.

LOCKHEED MARTIN'S COUNSEL: So the new figure 3 can't change that specification. But the key term is it filters light from the local display. It does not filter light in the local color display. And we know that figure 1 is an embodiment that shows a filter being outside the display, not only from figure 1 itself, but also from the statement that appears in the patent in column 2, line 13 that says a first optical filter is placed over displays. So ... the ordinary meaning of the term "from the first optical display" means that it must filter light that has left the local color display at a filter that's located inside or internal to the display, cannot filter light from the display, it can only filter light in

the display. [T]he Federal Circuit has held in the *Forest Laboratories* [v.] *Abbott Laboratories* case at 239 F.3d 1305 [(2001)], that there is a difference in meaning and scope presumed when different words are used in different claims. And if ... we were to look at the claims, claim 2, comparing it to claim 1, claim 2 recites a plurality of filters at the local color display. And from [WEBSTER'S] we know that "at" can mean "in" and we also know from [WEBSTER'S] that "from" can never mean "at" or can never mean "in." Consequently, we have different meanings. "From" is different from—"from" is different from "at." The terms were used differently and that further supports the argument that "from" should be interpreted that way that we believe it should be interpreted. [I]f we look at the page provided to us ... by Honeywell. All that this page says is that there is light that may be transmitted from the local color display. And that's all that it supports. It doesn't address the claim where the claim is reciting an optical filter, a first optical filter for filtering light from the local display. So what we have here in this provision of the specification is a discussion of a different embodiment of the invention than we see in figure 1. It is the embodiment we see in figure 3. So to sum it up, again, "from" never means "in." It means external. It means away from. And, therefore, the term "from" should be construed in the manner we suggest.

TR at 344–47.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: Just three brief points. It seems to me that it is impossible to have a filter inside a display that can filter light from the display. I don't know how you do that. [Honeywell's counsel] suggests that you can but it seems to me that that violates the law of physics. With respect to ... my comment on figure 3 ... was that you can't tell from figure 3, the figure 3 that's in the patent, where those filters are. I then went on to describe the figure 3 that appeared in the original application, and saying there it showed in the original application that the filters were inside the

display, but the original application of figure 3 also showed things that you don't see in this figure 3. It showed three cathode ray tubes, each of which provided individual sources of light. So there are differences between the two figures.... And in respect to the issue on embodiments, a lot has been made out of the fact that every claim has to include an embodiment. It can't exclude an embodiment. [Honeywell's counsel] just got up here and said claims 2 and 3 do exclude embodiments, that they are limited to the embodiments only shown in figures 2 and 3. And there are patents issued every day by the Patent Office where claims are listed in a hierarchical fashion or listed in series, where you have a separate set of claims, that the only way you would read them was to read them as being limited to one embodiment. And the specification may have five embodiments and you will find five sets of claims in the patent, each directed at different embodiments. That's what we had in this case. When we look at the history of this case, we started out with the '637 patent, which eventually was spun off in a continuation. Part of it was spun off in a continuation. The '637 patent claims are limited to particular embodiments and that's the use of polarizers. The claims in the '637 patent that dealt with band pass filters were the ones that appear in the continuation and show up in the '914 patent. So even in the history here, we have a situation where we have claims limited to particular embodiments and that's the standard practice of drafting claims.

TR at 370–72.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Lockheed Martin argued that "from" in Claim 1 means "a starting point" and cannot be constructed to mean "at." *See* 4/15/05 Int. Brief at 13. Therefore, Claim 1 "applies to filters located outside of the display and [C]laim 2 applies to filters located inside the display." *Id.* Lockheed Martin discounted Honeywell's argument that both Figure 2 and Figure 3 disclose that the filters are located inside the local color display and that Claim 1 therefore

covers both of these embodiments, because not every claim must read on every embodiment. *Id.* (citing *Johns Hopkins,* 152 F.3d at 1355). In addition, Lockheed Martin asserted that Honeywell admitted at the claim construction hearing that Claim 2 does not read on Figure 1. *See* TR at 359.

### d. The Court's Construction Of "Filters Light From The Local Color Display" In This Case.

The term "a first optical filter" in Claim 1(a) of the '914 patent consists of the noun "filter," modified by the adjectives "first" and "optical" to describe the order and functional type of filter. The term "filter" also is modified first by the phrase "filters light from the local color display" that described the purpose or function of the "first optical filter," which necessarily requires: 1.) the presence of a local color display; 2.) light emanating from the local source of light; and 3.) light filtered at least once thereafter, *i.e.,* by the first filter.

Accordingly, the court construes "filters light from the local color display" as: "the starting point for filtering light occurs at the filters."

Contrary to the Government's representation, *see* TR 362, the specification at the Detailed Description of the Invention Section does designate Figure 1 as the preferred embodiment. *See* '914 patent, col. 2, l. 49. The specification clearly provides that the "display system" invention "can be used by other viewers." *See* DMX 1 ('914 patent, col. 2, l. 52).

### 7. "Notch Filter."

▮ The language of Claim 1(a) states that "a first optical filter ... is a notch filter that passes light ... and that substantially blocks light associated with color bands[,] other than predetermined color bands." '914 patent, col. 6, ll. 1–6.

The parties have proposed the following competing constructions of "notch filter:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Notch filter: optical filter that either passes or blocks a narrow range of wavelengths of electromagnetic radiation | Notch filter: a narrow-band filter that may block light within the narrow wavelength band or may pass light within the narrow band, and do the opposite outside of the narrow wavelength band |

Honeywell *Markman* Slide 102; Gov't *Markman* Slide 026 (bold added by parties).

### a. Honeywell's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

Honeywell's proposed claim construction of "notch filter" did not differ with that of the defendants, insofar as all parties agree that a "notch filter" either passes or blocks a narrow range of wavelengths of light. *See* 12/23/04 Honeywell Brief at 22. Honeywell, however, disputed defendants' imposition of "an additional limitation, namely that the notch filter [does] the opposite outside of the narrow wavelength band," as being inconsistent with the language of the claims and the specifications. *Id.* Therefore, Honeywell warned the court that if defendants' construction was adopted, it would "exclude a common type of notch filter, namely a filter with multiple notches, such as a triple notch filter." *Id.*

#### ii. At The Claim Construction Hearing.

At the claim construction hearing, Honeywell advised the court that the use of "notch filter" was generic and therefore could be limited to either a single notch filter or a multi-notch filter.

HONEYWELL'S COUNSEL: Plaintiff's construction of notch filter is that it is an optical filter that either passes or blocks a narrow range of wavelengths of electromagnetic radiation. Defendant's construction generally agrees with that—well, does agree with the first part of our construction, but then inserts a second component to the construction that says that it does the opposite outside of the narrow wavelength band. And what this is all about is that—

THE COURT: Let's talk about what a notch is.

HONEYWELL'S COUNSEL: Yes. I have that, Your Honor. First of all, a notch filter, the key issue is whether or not a notch filter has this element of requiring to do the opposite, and what this goes to, Your Honor, once again, is the notion of whether a notch filter is limited to a single notch or excludes multi-notches as it is used in the patent and understood by one skilled in the art. And I can show you what a notch filter is.

THE COURT: Good.

HONEYWELL'S COUNSEL: Okay. A notch filter is a filter that has a portion, it is used to basically allow a range of wavelengths to be passed or blocked. So you can think of that, if I have a red filter, just a single red filter that I put over a white light, Your Honor, which has the entire visible spectrum in there all mixed together, which is why it is white. And if you put the red filter over that, the filter will only permit the red light to go in, go out, and it will exclude the other red light to go out, if it is a single notch filter. If it is a multi-notch filter, it may permit, say, red, green and blue light to come out, but block everything else in between.

THE COURT: So what, notch means one color?

HONEYWELL'S COUNSEL: Notch means—notch is referring to the notch in the wavelength spectrum which you see up here, Your Honor. The reason it is called a notch filter is that this is the notch. Here is the wavelength. This is the light. If this is your white light coming out of here, this spectrum was all the white coming out. The notch, see, this is zero and this is—well, in this particular instance, it will be not letting any light through in these wavelength ranges and only letting out what they call a notch. And they call it a notch because it sort of cuts out of the spectrum a notch and let's the red light through. And this notch filter, you have the light letting through—the filters are letting through the blue line, the green light, and the red light and blocking everything in between. So it has got a notch— and this has notch, okay? Now, in the patent, that is significant, because we use

these notch filters in the patent to alter the characteristics of the light. Remember when we talked in the beginning about using, for example, a red filter, which is one notch of the notch filter, to block certain wavelengths and pass certain wavelengths, lambda 1 is the light permitted through the notch. It would look like the red notch over there. Likewise, the green filter passes only the green notch and the blue filter only the blue notch. And then you combine those three colors together on the front face of the projector, which is defined as 55 in the display, to combine them all together to make an image just like here.

THE COURT: What does the word notch mean?

HONEYWELL'S COUNSEL: The notch means the notch out of the visible spectrum that is either allowed to pass through or not allowed to pass through.

THE COURT: One notch equals one color?

HONEYWELL'S COUNSEL: One notch equals—well, it can or cannot be limited to one color but it is at least limited to a wavelength range. It doesn't have to be associated with a particular color, so one notch per wavelength range.

THE COURT: All right.

HONEYWELL'S COUNSEL: Now, the defendants would like to limit the term, notch filter, to read in that it is a single notch filter, and they say that instead of meaning notch filter in the claim, they meant to write single notch filter and that would then limit it to the circumstances you have on the left-hand side. The plaintiffs make—

THE COURT: What would the plural of notch filter be, notch filters?

HONEYWELL'S COUNSEL: No, no, you would use—the generic term is notch filter. And if you want to have a single notch, you call it single notch filter. If you want multi-notch, you call it multi-notch filters. Again, we will—

THE COURT: But you didn't use the word multi-notch.

HONEYWELL'S COUNSEL: We didn't use the term single notch either. The generic term is notch. That's the point of the discussion here. There is nothing in the ordinary meaning of notch filter that requires a single notch. To the contrary, it is common parlance, both within the industry, filter area, and even in patents to use the term notch to talk about either single or multi-notch filters, okay?

TR at 385–89.

Honeywell also argued that the language referring to color bands in Claim 1 "are multiple bands being passed ... that correspond to the multiple notches. A fair reading of the patent is there is no way to get those multiple bands or to cover a full color display unless you, in fact, have a notch filter which is passing multiple bands which makes it a multi-notch filter. So from the face of the patent and the claim itself, it is clear that certainly multi-notch filters are contemplated." TR at 391. Therefore, Honeywell concluded that since the specification contemplates a full color display, multiple notches must be used and the term "notch filter" must not read a multi-notch filter out of the claim. *See* TR at 392.

### iii. Post–Claim Construction Briefs.

In Honeywell's post-claim construction briefs, prior art is discussed, *i.e.,* U.S. Patent No. 4,663,562 (the "Miller Patent") that discloses a multi-notch filter in the specification thereof. *See* 4/1/05 Honeywell Brief at 28. The Miller Patent also used the specific terms "multi-notch didymium filter" and a "multi-notch filter" in the claim language, although the latter uses the term "notch filter." Honeywell represents that the "use of a multi-notch filter [in the Miller Patent] was 'indicative of what those skilled in the art generally believe a certain term means.'" *Id.* at 29 (quoting *Vitronics,* 90 F.3d at 1584). Therefore, Honeywell concluded that "[m]ultiple color bands implies multiple notches, one for each color band, as taught for example, by the Miller patent." 4/15/05 Honeywell Brief at 10.

### b. The Government's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

The Government argued that "one of ordinary skill in the art would conclude that the term notch filter means a narrowband filter that may block light within the narrow wavelength band or may pass light within the narrowband, and do the opposite outside the narrow wavelength band." 1/14/05 Def. Joint Brief at 25. Although the Government recognized that the term notch filter is not defined in the '914 specification, the Government argued that Claim 1 provides that "the first optical filter is a notch filter that passes light, comprising predetermined color bands . . . and that substantially blocks light associated with color bands[.]" '914 patent, col. 6, ll 2–3, 5. Therefore, a notch filter is one that both "passes light" and "substantially blocks light." *Id.* The specification, however, provides that the "[l]ight blocking device 39 on the ANVIS *may* therefore be a notch filter for blocking light corresponding to the narrow color band ¢." '914 patent, col. 5, ll. 13–15 (emphasis added).

#### ii. At The Claim Construction Hearing.

At the claim construction hearing, the Government argued that a notch filter "could also be termed . . . a band pass filter . . . no light is getting through, and then . . . you let some light through and then you go back up on the other side." TR at 400–01. "[A]t zero . . . no light is getting through and then as you get to this wavelength here, you drop down and you . . . let some light through . . . [n]ow what you have is a pass, passage of a band of light. . . . [T]he other thing is what is called a band stop filter which according to this representation here, you would have something going along at the bottom and it would peak up like this and come back down. . . . And so there you would have light over a broad range transmitted and only blocked within a certain area. And that's what's called a band stop filter." *Id.* In addition, the Government asserted that notch filter "can either pass or block light with that narrow range of wavelengths . . . the patent

as a whole is silent on what the transmission of a notch filter looks like." TR at 401–02.

THE COURT: Let's flip back to your other chart, you go to "it may block light or may pass light."

GOVERNMENT'S COUNSEL Right.

THE COURT: What would be required for [a notch filter] to do either?

GOVERNMENT'S COUNSEL Well, it has to do one or the other. It may block light or it may pass light. And I think that that's just implicit in the—they say either passes or blocks. We say may block light or may pass light. I think we were trying to be more explicit, that it may do one or may do the other.

THE COURT: I thought the notch filter always passed the light.

GOVERNMENT'S COUNSEL If you have one—no. And I think that comes out here. And I will show you how it comes out in the specification as well that the patent contemplates that it can pass or block within a narrow range.

THE COURT: What features does it have that makes it do that or what makes it do that?

GOVERNMENT'S COUNSEL What makes it sensitive to that one band?

THE COURT: Yes. What about the notch filter allows it to do one or the other?

GOVERNMENT'S COUNSEL It is the construction of the filter. I'm not a filter expert. I think once we get our experts on the stand they can explain it better than me. It has to do with—they are typically called interference filters. And as I understand it that means that the light interferes with itself in certain wavelength ranges and doesn't in others. So it is able to go through in some and not in others.

THE COURT: But there is nothing inherent within a notch filter which does one or the other?

GOVERNMENT'S COUNSEL Well, I think once you have built it, it is a notch filter and so it does one or the other. But when you say notch filter, it could mean one or the other. You are talking about

two different pieces of hardware. Notch filter could be a band pass or a band stop filter.... Now, you asked me why it must block when all the examples we saw from [Honeywell's counsel] were passing a narrow range. I think that comes straight out of the specification, which says light blocking device may be a notch filter for blocking light corresponding to the narrow color band, lambda sub 1. There you go. Going back to it has to be read in light of the specification. The specification clearly says that the notch filter blocks light within a narrow band. Now, it also comes out here, why it must do the opposite outside of that, because, as I have highlighted there, this provides a minimum of filtration of total light input. The idea is the—you want to block light in the narrowest band possible and let the rest of the light in because as you can see on figure 3, the excerpt I pulled out there, the filter they are talking about is the filter on the AN-VIS. As we talked about before there is always a tradeoff with the sensitivity of the ANVIS versus what lights are getting out of the display. So you want your ANVIS to be able to see as much light as possible because it allows you to see better at night. So you want lambda sub 1 to be as narrow as possible. And you want to allow all the other light in that you can. That's what this part of the specification talks about. It shows clearly that it needs to—

THE COURT: What *do I do* with the word "may"?

GOVERNMENT'S COUNSEL Right. It is because as I said before, the figures are exemplary. They show that this is one embodiment of the invention. We believe that it is clear that notch filter must do at least what it says that it may do. Now, it may do other things as well, or, as I said before, as [Honeywell's counsel] put up here, it may be a band pass filter which would be the opposite of what it is talking about here. But you have got—it would be the conversion. You can think of them as mirror images of one another, the mirror image of a band pass filter would be a band stop filter, if you inverted it.

THE COURT: Okay. Both of which could be notch filters?

GOVERNMENT'S COUNSEL Yes, Your Honor.

TR at 402–05.

### iii. Post–Claim Construction Hearing Briefs.

The Government's post-claim construction hearing briefs continued to insist that in addition to passing or blocking light, the specification required that the notch filter also "must have a specified characteristic outside the narrow band." 4/1/05 Gov't Brief at 29. Therefore, the Government asserted that the filter " 'does the opposite'—namely block—light outside the narrow range." *Id.* at 30. Not surprisingly, the Government dismissed Honeywell's view that the notch filter could include multiple notches as contrary to the claim and specification language. *Id.* at 31; *see also* 4/15/05 Gov't Brief at 12–13.

### c. Intervenor Lockheed Martin's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's pre-hearing construction of "notch filter" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 25–26.

### ii. At The Claim Construction Hearing.

At the claim construction hearing, the issue of whether notch filters meant a single notch or permits the use of a multi-notch filter was explained by Lockheed Martin:

LOCKHEED MARTIN'S COUNSEL: So what we're saying is that the notch filter here is referring to a single notch. I will discuss that a little bit more but it is referring to a single notch that passes light comprising predetermined color bands and also has a feature that it substantially blocks light. It passes light including a predetermined red color band and then substantially blocks light associated with color bands other than said predetermined color bands. So it doesn't define the size of the notch but it simply defines the size

of the characteristic which are to both pass and block.

THE COURT: By size, you're not meaning several notches, you are saying how long?

LOCKHEED MARTIN'S: Right. It doesn't say how wide, how wide or how long.

THE COURT: How much of the band is taken up?

LOCKHEED MARTIN'S: Right, how much of the band is taken up, how deep is the notch. And it doesn't say, there is no reference there that there is more than one notch. Now, our position is based on the language of the claim that's understood by one of ordinary skill in the art, and, again, it doesn't, this construction doesn't contradict the intrinsic evidence and specification and prosecution history. The specification—

THE COURT: You mean, do we run into a problem with this notch filter issue, meaning "a" doesn't mean one?

LOCKHEED MARTIN'S: We run into a problem where "a" means one or more notch filters? You do when you say a first optical filter is a notch filter. But it is describing here what we have, it is describing a notch filter. So, I mean, if they are going to say one or more optical filters that are one or more notch filters, I think we run into problems with whether "a" means one or more.

THE COURT: Well, the word "is" before that, though, the tense on that would imply that it is single.

LOCKHEED MARTIN'S: Exactly. We're saying the filter is a notch filter. TR at 411–12.

\* \* \* \* \* \*

In addition to discussing the specification references cited in its brief, Lockheed Martin also discussed the relevance of the prosecution history of "notch filter:"

LOCKHEED MARTIN'S COUNSEL: [W]e see a reference to a letter that the Patent Office issued on March 20th, 2001. And that letter, by the way, went to both the '760 application and the '914, the application that was then the '914 application because the '760 application had not yet been banded. So the identical letter went out for both the '760 and the application that was the then—the one that was supporting the '914 patent. And there the Patent Office rejected the claims that were pending as being unpatentable over a patent issued to Swift. And what the Patent Office did is it gave their interpretation of the application, that was the '914 and '760 application.

THE COURT: Were they any more specific in saying why it was unpatentable?

LOCKHEED MARTIN'S COUNSEL: There are more details that go into—on the next page.

THE COURT: Okay.

LOCKHEED MARTIN'S COUNSEL: We have, we give you more from that, more of an extract from it but essentially what you had in Swift was you had a filter, a notch filter at the goggles, not at the display. And the notch filter at the goggles had basically a hole in them to allow a certain amount of light, for example, green light, to pass through because green light doesn't interfere with the night vision goggles. And so there was some ability to look at a, to have that type of light in the cockpit without interfering with the night vision goggles. But, anyway, what the patent examiner said is that Swift teaches "an effective filter by virtue of the operation" and it is a reference to filter 9 in column 3, where "it may be such as to transmit all available light in the circumstances of use, except for one narrow spectral band." Our point in citing this correspondence is that here the patent examiner is rejecting the application and the claims in the application based on the conclusion by the patent examiner that what was taught in the applications was a notch filter that had one narrow spectral band.

TR at 414–15.

### iii. Post–Claim Construction Hearing Briefs.

In the post-hearing brief, Lockheed Martin argued that the specification descriptions concern a single notch filter, although Claim 1(a) admittedly did not specify whether a

notch filter is a single notch filter or multi-notch filter. *See* 4/1/05 Int. Brief at 38 (citing '914 patent, col. 3, ll. 34–38) (specification providing that either the first or second filter (23 or 25) will be a notch filter; the other filter (23 or 25) will substantially block the "light of a predetermined red color band ¢, passed by the notch filter."); *see also* '914 patent, col. 5, ll. 13–15 (the "[l]ight blocking device 39 on the ANVIS may therefore be a notch filter for blocking light corresponding to the narrow color band ¢."); '914 patent, col. 4, ll. 52–57 ("a filter 61, such as a band-pass filter [a type of notch filter], may be used with CRT[.]"); '914 patent, col. 4, ll. 59–61 (CRTs "may be provided with high pass . . . filters 62 and 63[.]").

### d. The Court's Construction Of "Notch Filter" In This Case.

Honeywell's proposed construction, defining an optical filter that *"either* passes *or* blocks,"* must be rejected since the claim language provides that a notch filter *both* "passes" *and* "substantially blocks light." '914 patent, col. 6, ll. 2–5 (emphasis added). Since the court is satisfied that the claim language clearly delineates the purpose and function of a notch filter, the court also declined to adopt the Government's more restrictive construction, *i.e.,* defining a "notch filter" as a *"narrow* filter that *may* block light . . . or *may* pass light . . .*," and do the opposite outside the narrow wavelength band." *See Renishaw PLC,* 158 F.3d at 1248 ("A party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements; without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right."); *see also id.* at 1249 (quoting *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987 (Fed.Cir.1988)) ("Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims."). Although the term "notch filter" is "susceptible" to further clarification, the specification of the '914 patent does not require that the "notch filter" exclude multi-notch filters. A

Accordingly, the court construes "notch filter" to be "an optical filter that has the capacity both to pass and substantially block light and may be a single-notch filter or a multi-notch filter."

### 8. "Passes."

The parties have agreed that the term "passes," as used in the claims of the '914 patent, means "allows to go through." Jt. Stip. ¶ 3.

### 9. "Color Band[s]."

■ "Color band" does not appear in the '914 patent, although the plural "color bands" is found in Claim 1(a) to describe the light that is passed at a filter notch, *i.e.,* "a notch filter that passes light comprising predetermined color bands." *See* '914 patent, col. 6, ll. 2–3 (emphasis added).

The parties have proposed the following competing constructions of "color band[s]:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Color Band: range of wavelengths within the visible spectrum | Color Band: a range of wavelengths within a single color |

Honeywell *Markman* Slide 118; Gov't *Markman* Slide 031 (bold added by parties).

#### a. Honeywell's Proposed Construction.

##### i. Pre–Claim Construction Hearing Brief.

Honeywell's pre-hearing brief argued that "color band" means "a range of wavelengths within the visible spectrum." 12/23/04 Honeywell Brief at 25. Honeywell asserted that defendants agreed with this definition but also imposed an impermissible limitation that the range of wavelengths be "within a single color." *Id.* Honeywell further asserted that because the '914 patent does not specify any particular division of the visible spectrum, there is "no requirement that a particular color band falls within a single color." *Id.* at 26.

### ii. At The Claim Construction Hearing.

HONEYWELL'S COUNSEL: What we say is a color band is a range of wavelengths in the visible spectrum. Visible spectrum is what you can see, it is this.

THE COURT: Correct.

HONEYWELL'S COUNSEL: And the parties agree that a color band is explained as a range of wavelengths. And what we disagree on is that the defendants seek to say, add the word, the color band means a single color band, okay?

TR at 461–62.

\* \* \* \* \* \*

HONEYWELL'S COUNSEL: The color band definition, like what we discussed before, the color band is a continuum. There are any number of ways around the color band. What we call those colors is a matter of convention, not a matter necessarily of science. It is what individuals over the years have been programmed to call red or to call green or to call blue. And, in fact, you might go to other countries and they refer to it differently. It is frankly very much a cultural thing. It is an industry-specific thing. And so the reason we say that you should not be talking about a color band as limited to a specific single color by name is, first of all, the band is a continuum around here. This is the visible spectrum, if you will. And what single color you name it depends very much on how you carve it. Are you going to call it red or reddish orange? And the notion that you would call, pick a single name is not just the—it doesn't make any sense because what one person calls red, somebody else might call reddish-orange. And what one band, the band includes what somebody calls red, might be a band somebody else calls reddish-orange. And the notion of a color band generically is only intended to make it clear that ... [i]t starts with wavelengths down here, which are x-rays, for example. And then you have got all the—from there you go to the other end, which is, you know, long electrical oscillations and microwave, infrared, we have x-rays, gamma rays, cosmic rays. These are all in the electromagnetic spectrum. Each one of these can be defined as a range of wavelengths in the electromagnetic spectrum, but they are not colors because they are not in the visible spectrum. So the notion of a color band is nothing more in this patent than a band ... that covers the visible spectrum. It is something within the visible spectrum and it is called a color band because the visible spectrum can differentiate it from an x-ray band, cosmic ray band, it is a range of wavelengths. The patent, on the other hand, when it wants to talk about a particular band, it does so. When it wants to talk about the red color band, it calls it the red color band. And when it talks about the green color band, it calls it the green color band. And you can have an orange-red color band and a green-blue color band, it would be a wider band. So the idea that there is nothing in the way the term color band is used that suggests it should be a single color. That doesn't make any sense to suggest that—whether it is a single color or multiple colors depends on how thin you slice it.

THE COURT: Let me ask you this ... under claim 1(a), you used the word predetermined red color band. Now, to me what that means is you have wavelengths within the parameters of what is red that you predetermined.

HONEYWELL'S COUNSEL: Yes.

THE COURT: It could be from wavelength here to here, all these are red, or it may be within that red grouping.

HONEYWELL'S COUNSEL: That's correct, Your Honor. We start out with color band and sort of whistle your way down. Color band is something within the visible spectrum, and then you can have a red color band which says that red color band is now within the red portion or red region of the visible spectrum. And now you can have a predetermined color band or I think it is also called, in claim 2, the narrow band of the red color band, so you can have a portion of the red color band. So in each instance, though, the patentee has said when he wants to refer to a particular aspect of the color band, of the visible

spectrum, he tells you what aspect he has in mind.

THE COURT: Now, why wouldn't the inventor put in . . . specific, wavelengths between X and Y? . . . Why don't they say, including—I don't know how you measure these things, but by wavelength 1 to wavelength 3?

HONEYWELL'S COUNSEL: —actually, the inventors certainly could have written a claim that said we want to block everything between 620 and 630. I think that's your question, Your Honor, why don't they instead say we're going to call that a predetermined color band.

THE COURT: Right.

HONEYWELL'S COUNSEL: I think the answer is that shows manifest intention that the claim shouldn't be narrowly limited to a specific range of wavelengths, but should be limited to what the people consider to be the red color band and red region.

TR at 467–72.

\* \* \* \* \* \*

HONEYWELL'S COUNSEL: We would agree with the defendants that the color band is a range of wavelengths. And I believe we have agreement that that range of wavelengths has to be within the visible spectrum. The place we seemingly disagree with the defendants on is whether or not you need to be—a color band has to be associated with a specific single color. And just to point out the dilemma in doing that, Your Honor, as I indicated previously, you can divide up the spectrum by any variety of color names, but if you look, for example, over here, that—this would be a color band[.]

TR at 479–80.

\* \* \* \* \* \*

HONEYWELL'S COUNSEL: Your Honor, let me answer the question you were interested in first and then I will hit the other points. . . . When we get to the claim on color bands, we're not designing to a color band. We're designing to the red, green, and blue color bands, which are later on specified in the claim. For example, here, in claim 1, we're designing to the

red color band and if we had claim 2 up, I have it here, because [the Government's counsel] put it up, there you are designing to the specifics called out, blue, green, and red color bands. What I mean by that is when you want to practice the invention, you know you need a blue, green, and red color band. And the engineer, the person who—

THE COURT: But the second portion of 1(a) says associated with color bands other than predetermined ones, which could be a large—that could be a bit of a guessing game, wouldn't it?

HONEYWELL'S COUNSEL: No, because you know which ones you are blocking. It says it is a filter that passes light comprising a predetermined color band, including the red color band. That means it has to be at least red, it is passing some other colors, that's how you get the color display. And it substantially blocks light associated with the other color bands. All that says, Your Honor, is we're going to figure out which ones are passing, it is going to be red and something else. So if it is a full color display, it is passing red, green, and blue, and it is blocking—

THE COURT: What about the associated with? What does that mean, associated with color bands?

HONEYWELL'S COUNSEL: And blocks light associated—

THE COURT: Next to?

HONEYWELL'S COUNSEL: Because the color bands are the mathematical formulations of what is part of the spectrum.

THE COURT: What does associated with mean?

HONEYWELL'S COUNSEL: So it is the light, it is the light that is in those wavelengths of that color band. So the light associated with the red color band, if we assume the red color band was 600 to 620, the light associated with the color band would be the light at 600 to 620.

THE COURT: Isn't that substantially blocks light within, would have been a better way of saying it if that's what you wanted to do?

HONEYWELL'S COUNSEL: No, not if it is. This is the predetermined color band. So it is—

THE COURT: I am looking at the part that goes, "and that substantially blocks light associated with color bands other than said predetermined color bands."

HONEYWELL'S COUNSEL: Yeah, maybe within or maybe at. We can always sit here and sort of figure out another way to write it, but that's what it means. I think that's—I have never got focused on that language. It is clearly the light, though, at those wavelengths. I don't think that's particularly in dispute. So it blocks the light. Let's assume we said that the color band that is—it says it is passing certain light, that's the reds and greens, and it is blocking the blues, okay. Then it is blocking the light associated with the blue color band, but the claim—which would be the range of wavelengths that are blue. But the claim is not attempting to specify anything other than say—which is they clearly want to block red and depending on what other colors you want to let through, you are either going to block them or pass them. It doesn't really have anything to do with what the color bands are in terms of how you specify them. What is claim—

THE COURT: Well, within this, let's just stay within 1(a) right now. Is the only thing that's predetermined is red?

HONEYWELL'S COUNSEL: The only thing that is required to be predetermined is red. But it says it passes light comprising predetermined color bands, plural, including a red. So it has got to be more than one band but at least one of the bands has to be red. This all goes to the notion that claim 1 is, again, not specific to whether it is full color, whether you have the idea of three bands or two bands. You know you have to have more than one band. The claim is being drafted in a way that is broad enough to be multiple color bands, whether it is two or three, and doesn't tell you which ones are being blocked and which ones are being passed. And it doesn't need to. All it is telling you is for sure you have to block the red.

THE COURT: Wasn't that this other gentleman's point, it doesn't tell you that and how would someone know?

HONEYWELL'S COUNSEL: You don't have to know. The invention only worries about making sure you block the red. And whatever else comes and goes, is going to affect the color gamut associated, the colors you can get out of your display.

THE COURT: Because the red is the only thing we're worried about.

HONEYWELL'S COUNSEL: So the claim is intentionally broad to make sure, okay, we know red has to be stopped, but now there is going to be other things that are stopped, other things that pass. And we're not necessarily going to decide here now because that's not really the important part of the invention. The important part of the invention is making sure that you at least block the predetermined red color band.

THE COURT: Why are they making the argument they are making? I am going to flip it on you.

HONEYWELL'S COUNSEL: I don't know for sure, but I have a guess. I am trying to think of what is the best exhibit to use to explain this. Maybe it is—this is the Westinghouse guide, Plaintiff's Markman Exhibit 24. This is a phosphor handbook. This is a book—we're going to see more of these later on, but these are specifications for particular phosphors. And in this particular case, it is—it happens to be an orange, what they call an orange—red phosphor. And so what that means is that this area from here to here (indicating) is clearly a range within the color portion of the spectrum. It satisfies our definition. And our definition never says it is the entire spectrum. It says it is a range within. So we're not trying to cover the entire visible spectrum. It is always a subset of it. But you see this particular one goes back all the way down from roughly 550 and all the way up to—I don't know where it trails off and that clearly would be a band, it clearly is associated with something, with red and orange, but it is not associated with a single color. But it is a range of wavelengths in the

color spectrum. And I assume that they would probably want to say that this is not a color band. I think it also comes into play when they try to carve up certain bands, they want to call in Plaintiff's Markman Exhibit 44.... [W]hen they were trying to—when defendants were trying to explain their theory of why claim 1 has multiple color bands instead of just one, they said, well, under their definition, maybe not ours, this band covers both red and orange. So they would want to say that's multiple bands, and in our definition, we would say, no, that is a band within the visible spectrum here. It happens, and it is a range within, it is not the whole spectrum, and it is a range within the color spectrum, which makes it a color band. And it happens to be associated with these two, this area, which, one may call—they would call, red and orange. So they would say that's not one band, it is two, and we say no, it is one band, it is one range, it is within the color spectrum. And just because somebody chose to call it red versus orange doesn't make it two color bands. It clearly—see, it has, this is a filter, but if you assume this is light, it has, you see, the characteristics of being one band. This also gets to the point that [the Government's counsel] said, which was what he said, in claim 2, that he says when they meant bands, plural, they said bands, and when they meant band, singular, they must mean band singular, so it must mean one color. And he pointed to the claim where he talks about having blue, red, and green color bands, plural, and he said uh-huh, down here, when they want to talk about one band, they talk about the green color band. That's, I think, making our point once again, that there are—see, we're not suggesting that the color band is the entire spectrum. And when you talk about red, green, and blue, they are separated apart. So they are separate bands. They happen to be called red, green, and blue. And when you want to talk about one of those bands, one of those ranges within the color spectrum, you talk about a red band. We're not saying, we have never said this whole thing is one big band and then that's why it should be singular, not plural. So

the claim is entirely consistent. There are three bands, that's why you use, when you are talking about all three, it uses a plural. And when it talks about the single band, it talks about it in the singular. But nothing in the definition of color band by itself says we have to figure out and call it by some conventional single name. And if we can't find the color system that comes up with a name that particular band, it is not a color band. It is clearly a range within, regardless of what you call it.

TR at 500–08.

### b. The Government's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's pre-hearing construction of "color band" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 28–34.

### ii. At The Claim Construction Hearing.

GOVERNMENT'S COUNSEL: [W]e agreed that color band is a range of wavelengths. And we actually agree that it is the range of visible wavelengths. The difference is whether it is within a single color. We believe it is clear from the extrinsic evidence, clear from claim construction rules you don't read a word out of the claims that it needs to be within a particular color. I want to point out that-

THE COURT: How would they be reading out? ... So, in other words, that his construction would be band equals a range of wavelengths? Is that what you are saying?

GOVERNMENT'S COUNSEL: Right, Your Honor, by adding in color, specifying it is a color.

TR at 483.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: Claim 2 uses color bands a number of times. But if you notice, every time it refers to one color, it is a color band. Every time it refers to multiple colors, it is color bands. I think that clearly shows that every time

you are talking about a color band, you are talking about one color, a primary color. It doesn't have to be a primary color but the claim clearly shows that it is a primary color. The only thing time you get into multiple colors, the blue, red and green is color bands.

THE COURT: But how could you convey to someone that you are just working within the wavelengths that we, most people look at as blue without saying it the way they did? What would you suggest they do?

THE WITNESS: I guess I don't follow the question.

THE COURT: Well, what you are arguing is that every time they use bands they have several colors. Every time they use the word band, they only have one color. And therefore, what you are suggesting is that your argument is band means one color. And they are saying, no, it is the entire, it can be the spectrum or portion of the spectrum, depending on kind of what you want to convey.

GOVERNMENT'S COUNSEL: Yes, Your Honor. I think it is clear from this, and I will show you some more evidence, more intrinsic evidence that a color band is also referred to as being within one color. You are not talking about the whole spectrum. It doesn't make sense to say the red, orange, yellow, green, blue, color band. It just doesn't make sense to say that.

THE COURT: I would agree with you on that.

GOVERNMENT'S COUNSEL: As I said before, claims never refer to a color band as containing more than one color. So when you use color bands, plural, it refers to more than one color. The specification says—figure 2, each color band provides a monochromatic image in one primary color.

THE COURT: Each.

GOVERNMENT'S COUNSEL: Each color band, meaning one color band provides a monochromatic image in one primary color. Because what this is referring to is figure 3 that they keep flashing up, there is 51 through 53, 51, 52, 53 are the color bands. Each one is one color. And again,

the portion of the specification that discusses figure 3 says figure 3 shows an arrangement in which the local source of light, 50, comprises red, green, and blue color bands. Source for monochromatic display transducers, again, monochromatic again meaning one color.

THE COURT: One color.

GOVERNMENT'S COUNSEL: Again, this is going back to what I said before. The color band under their definition could cover the entire spectrum. Again, reading color out of the claims, you talk about, you know, as I said before, red, orange, yellow color bands. It doesn't make sense to say it that way. Now, there is no evidence where a color band refers to more than one color. And that's just—you read the whole entire specification, every time you talk about a color band, it is one color. You don't say the red-blue color band. It doesn't make any sense.

THE COURT: Your argument is there are color bands within the spectrum and really what they are using is using the word color band to mean spectrum?

GOVERNMENT'S COUNSEL: That would be the effect of their interpretation, Your Honor, is that the entire visible spectrum could be a color band.

THE COURT: And what you are saying is that their use of color band means this effect or where you are defining it as each color is a band?

GOVERNMENT'S COUNSEL: That's correct, Your Honor.

TR at 489–92.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: One of skill in the art reads red and they say, oh, I know exactly what that means. The lay person has to pick up a dictionary or treatise and educate themselves up to that level of skill but that's what you get when you read it. So there is no need to put that in there. Some level of knowledge is always assumed or else patents would be hundreds of pages long.

THE COURT: Well, I guess I can see your construction by looking at 1(a) be-

cause when they decided to talk about red color and they have got that—and then they have associated with other color bands, meaning other bands of color. That's what I was mentioning before. So they did not really mean to have it being associated with the entire spectrum.

GOVERNMENT'S COUNSEL: Exactly, Your Honor.

TR at 495–96.

### iii. Post–Claim Construction Hearing Briefs.

In the Government's post-hearing brief, "color band" was asserted, without citation, to mean: "range of visible wavelength within a single color." 4/1/05 Gov't Brief at 32. The Government also argued that Honeywell agreed during the claim construction hearing that "color band" means "a range of visible wavelengths," but later modified its construction to mean "light that can be characterized by color." *Id.; see also* TR at 479 (Honeywell's Counsel: "We would agree with the defendants that the color band is a range of wavelengths ... and ... that range of wavelengths has to be within the visible spectrum."). The court, however, did not find that portion of the record inconsistent with Honeywell's argument that "color bands" means a range of wavelengths within the visible spectrum.

### c. Intervenor Lockheed Martin's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's construction of "color bands" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 28–29.

### ii. At The Claim Construction Hearing.

At the claim construction hearing, Lockheed Martin argued that unless color band is defined by a specific color: "how does the optical engineer know which wavelengths are of interest? If a color band can go across individual color bands, what do you design to [in order to avoid infringement]?" TR at 498.

LOCKHEED MARTIN'S COUNSEL: I think that when you subject any of the terms that Honeywell is or any of the definitions or constructions that Honeywell is proposing throughout the course of the Markman hearing, and you subject them to the analysis that [Lockheed Martin's co-counsel] set forth under *Vitronics,* what you are going to conclude is that they don't work.... There is going to be examples where Honeywell acted as a lexicographer. There are going to be examples where the specification defines things in a manner that is inconsistent with the construction that is being proposed by Honeywell. And the other thing you are going to find is that there are numerous instances in the intrinsic evidence, the patent file history, where they have surrendered the broader definition that they are now trying to take back and they can't do that.

THE COURT: But they didn't do that on color band.

LOCKHEED MARTIN'S COUNSEL: No, ma'am, they didn't.

TR at 499–500.

### iii. Post–Claim Construction Hearing Briefs.

Lockheed Martin further asserted that "[o]ne of ordinary skill in the art would conclude that the term 'color band' means 'a range of visible wavelengths within a single color.'" 4/1/05 Int. Brief at 40. The court was warned that Honeywell's proposed construction reads the adjective "color" out of the term "color bands." *Id.* Therefore, Lockheed Martin argued that the specification refers to single primary individual color bands. *See* '914 patent, col. 4, ll. 46–47 ("[e]ach color band 51–53 provides a monochromatic image in one primary color for the full color display.").

### d. The Court's Construction Of "Color Bands" In This Case.

The specification provides no definition of "color band." "Color bands" appears at '914 patent, col. 4, l. 51, wherein we are informed that the invention has "different" color bands that are to be filtered by "multiple monochromatic display transducers." '914 patent, col.

4, ll. 51–52. In Claim 1, where "color bands" is used, without such adjectives as "predetermined" or "predetermined red," the court construes "color bands" as: "a range of visible wavelengths that may include all colors visible to the human eye." *See* '914 patent, col. 6, l. 5.

On the other hand, when "color bands" is used in Claim 2(a), with adjectives such as "blue, red, and green color bands," the court construes "color bands" "to include the range of wavelengths, within which the colors blue, red, and green are visible to the human eye." *See* '914 patent, col. 6, ll. 13–14.

This construction is consistent with the specification that discusses "color band" in two contexts. First, the specification refers to single primary individual color bands. *See* '914 patent, col. 4, ll. 46–47 ("Each color band 51–53 provides a monochromatic image in one primary color for the full color display."). Second, in Figure 3, local source of light without reservation "comprises red, green, and blue color bands[.]" '914 patent, col. 4, l. 41.

**10. "Predetermined Color Bands."**

The parties have agreed that the term "predetermined color bands," as used in Claim 1(a) of the '914 patent, requires no further construction aside from the term "color band." Jt. Stip. ¶ 4.

**11. "Red Color Band."**

▮ The term "red color band" appears in the preamble to Claim 2 and in Claim 2(a)(3) of the '914 patent. The preamble to Claim 2 speaks of "a local source of light having ... red ... color bands[.]" '914 patent, col. 6, ll. 13–14. Claim 2(a)(3) provides for a "third filter for filtering the red color band." '914 patent, col. 6, l. 21.[11]

The parties have proposed the following competing constructions of "red color band:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Red Color Band: range of wavelengths within the red | Red Color Band: a range of color in the range from |

| region of the visible spectrum | 622 to 770 nanometers |
|---|---|

Honeywell *Markman* Slide 130; Gov't *Markman* Slide 043 (bold added by parties).

**a. Honeywell's Proposed Construction.**

**i. Pre–Claim Construction Hearing Brief.**

Honeywell's pre-hearing brief argued that the term "red color band" means a "range of wavelengths within the red region of the visible spectrum." 12/23/04 Honeywell Brief at 27. Honeywell asserted that this construction also is consistent with the specification wherein there is a reference to "the first monochromatic display transducer, such as a CRT providing a red color band 51, projects an image in the red spectrum." '914 patent, col. 4, ll. 52–54. In addition, the '914 patent provides: "In the case of CRT displays, the narrow color band may be defined for example as the band at which the most light is transmitted by a phosphor coating on the CRT." '914 patent, col. 5, ll. 8–11. Honeywell insisted that this language "clearly defines the narrow band ¢, (an example of a red color band) as the region of the spectrum where a red phosphor emits most of its light." 12/23/04 Honeywell Brief at 32. Honeywell also argued that since the '914 patent does not define a red color band by reference to any specific range of wavelengths, it would be improper for the court to limit this claim term in that manner. *See* 12/23/04 Honeywell Brief at 27 (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1371 (Fed.Cir.2003)) ("The district court properly declined to read into the claim any specific numerical improvement, such as ten-fold increase in competence."); *RF Delaware, Inc. v. Pacific Keystone Tech., Inc.*, 326 F.3d 1255, 1263 (Fed.Cir.2003) ("When a claim term is expressed in general descriptive words, it typically will not be limited to a numerical range."). In the alternative, Honeywell argued that if the court were to define "red color band" by using a specific wavelength, a plethora of extrinsic evidence contradicts defendants' selection of 622 na-

---

11. Claim 2(b) and Claim 3 include the term "narrowband of the red color band," which the parties have agreed means "a narrow range of wavelengths within the red color band." Jt. Stip. ¶ 6.

nometers as the lower limit of the "red color band." *See* 12/23/04 Honeywell Brief at 28–33.

### ii. At The Claim Construction Hearing.

HONEYWELL'S COUNSEL: We believe that both parties agree that a color band is a range of wavelength, as we have talked about. We believe that for purposes of the patent, it is more appropriate to define it as the red region of the spectrum, but not to pick one set of numbers that define that with sharp boundaries because we don't think it lends itself to sharp boundaries, as I will go into more detail. We think that the patent itself gives you guidance as to how to determine whether you are red or not[.]

TR at 509–10.

\* \* \* \* \* \*

HONEYWELL'S COUNSEL: [T]he question is, you know, is this the proper time for the Court to engage in fact-finding, to try to define an absolute bright line lower boundary for red because we don't believe we're ever going to get there in this case. I mean, that could be figured out through testing and psychological studies or through other resources and references, perhaps, but that hypothetical exercise is not going to be important because we know that the displays have red. The government calls them red. And we know that they are right within the range of what people call red, so we will never have to figure that out. Even if you did, that number just won't—doesn't square with the display industry. So maybe if I walk through it, it will become clearer as well. So we had based our construction on the intrinsic evidence, which the patent itself does not put wavelengths in, because everybody knows what the red color band in [sic]. It is a region within the red portion of the spectrum.

TR at 512–13.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Honeywell continued to argue that "red color band," as "described in the specification and set forth in the claims of the '914 patent, is light from the local source of light that provides the *primary red color* for producing a full color image in the display." 4/1/05 Honeywell Brief at 30 (emphasis added) (citing '914 patent, col. 4, ll. 46–54) ("*Each color band 51–53 provides a monochromatic image in one primary color for the full color display*, which appears on a front screen 15 as a combined full color image ... For example, ... the first monochromatic display transducer, such as a CRT providing a red color band 51, projects an image in the red spectrum[.]"); *see also* '914 patent, figure 3 (wherein the red color band 51 is mixed with the blue and green primaries to generate a full color image).

Honeywell's revised proposed construction was submitted to conform to the evidence at the claim construction hearing that "red color band" could be differentiated from other color bands by wavelengths. *See* 4/1/05 Honeywell Brief at 31. As Honeywell recognized, however, at least three extrinsic sources were cited as providing a wavelength for the "red color band," *e.g.*, the CIE color chromatic diagram, Munsell coordinates, and dominate wavelength. *Id.* Therefore, Honeywell urged the court to adopt "dominant wavelength," *i.e.*, 600 nm "or greater" to demark the boundaries of the "red color band." *Id.* at 31–32.

### b. The Government's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

The Government's pre-hearing brief advised the court that "red color band" inherently would be understood by one of ordinary skill in the art to be "light in wavelengths from 622 to 770 nanometers." 1/14/05 Def. Joint Brief at 30 (citing MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (3d ed.1984) at 1344); *see also id.* at 31 (citing Ex. 22 at 52 (RCA ELECTRO-OPTICS HANDBOOK) that red is in the 622 nm–770 nm range). The court also was advised that the prosecution history supported this proposed construction. *See* 1/14/05 Def. Joint Brief at

31 (citing Ex. 7 '914 patent Wrapper at D000364–5,369) (referring to French patent application concerning night vision goggles compatible with "rouge" wavelengths bounded at approximately 620–770 nanometers); *see also id.* (citing Ex. 7 '914 patent Wrapper at D000633) (referring to United States Department of Navy document discussing night vision goggles compatible with a color chart showing a boundary of red at approximately 620 nanometers).

In addition, the inventor of the '914 patent testified during his deposition that "Red is in the range of 625 to 700 (nanometers)." Ex. 5 at 66.

### ii. At The Claim Construction Hearing.

GOVERNMENT'S COUNSEL: We talked a lot about color. I want to go back. I mean, I know that Your Honor has had a chance to review the primer, but color is a psychological response to a physical perception.

THE COURT: I found that very interesting when I read that. Because I certainly—did not consider it that way.

GOVERNMENT'S COUNSEL: You ask the inventors, I don't remember which one said it, but I asked him, you know, how would you determine if something is red and he said—

THE COURT: Psychological primer.

GOVERNMENT'S COUNSEL: There was a little bit of dispute over which one. I think—I mean, I think there is a physical element to it as well, but whichever one, the key is it is psychological. We asked one of the inventors how would you define what red is. He said I would ask a bunch of graduate students and do a study, but the key is the study has been done and that's what that Beare study that was cited by the plaintiffs talks about.

TR at 549–50.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: You look at the claim context first. I know a lot of times I will come across things I know from the context I can't figure out, and I have to go to the dictionary. This is one of the instances where that's the case here. So we believe that since the patent doesn't define it, it is not defined anywhere in the intrinsic evidence, you have to say, well, what does one of ordinary skill in the art say about it. And we believe the [MCGRAW-HILL DICTIONARY] authoritative, famous book, shows clearly 622 to 770. There is no disputing that's what it says. Now, it is backed up by the [RCA ELECTRO-OPTICS HANDBOOK.]

TR at 552.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: Now, I want to talk about Honeywell's construction briefly. There are a number of problems with it, but I think the Court is focused in on the most important one. They say: Well, okay, it is inappropriate to construe red color band to any particular range of wavelengths. [Honeywell's counsel] said today maybe we can do a study and figure out what it is. That's not what that says in their brief. I don't know what their position is. But if it is this first one, patent is indefinite, claim is indefinite because you can't figure out whether you are in the red color band or not.

THE COURT: That's why I asked this gentleman before, why didn't the Patent Office pick that up.

GOVERNMENT'S COUNSEL: I mean, I really can't say. I think it is because the patent examiner has the same understanding of what red means as we do, which is that it is set within a particular well-known wavelength range. Now, what I am saying is that if you adopt their definition, it is indefinite because you cannot find whether you are inside the claim or outside the claim. . . . That's only if one of skill in the art would understand the bounds of the claim, when you read the claim. Now, we think that they would. They think that one skilled in the art wouldn't. And you would have this vague—

THE COURT: Remember yesterday when I asked the question, who was the person skilled in the art and whether or not they had to have—I probably said it inartfully, but aviation background, okay?

And it seemed to me that that question is equally relevant here because one who is skilled in the art of, it is more than just aviation, it is in terms of what is used in [instrument and panel lighting,] IPL they would have to be skilled in IPL?

GOVERNMENT'S COUNSEL: I think the knowledge of night vision goggle compatible lighting is relevant.

THE COURT: Which is the broader category.

GOVERNMENT'S COUNSEL: But the claims are construed as one of skill in the art at the time of the invention.

THE COURT: And you wouldn't have had the IPL at that time?

GOVERNMENT'S COUNSEL: You would have had IPL. You wouldn't have had NVIS red. So you go and ask—

THE COURT: Which came up in '88.

GOVERNMENT'S COUNSEL: Right. So that's another reason why we think NVIS red is inapplicable. The wavelength cutoff, sure, they don't change over time, but somewhere, [the inventor] writing the patent in 1985 had no idea what NVIS red was because it didn't exist yet, so how could he have referenced that?

THE COURT: Right. And you don't want to use the word IPL. You gave me—

GOVERNMENT'S COUNSEL: Instrument and panel lighting.

THE COURT: I have got that. There was a broader category you used a moment ago.

GOVERNMENT'S COUNSEL: Aviation red.

THE COURT: No, no.

GOVERNMENT'S COUNSEL: Night vision compatible lighting?

THE COURT: Yes.

GOVERNMENT'S COUNSEL: Okay.

THE COURT: Hold on.... [I]f I use that term in the time the patent was filed, that would have been a known specialty?

GOVERNMENT'S COUNSEL: I think if you talk to someone who was knowledgeable in night-vision goggle compatible lighting and displays, we will add that in there since this talks about displays, that they would have had knowledge in display, manufacturing for cockpits.

TR at 572–75.

### c. Intervenor Lockheed Martin's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's pre-hearing construction of "red color band" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 29–35.

#### ii. At The Claim Construction Hearing.

LOCKHEED MARTIN'S COUNSEL: Honeywell's construction potentially includes any range of visible wavelengths. And it is regardless of the color, and so there are no divisions. There are potentially no limits. And we think that such a construction really violates one of the fundamental tenets of patent law that we have been talking about over the past two days. And that is that a patent has to have metes and bounds. It has to have some definite tightness to it so people that are trying to improve upon what's there or make it better know what the invention is so they know what they are trying to improve upon. And we think that the construction of color band doesn't enable people to accomplish that.

THE COURT: Why wasn't that picked up by the patent examiner?

LOCKHEED MARTIN'S COUNSEL: I don't know, Your Honor. It could have been the patent examiner interpreted the term in accordance with our definition. Because, again, yesterday when—

THE COURT: Because if your point is valid, that is a big issue.

TR at 496–97.

\* \* \* \* \* \*

LOCKHEED MARTIN'S COUNSEL: [I]f you look at Honeywell's proposed construction, it doesn't provide any guidance. If a color band isn't a specific band of blue, red, or green, how does the optical engineer know which wavelengths are of inter-

est? If a color band can go across individual color bands, what do you design to? So in order to know which color bands to design to—

THE COURT: That's a very good point. TR at 498.

iii. Post–Claim Construction Hearing Briefs.

Lockheed Martin represented that "[b]ased on the intrinsic evidence, one of ordinary skill in the art would determine that the term 'red color band' means a 'range of colors … from 622 to 700 nanometers.'" 4/1/05 Int. Brief at 41. For the construction of this term, the court was advised that it was appropriate to consult dictionaries and technical treatises, along with the intrinsic evidence, *i.e.*, specifically the MCGRAW-HILL TECHNICAL DICTIONARY (DMX 18 at DE–963; DMX 21 at DE–980) or the RCA ELECTRO-OPTICS HANDBOOK (DMX 22).

Here, Lockheed Martin emphasized the relevance of the prosecution history to the need to construe the color red within a specified wavelength range. Since Honeywell relies on a February 14, 2001 Information Disclosure Statement citing a French patent designating that the "red color band" begins at approximately 622 nanometers. *See* IMX 36 at DE–1401. Therefore, on June 20, 2002, Honeywell submitted a Supplemental Disclosure Statement, to include a technical article by Breitmaier and Reetz that contained the Kelly Chart of Color Designation of Lights, showing that the "red color band" begins at 622 nanometers. *See* IMX 36 at DE–1670.

Therefore, Lockheed Martin argued that this prior art confirms that one of ordinary skill in the art would define the color "red" in accordance with the defendants' proposed definition, rather than by dominant wavelength, particularly since the '914 patent does not specify a dominant wavelength and the only reference in the specification are to peak wavelength. *See* 4/1/05 Int. Brief at 46 (citing '914 patent, col. 5, ll. 8–12) ("the narrow color band may be defined … as the band at *which most light is transmitted* by a phos-phor coating on the CRT, typically a five to twenty nanometer band.").

Nevertheless, Lockheed Martin insisted that peak wavelength is "more important" than the dominant wavelength because "optical filters filter the physical manifestation of light, *i.e.*, the peak wavelengths of phosphors in the visible range of the electromagnetic spectrum, and not the dominant wavelength, which is the wavelength at which the human eye perceives color." 4/1/05 Int. Brief at 46. Lockheed Martin also pointed out that Honeywell could have drafted the patent to cover specific lower wavelengths or define red to include "reddish orange, orangey red, or orange," but did not do so. *Id.* at 47. Therefore, Honeywell should not now be allowed to interpret words "to convey the special definition it now asserts." *Id.*

In Lockheed Martin's April 15, 2005 post-hearing brief, the court was urged "to define the term 'red color band' according to its peak wavelengths," because "one of ordinary skill in the art would utilize peak wavelength because this is where the filtering will occur." 4/15/05 Int. Brief at 20 (citing '914 patent, col. 5, ll. 8–11). In this regard, Lockheed Martin staked out a more aggressive position than the Government by arguing that "subsumed within Honeywell's construction is the apparent belief that if a display produces a color that is defined by a dominant wavelength, then the device must infringe irrespective of the wavelengths filtered by Honeywell's display system." 4/15/05 Int. Brief at 21.

**d. The Court's Construction Of "Red Color Band" In This Case.**

The term "red color band" is not defined in the claims or specification. Honeywell conceded that wavelengths are an appropriate measure of this term, as it must, in light of numerous citations to the symbol ¢ in the specification. *See* '914 patent, col. 3, l. 38; col. 4, l. 56; col. 5, ll. 7–8, 15. The court, however, declines to construe "red color band" without defining a specific range of light wavelengths, because the claim would be indefinite, in light of the psychological and subjective nature of the term without such

parameters.[12]

Since defendants agree that the prosecution history of the '914 patent recognized the lower end of a red color band is 620 nm, rather than 622 nm, the court construes 620 nm as the lower end wavelength boundary of the "red color band." *See* 1/12/05 Def. Joint Brief at 31 (citing '914 Wrapper at D000364–65, 368–69); *see also* D000633. The court is aware that Honeywell's expert, Mr. Tannas, criticized Dr. Task's opinion that red color band begins at 622 nm, because "numerous prior patents ... (*see* U.S. Patent Nos. 4,542,084; 4,390,637; 3,742,277; and 3,721,-849) [have] cited a lower range." *See* PMX 36 ¶ 15 at 4. None of these patents, however, are listed as prior art of the '914 patent. *See* DMX 1. Moreover, although Honeywell introduced these patents at trial, *see* PMX 3–6, they are still extrinsic evidence that the court does not need to consult at this juncture in light of the fact that the intrinsic evidence provides a low range parameter in this case.

To determine the high end of the red color band, the court has no alternative based on the record, but to turn to extrinsic evidence. Although both the MCGRAW HILL AND RCA ELECTRO-OPTICS HANDBOOK define the upper end of the red color band range as 770 nm, the court must decline to adopt that suggested construction since prior art of a related technology is more relevant than dictionary or treatise definitions, albeit latter are industry-specific and widely respected reference sources. In this case, USPTO No. 4,390,637, filed on September 9, 1981 and issued on June 28, 1983, "X–Ray Absorbing Glass For A Color Cathode Ray Tube Having a Controlled Chromaticity Value And A Selective Light Absorption" describes "highly transparent for the red color light (the wavelength of about 610–780 m¢)[.]" 4,390,637 patent, col. 1, ll. 29–30.[13] The court has reviewed the entire prosecution history of the '914 patent and related patents and found no reference to USPTO No. 4,390,637. Nevertheless, this prior art is extrinsic evidence and, in the court's judgment, more relevant and reliable than either industry-specific references and the expert testimony proffered by the parties. Therefore, the court construes "red color band" in this case as having an upper end range of 780 nm.[14]

Honeywell also argued that in the event that the court construed "red color band" by a range of wavelengths, the court also should specify that the "dominant wavelength" should be 600 nm or greater. *See* 4/1/05 Honeywell Brief at 31. Although there was a great deal of discussion at the claim construction hearing about the relevance of dom-

---

**12.** The court is mindful that in *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed.Cir.1996), the United States Court of Appeals for the Federal Circuit held that "technical terms are not *per se* indefinite when expressed in qualitative terms without numerical limits ... [m]athematical precision should not be imposed for its own sake." The court, however, does not view "red color band" as a technical term, but rather as a synonym for wavelengths expressed within a range measure of nanometers. *See, e.g.,* '914 patent, col. 4, l. 13 ("colors at lower wavelengths (red)").

In addition, as will be discussed below, after the claim construction hearing, Honeywell changed its position to agree to defendants' proposed construction of "blue color band" and "red color band" by specific ranges of wavelengths. Therefore, Honeywell's continued insistence that the court should not construe the "red color band" by a specific range of wavelengths, but may do so with regard to "blue color band" and "green color band," has no credible basis in logic.

**13.** The invention described in this patent "relates to glass for use as a color cathode ray tubes, and in particular, to X-ray absorbing glass for use as panels of color television tubes having a selective light absorption and a controlled chromaticity value." 4,390,637, col. 1, ll. 8–12.

**14.** Although several federal trial courts have issued constructions related to the wavelength of the color red, these constructions have not been reviewed by the United States Court of Appeals for the Federal Circuit. *See, e.g., Metrologic Instruments, Inc. v. PSC, Inc.*, 2003 WL 22077652, at *2 (D.N.J.2003) ("Because laser light is usually measured in the range of 640–670 nanometers, ... the appropriate wavelength of the color red .... [T]he high band-pass filter, which blocks ambient light with wavelengths above 640 nanometers, is also called the red pass filter. [The invention at issue] lies at 670 nanometers, in the visible region of the electromagnetic spectrum, at or near the color red."); *Jena v. Bio–Rad Lab.*, 2002 WL 181699, at *12 (S.D.N.Y.2002) (federal trial court relying on EUGENE HECHT AND ALFRED ZAJAC, OPTICS (1974), stating that the low end of the red color range was 622 nm and the high end was 780 nm).

inant versus peak wavelengths, since the '914 patent did not specifically address this issue, the court has declined to import what might be viewed as a limitation into the '914 patent by construing "red color band" either by a dominant or peak wavelength. *See Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1370 (Fed.Cir.2005) (forbidding a federal trial judge from adding a "limitation that is not present in the claim language and is not supported by the specification or prosecution history").[15]

### 12. "Predetermined Red Color Band."

The parties have agreed that the term "predetermined red color band," as used in the claims of the '914 patent, means "a specific range of wavelengths within the red color band." Jt. Stip. ¶ 5.

### 13. "Substantially Blocks."

■■■ Claim 1(a) describes a display system comprising a first optical filter that "filters light" and "substantially blocks light[.]" '914 patent, col. 6, ll. 1, 5. Claim 1(b) describes a display system comprising a second optical filter that also "filters light" and "substantially blocks light." '914 patent, col. 6, ll. 7, 8–9.

Claim 2(b) describes a display system comprising a fourth filter that "filters light" and "cooperating with said plurality of filters to substantially block at least said narrowband of the red color band[.]" '914 patent, col. 6, l. 26.

The parties have proposed the following competing constructions of "substantially blocks":

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Substantially blocks: obstructs the passage of light sufficiently to permit the | Substantially blocks: to render a large degree of light unsuitable for passage |

night vision aid to be used for its intended purpose | by an optical filter, such that the invention is fit for the intended purpose

Honeywell *Markman* Slide 180; Gov't *Markman* Slide 066 (bold added by parties).

#### a. Honeywell's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

In Honeywell's pre-hearing brief, the court was advised that "[a]s used in the patent, *substantially blocks* means to obstruct the passage of light sufficiently to permit the night vision aid to be used for the intended purpose." 12/23/04 Honeywell Brief at 34 (citing PMX 37 (Tannas Suppl. Report) ¶ 2 at 2; WEBSTER'S at 235 defining "block"). In all three claims utilizing the term "substantially blocks," Honeywell argued that "the objective of the substantially blocking is to permit the night vision aid to work ... without being disrupted by light from the local color display." 12/23/04 Honeywell Brief at 35 (citing '914 patent, col. 2, ll. 5–7) ("[T]o permit light which originates at the full color display from overwhelming the night vision aid."). The court further was advised that the "benchmark" for determining whether light is *substantially blocked* is whether the night vision aid can be used for its intended purpose." 12/20/04 Honeywell Brief at 36 (emphasis added).

#### ii. At The Claim Construction Hearing.

At the claim construction hearing, Honeywell argued that "substantially blocks" is "talking about what night vision goggles do." TR at 702.

> HONEYWELL'S COUNSEL: So Plaintiff's construction is that it obstructs the passage of light sufficiently to permit the

---

**15.** On April 20, 2005, after the claim construction hearing, Honeywell moved for leave to supplement the record with: Dr. Darrel Hopper, *"Draft Standard for Color Active Matrix Liquid Crystal Displays in U.S. Military Aircraft: Recommended Best Practices"* (Doc. No. GVT032–0001–00740). Honeywell represented to the court that this document states that red is defined by a dominant wavelength and in the field of military cockpit display, a claimed wavelength of 610 nanometers is considered "red." *See* 4/20/05

Honeywell Motion at 1–5 (citing GVT032–00034; GVT032–00037, Table 4). The court admitted this document into the record to create a complete record, but has not relied on it to construe "red color band" because the document was published in June 1994, almost a decade after the '914 patent issued and therefore is irrelevant. Moreover, the document is not a party admission against interest for several reasons, not the least of which is it is a "draft" and never formally was adopted by the Government for any purpose.

night vision aid to be used for its intended purpose.

TR at 704.

\* \* \* \* \* \*

THE COURT: Is your noun the same for all of the ...

HONEYWELL'S COUNSEL: The noun is different ... in ours [construction of "substantially blocks"], we're saying it's the night vision aid, to render night vision aid suitable. And in the second, in Defendant's construction, they are saying it renders the invention suitable.

THE COURT: Is there a difference?

HONEYWELL'S COUNSEL: Well, we think there is a difference, Your Honor. I don't know how—this is one of those where we're just trying to do what we think the claim says. I'm not sure why—what the significance of what the issue is, but it's one we didn't reach agreement on. I think the claim example here, it's quite clear substantial blocking—this is claim 2, substantial blocking that is associated with the fourth filter which is on the night vision aid. So the whole notion is that you're blocking to make the night vision aid work the way it's supposed to work. The—likewise, here, you are substantially blocking—this is in claim 1, to make the night vision aid work. And then substantial blocking up here. It all seems—the whole invention is associated with preventing interfering with the night vision aid. So I'm not sure what it means when they say, you know, the—render the entire invention suitable for its intended purpose, versus a night vision aid. So since we don't know what they're getting at, and we do think the claim itself, the whole substantial blocking aspect was relating to the proper functionality of the night vision aid, that's why we have focused on that in our construction. And perhaps we'll learn more from the Defendants and why they think that's incorrect. But there's no requirement—substantially blocked imposes no particular requirement on the colors that are displayed on the local color display itself. It's all—it's all surrounding what's happening for the functionality of the night vision aid in both claims. Here even in

claim 1, in 1(a), we have substantially blocks the light. But, again, that blocking, going back to figure 1, which there's no—

TR at 704–06.

\* \* \* \* \* \*

HONEYWELL'S COUNSEL: So in any event, the—the substantial blocking, again, if you look at figure 1, remember, the whole notion of why we're doing this blocking is to permit the night vision aid to operate as it's intended to, at the same time that it, again, doesn't—without interfering with the display itself[.]

THE COURT: So the pilot can look at the display and look straight out into the ... window?

HONEYWELL'S COUNSEL: Right. So there are three areas we disagree on. We already touched on one. I haven't got much more to say on it other than the fact that the third one, which is what we just covered—substantially blocks requires that the night vision aid or the entire—whether substantially blocks requires the night vision aid or the entire invention to be used for its intended purpose. That's the question. We think that intended purpose is a perfectly good way to characterize this term. But we think the perfectly good ought to be looked at in the context of the night vision aid.

THE COURT: Well, your construction ... you're using the word obstruct the passage of light sufficiently, which to me means "a lot of."

HONEYWELL'S COUNSEL: Actually, I think it might be the other way around. We're not trying to quantify it. Our second issue—

THE COURT: You're not.

HONEYWELL'S COUNSEL: No. The quantification is does it work for its intended purpose. In other words—but there's no quantification of this in the patent, nor should there be. If the thing works and it's doing what it's supposed to do, then so be it.

THE COURT: Let's back up ... [i]s there a finite amount of light that needs to be either blocked or obstructed?

HONEYWELL'S COUNSEL: The reality—

THE COURT: Do we know?

HONEYWELL'S COUNSEL: Well, I think—I don't think there's a number that exists.

THE COURT: Could you put a number there?

HONEYWELL'S COUNSEL: There certainly have been—there are certainly numbers of things that have been done, well after the patent, to try to figure out well, how good does it have to be, you know, and so forth. That wasn't in existence at the time of the patent. That wasn't in the inventor's head. In the inventor's head was I am going to make something which is unsuitable suitable. Our view is that's sort of self-explanatory in the end, frankly, if this thing makes its way into a $500 million aircraft with a several hundred thousand dollar display, it must be there because it's doing its job. And I—we don't think there's really any more that needs to be said about that in these patents. One might come up with another patent that has all sorts of other things and tests and parameters, but that's not what this patent is all about. This patent tells you you're going to do this and make it, and it's going to do what it's supposed to do.

THE COURT: Let's go back to the idea of the engineer looking at this and wants to make one of these things, or make something better than what you have. How does that person know that a—a person skilled in the art know how much [light] to block?

HONEYWELL'S COUNSEL: Well, you know, frankly, there's no—you have to see if it works. There's nothing in the rules or the law that says you can't do routine experimentation. Not everything in the world is set down and quantified. But if it's doing its job, if it's blocking—if it didn't work adequately without the filters and it does work adequately with the filters, it's substantially blocking and it's achieving its intended purpose.

THE COURT: Well, is the amount blocked each time different? In other words—

HONEYWELL'S COUNSEL: Well, I think—I guess, the reality is if the display has a changing image, what's actually blocking is going to vary with what's in the—what the output is of the display.

THE COURT: Of the display.

HONEYWELL'S COUNSEL: I think as a general matter the filter properties are not going to change, you know. So that's an implementation area. But, again, this is not a patent that's designed to sort of figure out exactly how you implement, nor do you have to. But the invention here is the notion of striking a compromise, it's block some light that makes the night vision goggles suitable and, you know, permit enough so you can see color in the display.... There are really three issues. The first one, I think we've actually touched on the first one a little bit here, because the claim talks about substantially blocks. We've talked about obstructing passage sufficient to work for its intended purpose. And the Defendants have added in the word, a large degree. Well—

THE COURT: Go back ... It seems to me—obstructed to me is kind of a measure. It seems to me that you're—it implies to me that you are blocking more in your definition than they are in theirs.

HONEYWELL'S COUNSEL: That's funny, because I certainly hadn't intended that, Your Honor. We say obstructs it sufficiently to make it work. They say obstructs a large degree. I guess our view is it doesn't make much sense to go from substantially to large degree. You're substituting one word of degree for another one, ... they're trying to import a large measure of blockage in there. And it may not have to be a large amount. It just has to be substantial enough to do the job. So we think [the defendants are] the ones who are putting in a measure of degree of blockage that's just not there. And it really doesn't make much sense to take one relative term of degree and swap it out for another one. Claim construction doesn't sort of compel you to sort of say let's change every word in the claim and come up with a synonym for it. Because it's not particularly helpful to go from one syn-

onym to another, ... there's nothing that's compelling. Large degree, for example, is not anywhere in the claim. It may well be ... one of many definitions of substantially[.] But I don't think that means ... we haven't gone in the claim and every word you find substitute a dictionary definition. And oftentimes dictionary definitions don't shed any light on things.

TR at 707–12.

＊　　＊　　＊　　＊　　＊　　＊

HONEYWELL'S COUNSEL: [T]he claim language itself says substantially blocks. And in their construction, they then convert that. I think their large degree of is probably their synonym for substantially. So what they're doing is saying let's take substantially, which is a matter of degree in the claim, and let's stick in a large degree in lieu of that word in our construction. And I don't think that necessarily sheds a lot of light on the subject. And frankly, whether it's a large degree or an adequate degree or a—is—all that really matters is is it doing the job.

THE COURT: Would it be the same if they had you eliminate the words a large degree so it would be to render light unsuitable?

HONEYWELL'S COUNSEL: I have a problem with that part of the construction, too.... they have substituted blocks ... if you were to figure out where that came from, the light—the unsuitable for passage is a dictionary definition—one dictionary definition for the word blocks. I can block the door and render it unsuitable for passage, right. In the context of a filter and light, it's just not the appropriate definition because—actually filters don't render light unsuitable for passage. That's not what [filters] do. So it's just the wrong definition. Filters do block. Or they can absorb or they can reflect. There's all sorts of ways filters work. They don't render light unsuitable for passage. It's just not technically correct. It doesn't do anything for the light. It either sort of turns it into heat or redisburses it. So we don't think it's a proper choice for a dictionary definition in this case. So for that reason we—

we think that the more proper—the notion of blockage is obstructs the passage.

THE COURT: All right.

HONEYWELL'S COUNSEL: We agree it obstructs the passage, but doesn't render the light unsuitable. And ... the last point, substantially blocks requires that the night vision aid—or doesn't require the night vision aid or the entire invention to be used for its intended purpose. I'm not quite sure where the [G]overnment is going with that. But the claim itself to us seems to suggest that the substantially blocked terminology is being used in the context of the night vision aid....

THE COURT: Are you going to move to the difference between [defendants'] use of the word invention and your use of the word night vision aid? Because your invention is larger than just—or more than just the aid itself.

HONEYWELL'S COUNSEL: Well, the invention is ... what the filter is doing ... it's the filter that is substantially blocking. And that's the filter on the night vision aid to render the night vision aid unsuitable. I don't know that that's a huge issue for us. I just think that what we've proposed is correct.... I don't want to muddy up the issue into ... I don't know what [defendants are] suggesting we have to prove when they say the invention is used by—I guess I don't understand—I don't think they've helped us any here.

TR at 707–16.

### iii. Post–Claim Construction Hearing Briefs.

In post hearing briefing, Honeywell reaffirmed that "substantially blocks" appears in three claims to describe the "function of three different filters," i.e., 1.) the first optical filter in Claim 1; 2.) the second optical filter in Claim 1; and 3.) the fourth filter in Claim 2. See 4/1/05 Honeywell Brief at 47 (citing '914 patent, col. 6, ll. 5, 8–9, 26). Therein, Honeywell contended that the term "substantially blocks" has the same meaning in each of the claims, i.e., "obstructs the passage of light sufficiently to permit the night vision aid to be used for its intended purpose." Id. Each term has the same

meaning each time that it is used, *i.e.*, "obstruct the passage of light sufficiently to permit the night vision aid to be used for its intended purpose." 4/1/05 Honeywell Brief at 47. When "block" is used in context with the claim, Honeywell asserts that it is clear that "light is being rendered unsuitable and that the 'obstruction' is an optical filter." *Id.* at 36 (citing '914 patent, claim 1, *i.e.*, "optical filter ... that substantially blocks light."). Honeywell further advised the court that the "objective of the substantial blocking is to prevent light from the local display from interfering with the night vision goggles ... [*i.e.,*] the appropriate benchmark for measuring the degree to which light must be blocked is whether the night vision aid works for its intended purpose." *Id.; see also* 4/15/05 Honeywell Brief at 23 (emphasis added) ("no quantitative test is required for those skilled in the art to understand the meaning of *substantially blocks* or determine the limits of the claim.").

Honeywell also attacked defendants' interpretation of "substantially" to require that the offending light is to be blocked "to a large degree." 4/1/05 Honeywell Brief at 47. To which Honeywell appropriately asked the rhetorical question: by how large a degree? *Id.* at 48. Although Honeywell conceded that no quantifiable answer is provided by the Government, the court was informed that the '914 patent "implicitly defines *substantially blocks* by describing the objective of filtering light for the display 'to prevent light which originates at the full color display from overwhelming the night vision aid.'" *Id.* at 48 (citing '914 patent, col. 2, ll. 6–7). Therefore, "substantially" should be construed as "requiring the night vision aid to function for its intended purpose." *Id.* (citing *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed.Cir.1984)) ("[The] court must determine whether the patent's specification provides some standard for measuring that degree."). Honeywell also urged that "in the context of the '914 patent, 'substantially' should be construed as requiring the night vision aid to function for its intended purpose ..., *i.e.*, if the filters do not block light for the display sufficiently to allow night vision goggles to be used in the cockpit, then the claim is not infringed." 4/1/05 Honeywell Brief at 48.

Finally, Honeywell challenged defendants' proposed construction of "such that the invention is fit for the intended purpose" to render the claim "vague and indefinite." 4/1/05 Honeywell Brief at 48. Honeywell asserted, however, without citation, that "the '914 patent imposes no such requirement." *Id.* On one hand, Honeywell argued that "[t]he objective of substantially blocking 'light from the local color display' pertains solely to the night vision aid." *Id.* On the other, Honeywell argued that "one of the objectives of the ['914 display system] invention is to allow the *full color* display in a NVIS compatible cockpit"—an "objective not invoked by the substantially blocks." *Id.* (emphasis in original). Nevertheless, the court was advised that the objective of allowing a full color display in a NVIS compatible cockpit is "achieved by ... the requirement for a *color display* and a *red color band.*" *Id.* (emphasis added) (citing *Golight, Inc. v. Wal–Mart Stores, Inc.,* 355 F.3d 1327, 1331 (Fed.Cir.2004)) (holding that patentees are not required to include in each claim all of the "advantages or features described as significant or important in the written description."); *Resonate Inc. v. Alteon Websystems, Inc.,* 338 F.3d 1360, 1367 (Fed.Cir.2003) ("[W]hen the written description sets out two different problems present in the prior art, is it necessary that the invention claimed, and thus each and every claim in the patent, address both problems? We conclude ... the answer is no.").

### b. The Government's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

Prior to the claim construction hearing, the Government argued that the " 'ordinary meaning' of 'substantially blocks' is clear from intrinsic evidence ... the claim terms ... read in light of the specification, *i.e.*, "filtration must 'be *very* efficient' so light from the display will be nearly completely blocked." *See* 1/14/05 Def. Joint Brief at 36–37 (citing '914 patent, col. 1, ll. 1–54). Since the purpose of the optical filter "is to allow

the use of a color display in connection with an NVG ... 'substantially' means 'to a larger degree ... such that the invention is fit for its intended purpose.'" 1/14/05 Def. Joint Brief at 37 (citing '914 patent, col. 3, ll. 8–11) ("[T]he purpose of the optical filter is to allow the use of a color display in the connection with an NVG.").

The Government, however, appeared so uncertain about the persuasiveness of this argument that it resorted to a dictionary definition and expert testimony in support before even mentioning the prosecution history, in passing, that it attempted to reinforce by the disfavored testimony of the inventor. *Compare* 1/14/05 Def. Joint Brief at 36–37 (citing WEBSTER'S and Dr. Task) *with* 1/14/05 Def. Joint Brief at 38 ("This purpose is evident from ... the prosecution history and repeated by the inventors.") (citing '914 Wrapper D000109; Ex. 5 Cohen 7, ll. 16–18).

On the other hand, the Government persuasively argued that the word "overwhelm" is not defined in the patent, discussed in the prosecution history, and apparently is not a common term used by one skilled in the art. Therefore, to define "substantially blocks" by reference to "overwhelm" could render Claim 1(a), Claim 1(b) and Claim 2(b) indefinite. *See* 1/14/05 Def. Joint Brief at 38.

### ii. At The Claim Construction Hearing.

At the claim construction hearing, the Government summarized the three significant differences in the parties' construction of the term "substantially blocks."

GOVERNMENT'S COUNSEL: [T]he biggest difference ... is the invention versus night vision aid.... [W]e believe that [our construction] provides a workable test as one reading the patent would understand it.... [O]ne skilled in the art ... in night vision goggle compatible, will understand what the invention as a whole was meant to do.

THE COURT: I was surprised that both sides decided they wanted to construe this. Do you want to shed some light as to why?

GOVERNMENT'S COUNSEL: Why construe this at all? ... Well, Your Honor, I think it becomes necessary because, first of all, substantially ... has different meanings depending on the application and depending how the specification shows you should use it.

THE COURT: Okay.

GOVERNMENT'S COUNSEL: Second of all, substantially has different meanings depending on what the purpose of the invention is. So we wanted to make clear what the purpose of the invention was. Also we want to give Your Honor sort of a context for deciding this in terms of what someone would understand substantially blocked to mean.

THE COURT: Okay.

GOVERNMENT'S COUNSEL: Substantially blocked was used in the claims. Your Honor was right to point out that there are three times it's used. We don't believe it's always used in conjunction with the goggles.... [Y]ou can see that from 1(a). It says the filter passes light comprised of predetermined color bands, including predetermined red color band, and substantially blocks light associated with color bands other than that predetermined color band. That filter is on the display.

TR at 717–18.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: The filter in part A is the filter on the display.... This filter in part B is the filter on the goggles. Both of them must substantially block, whatever that means, whatever we decide that to mean.

THE COURT: Right. But they're two different items.

GOVERNMENT'S COUNSEL: Two different items. Two different things. We think that draws the invention in as a whole as opposed to just the night vision aid.... [T]here's nothing in the claim that tells you exactly what substantially means and what it doesn't. It doesn't give you a whole lot of context. But the specification uses substantially blocked only once. And, again, it's not extremely helpful. But what it does tell you is that the other filters, 23, 25, ... probably 24 may need to be in there as well, and that refers to figure 3,

which—. . . 23 and 25 are the filters that—you know, it says 25 being a notch filter. The other filter 23, 25, I think that's probably a typo. I think they probably meant to refer to one or the other. Substantially blocks light in a predetermined red color band. So that's the one use of it in the specification. . . .

THE COURT: Let me ask you something totally different. Is substantially blocks in one sense redundant if you use the word notch?

GOVERNMENT'S COUNSEL: No, Your Honor. Because it has to block light or substantially block light of—

THE COURT: But I thought that's what [it] did, when we were looking at what a notch was, the notch did block within that range. . . . Do you remember what I'm talking about?

GOVERNMENT'S COUNSEL: I do exactly know what you're talking about. . . . Filters don't have to be 100 percent blocking or passing.

THE COURT: So the notch itself is not a total block.

GOVERNMENT'S COUNSEL: You could have a notch that only blocks at 50 percent.

THE COURT: Okay.

GOVERNMENT'S COUNSEL: I think that what this does is it adds in it must substantially block, whatever substantially means. Now, we think there's context for this given in the specification, because it says filtration of the objectionable light must be very efficient because small amounts of light within the active frequency range of the night vision goggle will overwhelm the aid. So it ties it to very efficient blocking. The blocking must be very efficient.

THE COURT: I thought that was an unusual use of words, too. . . . [F]iltering needs to be efficient.

TR at 719–22.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: Now, the term substantially blocks isn't used in the prosecution history [or] in any of the art. We believe that it's a common word without special meaning. A dictionary definition is appropriate. The renders light unsuitable for passage comes straight out of [WEBSTER'S] dictionary. They use [WEBSTER'S] dictionary as well, a different definition. We believe ours is appropriate because it's a transitive verb, and because it says that the filter substantially blocks light. So if the filter is acting on the light and needs to render the light unsuitable for passage. . . . Now, getting to . . . substantially in patent law is a term of magnitude or approximation. . . . If you look at claim 3, [it] says substantially 5 to 20 nanometers wide. We haven't even discussed claim 3 . . . . But substantially is used there as an approximation term. Approximately 5 to 20 nanometers wide. But it can also be used as magnitude. Now what you do to determine which one is you look at the specification and how it's used in the specification. The specification says it must be very efficient. Okay. Well, what does very efficient mean. That's a matter of degree as well. So that leads you to the conclusion that substantially means to a large degree. Now, [Honeywell's counsel] has said well, that's just substituting one—one word for another. . . . But we think that it's actually clarifying between the two uses of substantially in patent law, which is that it's signifying a large degree. Now, I would also point out that [Honeywell's] construction suffers from the same fault, which is they use sufficiently. That's a matter of degree as well . . . substantially necessarily has a sort of mushy definition. And so sufficiently large degree, . . . [defendants' construction] is more appropriate because of the very efficient language. You understand that it has to be, to a fairly high degree, a blockage. That's why we inserted that language there. And I don't think it's redundant . . . [or] useless to make that construction. Now, I want to also talk briefly about how one of skill in the art would understand what substantially block means, because I think that goes to the invention as a whole.

THE COURT: That's why you use the word invention in your definition. . . . As opposed to just the night vision aid.

GOVERNMENT'S COUNSEL: That's correct, Your Honor. We believe the law is clear that when you're construing substantially, you look to the purpose of the invention. And so substantially has to mean that whatever it does, it achieves the purposes of the invention. I think that's pretty much common sense, but it's also the law. So you need to look at the invention as a whole. Now, what's the purpose of the invention as a whole? Is it to have a workable night vision aid? Yes. But there's more to it than that. Because it's also you have to have a color display—

THE COURT: You've got to be able to read at the same time.

GOVERNMENT'S COUNSEL: That's readable, usability within the same environment as the night vision aid. So that adds a little bit more complexity to the whole question. I—I think it's going to come out later, and again, I don't want to get into it too much, but I think that the—the night vision aid being workable is not a usable distinction. And—a usable measure of what substantially blocks is. If you look at the invention as a whole, there were known ways to measure compatibility between a color display and a night vision goggle in 1985. And I'll give you two of them right here.

THE COURT: In terms of quantitative—quantified?

GOVERNMENT'S COUNSEL: There's both a quantitative and a qualitative way to do it. The quantitative way to do it is you measure overlap, you look at the curve that the filtered light is putting out. And you look at the curve that the sensitivity of the goggle is. Then you do sort of a mathematical integration under the overlap. Because they're going to overlap ... the area under that had to be under a certain amount.... [I]t was called ANVIS radiance.... [T]hat's actually how the military measures compatibility today. But it was coming out in 1985 ... is even talked about in the prosecution history as one of the ways [the military was] looking at making things compatible and measuring whether things are compatible.

\* \* \* \* \* \*

THE COURT: Well, could they have put a measurement into the claim? ... Or is this one ... where you don't need to because the person skilled in the art automatically is going to know what that number is?

GOVERNMENT'S COUNSEL: ... [S]omeone skilled in the art would understand. Now, I'm not saying that they adopted it. As I'm going to say here, there are two measurements. We think they give about the same answer.

THE COURT: And what type of skill would the person have to have to know both of these measurements?

GOVERNMENT'S COUNSEL: These were known in the field in 1985. And by the field, I mean the field of night vision goggle compatible lighting and displays.

THE COURT: Okay.

GOVERNMENT'S COUNSEL: It was being developed by the military. They were really the ones that were looking for how to do all of this. Now the qualitative measurement, as I was getting to, is what you would do is ... put a user in a cockpit with the goggles on in a dark hangar, simulating night. And you put a chart with a whole bunch of lines, a contrast chart on the far wall of the hangar. With the lights off. Then you turn on the cockpit lights. And he would be looking through the goggles at this chart. If there was any degradation of performance, they didn't pass this test.... [T]he first one was designed to sort of mimic the second, but you can get a quantitative measurement rather than qualitative. Now the reason I bring this up is that these were tests that were known at the time. Again, it goes back to definiteness. And a claim has to be understood, the metes and bounds have to be understood by those skilled in the art. And we believe these were out here and they were understood. And, therefore—and these measure whether the invention as a whole—

THE COURT: And the patent examiner would know all that just by looking at this? He would have understood that these two measurements—

GOVERNMENT'S COUNSEL: I think he would have learned by reviewing the prosecution history.... I'm assuming, because I don't know what the examiner was reviewing.... [T]he problem with—with focusing on whether the NVGs operate is problematic. First of all, ... it's contrary to the stated purpose of the invention, which comes out at the very beginning of the ['914] patent language, ... [and] says [that] it is desired that a night vision aid be operable while a full color display is ... presented in the vicinity of the goggles. And in particular, to operate them in an environment in which a full color display is illuminated. So you've got to have a workable goggle and workable display. If you just focus on the goggle, you can just turn off the display. Or you can cover it up so it's not readable during daylight. That's a big problem. Because if you put too thick of a filter over the top of it, you can't read it during the day.... But the problem is Honeywell can't tell you what the test for goggles working for an intended purpose is. They're going to say, well, you look at the patent and the patent says it won't overwhelm the goggles. What does overwhelm mean? And they'll give you a list of things. Now, my problem with that is that if you've got five different tests and you meet three of them, do you fall within or without the claims. And that's the real problem here. So our view is that, if you only look at the goggles, the claims become indefinite because you can't—*there's no accepted, in 1985, measure for whether a goggle works for its intended purpose.* That's why you need to look at the invention as a whole.... [T]he prosecution history ... comes out of the same article that we were discussing earlier with the Kelly chart, which is by two gentlemen named Breitmaier and Reetz. And if you recall, Your Honor, ... Ferdinand Reetz was the gentleman who drafted that document that described the rationale behind the military standard... [that] comes from a—the 10th European Rotorcraft Forum that—... is August 28th through 31st, 1984.... [I]t's part of Defendant's Exhibit 36 ... DE 1621[.]

THE COURT: Okay.

GOVERNMENT'S COUNSEL: Now, do you see the spectral radiance limitations in ... the middle of the page? It talks about defining a new quantity called ANVIS radiance, defined in the units of AR. It's the amount of energy emitted by a light source that is visible through the ANVIS defined as the integral of the curve generated by multiplying the spectral radiance of the light source by the relative spectral response of the ANVIS. That's what I was talking about before, the two curves. When you multiply the two curves together, you get some—some function. And then what this shows you is that ANVIS radiance is you integrate from 450 to 930 the—that function.

THE COURT: And why do you want to know that?

GOVERNMENT'S COUNSEL: Because ... that's a measure of how much light is getting through.... And so if you integrate under it, that gives you the area under the curve.

THE COURT: So under ... is what you're telling me is that you could actually determine whether it was substantially blocked or not by utilizing this formula?

GOVERNMENT'S COUNSEL: There was a standard set—and it's in here that the military says [its]—okay.... They wanted to use—helicopter pilots wanted to use these goggles. The problem was ... defoliated trees, trees with no leaves on them are very dark, don't reflect very much light at all. And you want to fly on nights where there's no full moon. You want no moon at all because you want the other guy not to see you coming.... Now the problem is ... you don't want anything to show up brighter than tree bark and starlight. So what they did is calculated what the radiance was of tree bark and starlight and came up with a number.... That ends up being this number here. It says that the cockpit lights should be no brighter than the outside scene when viewed through the ANVIS. The ANVIS radiance of the cockpit lights should not exceed $1.7$ times $10$ to the negative $10$ AR when the cockpit is lighted to an acceptable level. So that was a standard that

was known ... you could use that to determine whether a display was compatible with your night vision goggle.

THE COURT: Okay. And how does that affect the substantially blocks?

GOVERNMENT'S COUNSEL: We believe that that is one measure that one of skill in the art would use to determine—

THE COURT: To determine whether it's substantially blocked.

GOVERNMENT'S COUNSEL: Whether it was substantially blocked. If it met that standard, it would be substantially blocked.... This was known, this is a test that was known—

THE COURT: At the time of the patent.

GOVERNMENT'S COUNSEL:—in 1985. And—

THE COURT: Why wasn't it referenced then? Does it need to be?

GOVERNMENT'S COUNSEL: Well, I don't know. I think it was referenced in that it was inserted in the prosecution history.

THE COURT: Okay.

GOVERNMENT'S COUNSEL: So it was before the Patent Office.... The examiners presumed to have considered everything in the prosecution history.... So it was at least familiar with this. As I said, there was another measure that was being used at the time that was this qualitative measurement, you sat in the cockpit and looked at the chart. But I think that the idea was that those were approximations. I don't think Honeywell is going to give you a test such as this that is going to give you ... what can the night vision goggle be used for. What is the intended purpose of the night vision goggle. Well, it's to look outside. Well, what is preventing the intended use from happening? Is it a 10 percent reduction in view? Is it a 20 percent reduction in view? They don't know. We don't know. So you ... need to look at the whole thing.

TR at 722–37 (emphasis added).

### iii. Post–Claim Construction Hearing Briefs.

The Government's post-hearing claim construction brief argued, again without citation to authority, that the "ordinary meaning of 'substantially blocks' ... is to render a large degree of light unsuitable for passage by an optical filter, such that the invention is fit for the intended purpose." 4/1/05 Gov't Brief at 44. Moreover, in this regard, the Government advised the court that it is necessary to consider "some extrinsic evidence to determine the degree of blocking that would have been considered 'substantial' at the time of the invention ... because the claims ... [*i.e.,* the specification and prosecution history] context provides little information as to the meaning of the term 'substantially.'" *Id.* The Government conceded, however, that the specification's use of "blocks" implies that an optical filter was acting on "incident light to obstruct or prevent its passage." *Id.* (citing '914 patent, col. 3, ll. 22–24).

### c. Intervenor Lockheed Martin's Proposed Construction.

#### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's proposed construction of "substantially blocks" was the same as that of the Government. *See* 1/14/05 Def. Joint Brief at 36–38.

#### ii. At The Claim Construction Hearing.

Lockheed Martin also adopted the Government's proposed construction of "substantially blocks" at the claim construction hearing. *See* TR at 737.

#### iii. Post–Claim Construction Hearing Briefs.

Likewise, in Lockheed Martin's post-claim construction briefs, the Government's proposed construction of "substantially blocks" also was adopted. *See* 4/1/05 Int. Brief at 48; *see also* 4/15/05 Int. Brief at 24.

### d. The Court's Construction Of "Substantially Blocks" In This Case.

In Claim 1(a), a first optical filter is described as a notch filter that "substantially blocks" light associated with color bands.

*See* '914 patent, col. 6, l. 5. The court construes the verb "blocks" as preventing light from a color display from reaching the night vision aid and "substantially" to mean in a sufficient amount to enable the night vision aid to function. *See* '914 patent, col. 2, ll. 6–7 ("It is ... desired to prevent light which originates at the full color display from overwhelming the night vision aid."); *see also* '914 patent, col. 2, ll. 13–15 ("[T]he first optical filter is placed over displays, which may otherwise present light that would interfere with the ANVIS."); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed.Cir. 2001) (quoting *Pall Corp. v. Micron Seps., Inc.*, 66 F.3d 1211, 1217 (Fed.Cir.1995)) ("We note that like the term ... 'substantially' is a descriptive term commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'"); *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1056 (Fed.Cir.1988) (The term "'substantially' ... must be interpreted in light of the specification and prosecution history[.]").

In Claim 1(b), a second optical filter is described as a notch filter that "substantially blocks" light associated with color bands. *See* '914 patent, col. 6, ll. 8–9. Here, too, the court construes the verb "blocks" as preventing light from a color display from reaching the night vision aid and "substantially" to mean in a sufficient amount to enable the night vision aid to function. *Id.*

In Claim 2(b), a fourth filter located at the night vision aid works with other filters to "substantially block" at least a narrowband of the red color band from being admitted into the night vision aid. The court construes the verb "block," at a minimum, as preventing light from the narrowband of the red color band from entering the night vision aid. The use of the verb "being admitted" renders the term "substantially blocks" unnecessary surplusage, since if the light at issue is prevented from being admitted into the night vision aid, *ipso facto*, such light also is substantially blocked.

### 14. "First," "Second," "Third," "Fourth," And "Filter."

Claim 1(a) includes the term "first optical filter" twice. *See* '914 patent, col. 6, ll. 1–2.

Claim 2(b) includes the term "second optical filter" twice. *See* '914 patent, col. 6, ll. 7–8. Claim 2(a)(1) includes the term "first filter." *See* '914 patent, col. 6, l. 6. Claim 2(a)(2) includes the term "second filter." *See* '914 patent, col. 6, l. 18. Claim 2(a)(3) includes the term "third filter." *See* '914 patent, col. 6, l. 20. Claim 2(a)(4) includes the term "fourth filter" twice. *See* '914 patent, col. 6, ll. 23–24.

The parties have proposed the following competing constructions of "First," "Second," "Third," "Fourth," and "Filter:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **First Filter:** a filter | **First Filter:** being number one in a countable series |
| **Second Filter:** another filter in addition to the first filter | **Second Filter:** being number two in a countable series |
| **Third Filter:** another filter in addition to the first and second filters | **Third Filter:** being number three in a countable series |
| **Fourth Filter:** another filter in addition to the first, second and third filters | **Fourth Filter:** being number four in a countable series |

Honeywell *Markman* Slide 188; Gov't *Markman* Slide 075 (bold added by parties).

The court has not repeated the parties' arguments here since, as a matter of law, it is settled that the use of "first," "second," "third" is clearly "not a serial or numerical limitation, [because] the claim does not follow a consecutive order.... The claim is thus clearly not using the ordinals-first, second, third-to show a consecutive numerical limit but only to distinguish or identify the various members of the group." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed.Cir.2005); *see also 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed.Cir.2003) ("The use of the terms 'first' and 'second' as common patent-law convention to distinguish between repeated instances of an element or limitation."). Accordingly, the court declined to construct "first," "second," "third," etc., to impose a serial limitation on a claim, but rather identify the various members of a group. *See Gillette*, 405 F.3d at 1373–74.

### 15. "Blue Color Band."

The term "blue color band" appears in the Preamble to Claim 2. *See* '914 patent, col. 16, l. 13. In addition, "blue color band" appears in Claim 2(a)(1). *See* '914 patent, col. 16, l. 17.

The parties have proposed the following competing constructions of "blue color band:"

| Honeywell's Proposed | Honeywell's Proposed |
|---|---|
| Honeywell's Proposed range of wavelengths within the blue region of the visible spectrum | Honeywell's Proposed a range of color in the range from 455 to 492 nanometers |

Honeywell *Markman* Slide 190; Gov't *Markman* Slide 079 (bold added by parties).

#### a. Honeywell's Proposed Construction.

##### i. Pre–Claim Construction Hearing Brief.

In Honeywell's pre-hearing brief, the court was advised that "[i]n the context of the patent, *blue color band* means a range of wavelengths with the blue region of the visible spectrum." 12/23/05 Honeywell Brief at 36 (emphasis in original) (citing Tannas Initial Report ¶ 17; Tannas Rebuttal Report ¶ 18). This construction was represented as being consistent with the specification wherein the *"blue color band* 53 is the light emitted by a monochromatic display transducer, such as a CRT, in the blue region of the visible spectrum." 12/23/04 Honeywell Brief at 37 (citing '914 patent, col. 4, ll. 40–43) ("the local source of light 50 comprises ... blue 53 color bands sourced from monochromatic display transducers, such as for example three monochromatic cathode ray tubes[.]"); *see also id.* at '914 patent, col. 4, ll. 46–47 ("Each color band 51–53 provides a monochromatic image in one primary color for the full color display."). Honeywell argued that it is improper to define "blue color band" using specific wavelengths. *See* 12/23/04 Honeywell Brief at 37. In the alternative, if the court were to define "blue color band" by wavelength, Honeywell asserted that the defendants' proposed ranges are incorrect, referencing U.S. Patent No. 4,390,637, wherein the following wavelengths for the blue color band emitted by a cathode ray tube were represented to be 430–460 nanometers, as opposed to the defendants' proposed 455–492

nanometers. *Id.* (citing USPTO Patent No. 4,390,637, col. 5, ll. 20–22). Based on this prior art, and other extrinsic evidence, Honeywell warned the court that defendants have specified a lower limit for the blue color band that excludes the wavelengths emitted by a blue CRT, which the '914 patent provides as "an example of a *blue color band."* 12/23/04 Honeywell Brief at 38 (citing '914 patent, col. 4, ll. 40–43).

##### ii. At The Claim Construction Hearing.

HONEYWELL'S COUNSEL: Our position, for the same reasons we described previously, is that it's just not appropriate to put wavelength ranges. And now I have this same concern that I'm—that once you start using these ranges which came from the same source, I don't know what they mean or how they get interpreted. I'm not so sure—I have now come to the conclusion they don't shed much light on the subject. I'm not sure if anybody is any better off trying to figure out what's red, green or blue based upon these numbers, because we're all interpreting the actual numbers differently. But we do think, once again, there is, as you remember from all of the arguments—literature I showed Your Honor has RGB, red, green, blue. So the same sort of data that's out there to define or empirically establish red is out there to empirically establish green and blue. So I think in the end these issues are going to—I think ought to resolve themselves the same way, however that is. And for that reason, we haven't said a whole lot about this. Again, as you'll see, the specification, in the same area it does talk about the green and blue bands the same way it talks about the red band. And by the way, just to—I didn't address [Government's counsel's] point before, but I'm happy to do it. These are not—there are no such things as monochromatic CRTs, but you can get pretty close. If you look at the—they are in a sense one color, which is what is meant by that, but they're not monochromatic in the Kelly chart sense. Because there is no such thing as a phosphor that looks like that. They all have a spike and a wavelength around them. So this is perhaps not

the most artful language, but those skilled in the art would certainly understand there is no such thing as a monochromatic CRT, at least I don't think there is.

TR at 686–87.

\* \* \* \* \* \*

HONEYWELL'S COUNSEL: And that is because, if you look, they have selected a range of 455 to 492, for example, for blue. If you look at the Kelly chart—and by the way, there's absolutely—there's only one Kelly chart. So whatever is in the intrinsic evidence, whatever—it's got to be a bad copy, because there aren't different versions of the Kelly chart. And that's what's referenced in the Breitmaier and Reetz thing. So whether it looks like 620 or not, it's just not 620. Because it says it's the Kelly chart. And blue on the Kelly chart starts at around 460 and ends at 480. And their construction is 455 to 492. So once again, 492 extends all the way out to about here. So once again, you know, we have lots of experts disagreeing on those ranges. This came out of [MCGRAW-HILL] again. This is the Kelly chart, yet a different one. And JEDEC would be different still.

TR at 688–89.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Honeywell conceded that the "blue color band" could be construed as "light that can be characterized ... between approximately 455 and 492 nanometers." 4/1/05 Honeywell Brief at 47. Although Honeywell changed its position regarding the nanometer ranges that the defendants designated for "blue color band," Honeywell, nevertheless, maintained that if "blue color band" is to be construed by specific wavelengths, the court should specify a "dominant wavelength for the same reasons argued regarding the 'red color band.'" Id.

### b. The Government's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

The Government advised the court that "blue color band" means "a range of color in

the range from 455 and 492 nanometers." 1/14/05 Def. Joint Brief at 39 (citing Ex. 30 MCGRAW HILL at 701–02). The Government challenged Honeywell's construction based on extrinsic patents and phosphor references as providing "no metes or bounds." 1/14/05 Def. Joint Brief at 39. The Government also noted that Honeywell's reliance on a numerical indication of acceptable wavelengths from phosphor references is an impermissible use of extrinsic evidence, since the '914 patent contains no mention of specific phosphors, but, relies on such sources to expand the claim terms—to the point of indefiniteness. Id.

### ii. At The Claim Construction Hearing.

GOVERNMENT'S COUNSEL: We've, again, shown what one of ordinary skill in the art would understand, which is definite wavelength boundaries.... [W]e believe this is known to those skilled in the art. The analysis is exactly the same as with red.

TR at 692.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: And, again, blue, 455 to 492, bleu, 455 to 492. The brief—and Mr. Gotts didn't turn to this, but their brief cites two things, one is the Westinghouse phosphor guide, we've discussed that to death. And then the U.S. patent 4,390,637, they say that shows different ranges than ours. I don't care. It's extrinsic. It doesn't matter. And finally, I don't know what their construction is anymore. The one that was popped up there, the one they had before that was in the briefs, the blue region and green region, again the same problem with the red color bands. It's unworkable, it's indefinite. Or if it is definite, we should decide where the boundaries are.

THE COURT: But the PTO didn't bounce it for that reason.

GOVERNMENT'S COUNSEL: No, because we think that one of skill in the art,

when they look at blue ... color bands, something clicks in their mind and they know what the wavelength boundaries are. But you and I maybe don't, and so we need to go to the dictionary. The PTO, the examiner is either one of skill in the art or he educates himself to skill in the art. So he didn't bounce it for that same reason. He knew—

THE COURT: As someone who works with color in patents.

GOVERNMENT'S COUNSEL: Possibly. Or again, he can educate himself just as well as we can.

THE COURT: Okay.

GOVERNMENT'S COUNSEL: So I don't know what their new definition is that they're going to come up with, the same way they come up with the red one. I don't know if they are. If they don't, I think that's wrong and indefinite. If they do come up with a new one, if it's anything like the red one, I again think it's wrong. That's all I have.

TR at 693–94.

### iii. Post–Claim Construction Hearing Briefs.

Although Honeywell changed its position after the claim construction hearing to agree with the Government that the nanometer range of "blue color band" was "between approximately 455 and 492 nanometers," Honeywell continued to seek a construction that designated a dominant wavelength. 4/1/05 Gov't Brief at 47. Likewise, the Government continued to argue that Honeywell's assertion that peak wavelength should be adopted as the "proper measure" was erroneous. 4/1/05 Gov't Brief at 48; *see also id.* at 34.

### c. Intervenor Lockheed Martin's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin adopted the Government's proposed construction of "blue color band." *See* 1/21/05 Def. Joint Brief at 39.

### ii. At The Claim Construction Hearing.

Lockheed Martin also adopted the Government's position regarding the meaning of "blue color band" at the claim construction hearing. TR at 694.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Lockheed Martin continued to adopt the Government's proposed construction of "blue color band." *See* 4/1/05 Int. Brief at 50.

### d. The Court's Construction Of "Blue Color Band" In This Case.

The court construes "blue color band" as a range of color from 455 nm to 492 nm. For the reasons discussed in the court's construction of "red color band," however, the court has declined to designate a dominant or peak wavelength to the construction of "blue color band."

### 16. "Green Color Band."

 The parties have proposed the following competing constructions of "green color band:"

| Honeywell's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| **Green Color Band:** range of wavelengths within the green region of the visible spectrum | **Green Color Band:** a range of color in the range from 492 to 577 nanometers |

Honeywell *Markman* Slide 190; Gov't *Markman* Slide 079 (bold added by parties).

### a. Honeywell's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

In Honeywell's pre-hearing brief, the court was advised that "[i]n the context of the patent, *green color band* means a range of wavelengths within the green region of the visible spectrum." 12/23/04 Honeywell Brief at 36 (emphasis in original) (citing Tannas Initial Report ¶ 17, Tannas Rebuttal Report ¶ 18). The court was informed that this construction is consistent with the specification wherein the "green color band 52 is the light emitted by a monochromatic display

transducer, such as a CRT, in the green region of the visible spectrum." 12/23/04 Honeywell Brief at 37 (citing '914 patent, col. 4, 11. 40–43) ("[T]he local source of light 50 comprises ... green 52 ... color bands sourced from the monochromatic display transducers, such as for example three monochromatic cathode ray tubes[.]"); *see also id.* (citing '914 patent, col. 4, 11. 46–47) ("Each color band 51–53 provides a monochromatic image in one primary color and for the full color display."). Honeywell also argued that it is improper to define "green color band" using specific wavelengths. *See* 12/23/04 Honeywell Brief at 37. In the alternative, if the court were inclined to define "green color band" by wavelengths, Honeywell asserted that defendants' proposed wavelengths are incorrect, referencing U.S. Patent No. 4,390,637, wherein the following wavelengths for the green color band emitted by a cathode ray tub is represented to be 500–570 nanometers, as opposed to defendants' proposed 492–577 nanometers. *Id.* (citing U.S.P.T.O. Patent No. 4,390,637, col. 5, 11. 20–22). Based on this prior art, and other extrinsic evidence, Honeywell concludes that defendants have specified a lower limit that excludes the wavelengths emitted by the green CRT. *See* 12/23/04 Honeywell Brief at 37.

### ii. At The Claim Construction Hearing.

Honeywell argued at the claim consideration hearing that "green color band" should be construed under the same parameters as "blue color band." *See* TR at 685.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, Honeywell changed its position to agree with the Government that the nanometer range of the "green color band" was "between approximately 492 and 577 nanometers." 4/1/05 Honeywell Brief at 47. Honeywell continued to insist that the "green color band" should be construed by a dominant wavelength.

### b. The Government's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

The Government advised the court that "green color band" means a "range of color in the range from 492 to 577 nanometers." 1/14/05 Def. Joint Brief at 39 (citing Ex. 30 MCGRAW-HILL at 197).

### ii. At The Claim Construction Hearing.

GOVERNMENT'S COUNSEL: [O]ne of skill in the art, when they look at ... green color bands, something clicks in their mind and they know what the wavelength boundaries are.

TR at 693.

### iii. Post–Claim Construction Hearing Briefs.

After the claim construction hearing, the Government continued to press the court to construe "green color band" by peak wavelength. *See* 4/1/05 Gov't Brief at 48; *see also* 4/15/05 Gov't Brief at 23.

### c. Intervenor Lockheed Martin's Proposed Construction.

### i. Pre–Claim Construction Hearing Brief.

Lockheed Martin's proposed construction of "green color band" was the same as the Government. *See* 1/14/05 Def. Joint Brief at 39.

### ii. At The Claim Construction Hearing.

Lockheed Martin supported the Government's proposed construction of "green color band" at the claim construction hearing. *See* TR at 694.

### iii. Post–Claim Construction Hearing Briefs.

Lockheed Martin's proposed construction of "green color band" continued to be the same as that of the Government. *See* 4/1/05 Int. Brief at 50; *see also* 4/15/05 Int. Brief at 23.

#### d. The Court's Construction Of "Green Color Band" In This Case.

The court construes "green color band" as a range of color from 492 nm to 577 nm. For the reasons discussed in the court's construction of "red color band," however, the court has declined to designate either a dominant or peak wavelength to the construction of "green color band."

#### 17. "Narrowband Of The Red Color Band."

The parties have agreed that the term "narrowband of the red color band," as used in the claims of the '914 patent, means "a narrow range of wavelengths within the red color band." Jt. Stip. ¶ 6.

## IV. CONCLUSION.

For the reasons discussed herein, defendant-intervenor Lockheed Martin Corp. is hereby granted the right to intervene in this case pursuant to RCFC 24(a). In addition, the court has determined as a matter of law that the disputed claims discussed herein are to be construed consistent with this Memorandum Opinion and Order Construing Certain Claims of United States Patent No. 6,467,914.

**IT IS SO ORDERED.**